(2008)
Richard F. MILLER, Plaintiff,
v.
Philipp HOLZMANN, et al., Defendants.
Civil Action No. 95-1231 (RCL).
United States District Court, District of Columbia.
August 12, 2008.

MEMORANDUM OPINION
ROYCE C. LAMBERTH, Chief Judge.
Winston Churchill prescribed magnanimity in victory. See Winston S. Churchill, THE SECOND WORLD WAR, VOLUME I: THE GATHERING STORM xiii (1948).
But Churchill, of course, spoke of war, not litigation.
On August 10, 2007, relator emerged victorious in this False Claims Act ("FCA") suit of epic duration when this Court entered judgment against six defendants[1] for over $90 million.[2] (See generally Judgment [883].) He now seeks another $20 million in attorneys' fees and costs.
Now before the Court are plaintiffs' bills of costs [928, 929, 933] and relator's motion for attorneys' fees, costs, and expenses [930]. Pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Civil Rule 54.1, the United States asks the Court to tax its $54,437.87 in costs to defendants.[3] Relator, in turn, requests reimbursement for $31,973.96 in costs.[4] Separately, relator seeks $9,945,765.25 in attorneys' fees[5] and $511,723.06 in associated costs and expenses.[6] Finally, he proposes a 100 percent enhancement of his attorneys' fees based on exceptional quality of representation, thus raising his overall demand to $20,403,253.56. Defendants, naturally, oppose plaintiffs' requests.[7] This Opinion first considers Anderson's argument that he shares liability only for the government's costs. It then examines defendants' challenges to plaintiffs' bills of costs, to relator's attorneys' fees, and to his expenses.

I. Anderson's Liability
Although the jury found for the government on its sole, live claim against Anderson, this Court dismissed relator's claims against Anderson as time-barred. (See Verdict Form [858] at 4, 7, 11; Mem. Op. of June 14, 2007[872] at 29.) In opposing relator's fee petition, Anderson contends the FCA permits only "prevailing parties" to recover fees and costs from a defendant, that relator is not a "prevailing party" as against him, and that accordingly, he is not liable to relator. (Anderson's Opp'n at 2-7.) Relator, however, insists the FCA does not limit fee and cost recovery to prevailing parties, and that because the government prevailed on its claim against Anderson, Anderson is jointly and severally liable with the other defendants for relator's fees and costs. (Reply to Anderson's Opp'n at 1.)
As the parties (at least, implicitly) concede, this issue is one of first impression. (See id. at 4; Anderson's Opp'n at 5.)
In incorporating a fee-shifting provision, the FCA is far from unique among federal statutes that create private, civil causes of action. Compare 31 U.S.C. § 3730(d)(1) (2008) (qui tam relator may recover "expenses... necessarily incurred, plus reasonable attorneys' fees and costs," from the defendants), with 42 U.S.C. § 1988(b) (2008) (court has discretion to award "reasonable attorney's fee as part of [] costs" to successful civil rights plaintiffs).
Under many other fee-shifting schemes, a plaintiff may recover his attorneys' fees and expenses from the defendant only when he is a "prevailing party."[8]See, e.g., Richlin Sec. Serv. Co. v. Chertoff, ___ U.S. ___, 128 S.Ct. 2007, 2011, 170 L.Ed.2d 960 (2008) (Equal Access to Justice Act, 5 U.S.C. section 504(a)(1), "permits an eligible prevailing party to recover `fees and other expenses incurred by that party in connection with' a proceeding before an administrative agency"); Winkelman v. Parma City Sch. Dist., ___ U.S. ___, 127 S.Ct. 1994, 2002, 167 L.Ed.2d 904 (2007) (Individuals with Disabilities Education Act, 20 U.S.C. section 1315(i)(3)(B)(i)(I), "allow[s] an award [of attorney's fees] `to a prevailing party who is the parent of a child with a disability'"); Farrar v. Hobby, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("in order to qualify for attorney's fees under [the Civil Rights Attorney's Fees Awards Act, 42 U.S.C.] § 1988, a plaintiff must be a `prevailing party'"). Cf. FED.R.CIV.P. 54.1(d) (providing for recovery of costs other than attorney's fees by "the prevailing party" in civil litigation).
The FCA does not expressly limit fee recovery to "prevailing" relators, but its description of which relators may recoup their fees is not exactly a model of clarity:
If the Government proceeds with an action brought by a [relator], such person shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim.... Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions [that have been publicly disclosed] the court may award... no [ ] more than 10 percent of the proceeds. . . . Any payment to a person under the first or second sentence shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses ... necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.
31 U.S.C. § 3730(d)(1) (2008) (emphasis added).[9]Cf. 42 U.S.C. § 1988(b) (2008) (court has discretion to award reasonable attorney's fee to "prevailing party" in suits brought pursuant to certain civil rights statutes).
To interpret the vague phrase "any such person," the Court must look to its context. See Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). In light of the immediately preceding sentence, "any such person" must mean any person who receives payment under the statute's first or second sentences. See 31 U.S.C. § 3730(d)(1) (2008). Those two sentences merely establish the percentage bounty a relator should receive when the government intervenes in the action he has brought and ultimately secures payment for its damages. See id. The internal cross-reference thus suggests that whenever the government intervenes and obtains relief, no matter the circumstances, the relator should receive both a share of the government's proceeds and reasonable attorneys' fees.
This reading, however, would yield absurd resultsat least some of which Congress clearly did not intend. For example, 31 U.S.C. section 3730(e) provides that no court shall have jurisdiction over certain actions, such as those "based upon the public disclosure of allegations or transactions. . . unless . . . the person bringing the action is an original source of the information"that is, "an individual who has direct and independent knowledge of the information on which the allegations are based and [who] has voluntarily provided the information to the Government" before filing his qui tam complaint. See 31 U.S.C. § 3730(e)(4) (2008). Logically, having erected a jurisdictional bar to these relators' claims, Congress could not have intended them to receive attorneys' fees. See Fed. Recovery Servs., Inc., 72 F.3d at 449-50, 453 (affirming district court's denial of attorneys' fees to relator whose claims were dismissed as barred under section 3730(e)(4)). Cf. United States ex rel. Merena v. SmithKline Beecham Corp., 205 F.3d 97, 106 (3d Cir.2000) (Alito, J.) (reversing district court's award of relator's share to relator whose claims were subject to dismissal under section 3730(e)(4)). On the contrary, Congress has sought to prevent, not reward, "opportunistic suits by private persons who heard of fraud but played no part in exposing it." Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 565 (11th Cir.1994) (emphasis added) (discussing comprehensive 1986 FCA amendments).
The fee-shifting provision itself does not appear to draw this linenor, for that matter, any other.[10] Relator suggests the Court should interpret this inscrutable language in light of the FCA's goals, which he argues support awarding attorneys' fees to relators, like himself, whose claims are dismissed due to "procedural," vice jurisdictional, defects. (See Reply to Anderson's Opp'n at 4-5.) Courts rightly balk at engaging in this sort of arbitrary line-drawing. E.g., Colgrove v. Battin, 413 U.S. 149, 182, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973) (Marshall, J., dissenting) ("Normally, in our system we leave the inevitable process of arbitrary line drawing to the Legislative Branch, which is far better equipped to make ad hoc compromises.").
Happily, here, Congress left an additional, unambiguous clue to its intent in drafting the FCA attorneys' fees provision. In its report accompanying the 1986 amendments, the Senate Judiciary Committee characterized the FCA's fee-shifting scheme as applying to "prevailing qui tam relators." S.Rep. No. 99-345, at 29 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5294 (emphasis added). As explained above, the qualifier "prevailing" appears in numerous other federal fee-shifting provisions, and its meaning is well-established. See, e.g., Farrar, 506 U.S. at 109-11, 113 S.Ct. 566. Its application here would harmonize the fee-shifting provision with the jurisdictional exclusions in subsection (e) and with more fundamental jurisdictional concerns.[11]See Fed. Recovery Servs., Inc., 72 F.3d at 450, 452 (government's intervention does not cure existing jurisdictional defect in relator's complaint so as to permit dismissed relator to recover attorneys' fees); United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co., 41 F.3d 1032, 1044 (6th Cir.1994) (despite government's intervention and settlement with defendant, if district court on remand determined co-relator lacked standing, it could not recoup attorneys' fees).
As the Supreme Court has observed, "[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." Hewitt v. Helms, 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), overruled in part on other grounds by Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Senate Report's "ordinary language" undercuts relator's contention that Anderson, against whom his claims garnered no relief whatever, should share liability for his attorneys' fees and costs.
Furthermore, contrary to relator's arguments, declining to assess relator's attorneys' fees against Anderson comports with the FCA's underlying purposes. Relator insists Congress enacted the FCA "to encourage the filing of this very kind of lawsuit," in which relator from the outset fingered Anderson as a ringleader in the fraud. (Reply to Anderson's Opp'n at 3-4.)
First, to answer relator's implicit proposition most directly, this Court is confident that potential relators will not be discouraged from filing meritorious FCA claims by a holding that 31 U.S.C. section 3730(d)(1) does not permit attorneys' fee awards against defendants who obtain judgment as a matter of law on the relator's claims.[12]
Second, this Court has encapsulated the FCA's purposes as follows:
The False Claims Act seeks, first and foremost, to detect, punish, and deter the submission of false claims, while seeking to restore funds to the federal fisc. The qui tam provisions enlist private individuals, often motivated largely by self-interest, to report and prosecute alleged false claims. Those provisions seek to strike a balance between the interests of the government and the selfinterest of relators.
United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., 474 F.Supp.2d 75, 87 (D.D.C.2007) (Lamberth, J.). "The [FCA's] statute of limitations," this Court reasoned, "advances those governmental interests." Id. Yet statutes of limitations, by their nature, also "facilitat[e] the administration of claims[ ] ... [and] promot[e] judicial efficiency." John R. Sand & Gravel Co. v. United States, ___ U.S. ___, 128 S.Ct. 750, 753, 169 L.Ed.2d 591 (2008) (citations omitted). Thus, Congress clearly did not seek "to encourage the filing of this very kind of lawsuit" at the expense of these governmental interests and prudential considerations.[13] Denying attorneys' fees to relators whose claims are time-barred strikes this balance.
Accordingly, the Court concludes that because relator's claims against Anderson were dismissed in their entirety, relator may not recover attorneys' fees, costs, or expenses from Anderson under the FCA. Under Federal Rule of Civil Procedure 54(d)(1), only a "prevailing party" may recover costs, other than attorneys' fees, from a private defendant. FED.R.CIV.P. 54(d)(1). Because relator's legal relationship to Anderson remains wholly unchanged, he may not recover costs from Anderson under this Rule. See Tex. State Teachers Ass'n, 489 U.S. at 792-93, 109 S.Ct. 1486; Graham, 473 U.S. at 168, 105 S.Ct. 3099.

II. Plaintiffs' Taxable Costs
As stated above, Rule 54(d)(1) permits a "prevailing party" to recoup his costs, other than attorneys' fees, from a private defendant. FED.R.CIV.P. 54(d)(1). Cf. 31 U.S.C. § 3729(a) (U.S. may recover "the costs of a civil action" brought to recover FCA penalty or damages). While Rule 54(d)(1) affords the court some discretion in awarding costs, the Courts of Appeals have consistently treated the allowance as presumptive, holding "that a court may neither deny nor reduce a prevailing party's request for costs without first articulating some good reason for doing so." Baez v. U.S. Dep't of Justice, 684 F.2d 999, 1004 (D.C.Cir.1982) (en banc) (per curiam). The unsuccessful party bears the burden of supplying this "good reason," and "trial judges have rarely denied costs to a prevailing party whose conduct has not been vexatious when the losing party has been capable of paying such costs." Id.; see, e.g., Bell v. Gonzales, No. 03-163, 2006 WL 6000485, **2-3, 2006 U.S. Dist. LEXIS 69415, at *7-8 (D.D.C. Sept. 27, 2006) (Bates, J.) (sharply reducing government's "plainly inflated Bill of Costs," where costs were "not well supported factually or legally" and comprised "a punitive effort ... against an unsuccessful discrimination plaintiff").
In particular, by statute, a prevailing party may recover "[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." 28 U.S.C. § 1920(2) (2008). This Court's local rules refine this allowance:
(6) the costs, at the reporter's standard rate, of the original and one copy of any deposition noticed by the prevailing party, and of one copy of any deposition noticed by any other party, if the deposition was used on the record, at a hearing or trial;
(7) the cost, at the reporter's standard rate, of the original and one copy of the reporter's transcript of a hearing or trial if the transcript: (i) is alleged by the prevailing party to have been necessary for the determination of an appeal within the meaning of Rule 39(e), Federal Rules of Appellate Procedure, or (ii) was required by the court to be transcribed[.]
Local Civ. R. 54.1(d).
Defendants' sole objection to plaintiffs' bills of costs concerns allegedly duplicative charges for transcripts. Specifically, the United States and relator have each billed for an original and one copy of thirteen individuals' deposition transcripts.[14] In some of these cases, it is clear that plaintiffs wish defendants to pay for four copies of exactly the same document.[15] Further, the United States and relator each seek reimbursement for an original and one copy of each afternoon's trial transcript. (See Ex. 1 to U.S. Bill of Costs [928] at 3-4; Ex. 4 to Relator's Bill of Costs [929] at 1-2.) Again, they repeatedly paid for four copies of the same document, at a premium for expedited preparation.
Such expenditures hardly seem reasonable. The Court does not suggest that as co-plaintiffs, the United States and relator must necessarily have shared a single transcript, prepared according to the court reporter's regular schedule. But for each plaintiff to bill for two copies of an expedited transcript strikes the Court as possibly excessive.[16]
Nevertheless, this practice does not fall outside the letter of Local Rule 54.1. The Rule refers to "[a] prevailing party," and its choice of article ("a" rather than "the") implies that any prevailing party, even if there is more than one, may invoke its provisions. Local Civ. R. 54.1(a). Further, the Rule specifically provides for reimbursement for an original and one copy of deposition and trial transcripts. Local Civ. R. 54.1(d). Defendants, who bear the burden of demonstrating a "good reason" for denying plaintiffs' costs, offer no authority and little argument for deviating from this presumptive allowance. See Baez, 684 F.2d at 1004. Moreover, plaintiffs' "conduct has not been vexatious," and it appears defendants are "capable of paying [these] costs." See id. Accordingly, the Court concludes defendants' meager opposition does not overcome the strong presumption in plaintiffs' favor.
Plaintiffs' bills of costs [928, 929] shall be granted in full.[17]

III. Relator's Attorneys' Fees
Relator also seeks an award of "reasonable attorneys' fees" against defendants under the FCA. "The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." Blum v. Stenson, 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).[18] A strong presumption exists that the product of these two variablesthe "lodestar figure"represents a "reasonable fee." Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). Upward adjustments of the lodestar are warranted only in "rare" and "exceptional" cases, where supported by "specific evidence" and detailed findings. Blum, 465 U.S. at 899-901, 104 S.Ct. 1541.
In calculating relator's fee award, the Court must thus make three separate determinations: (1) what constitutes a "reasonable hourly rate" for his counsel's services; (2) which among his counsel's claimed work hours were "reasonably expended on the litigation"; and (3) whether relator has offered "specific evidence" demonstrating this to be the "rare" case in which a lodestar enhancement is appropriate, and if so, in what amount. The Court considers each issue in turn.

A. Reasonable Rate
In calculating this component of the lodestar, the Court must resolve two contested issues: (1) which source(s) should supply the reasonable rate; and (2) whether current or historical rates should apply to work performed prior to 2007.[19]

1. Established vs. Matrix-Derived Rates
In this Circuit, "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is `in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" Kattan by Thomas v. District of Columbia, 995 F.2d 274, 278 (D.C.Cir. 1993) (quoting Blum, 465 U.S. at 896 n. 11, 104 S.Ct. 1541).
[W]hen fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys fee case into a major ratemaking proceeding. In almost every case, the firms' established billing rates will provide fair compensation. The established rates represent the opportunity cost of what the firm turned away in order to take the litigation; they represent the lawyers' own assessment of the value of their time.
Laffey v. Northwest Airlines, Inc., 746 F.2d 4, 24 (D.C.Cir.1984) (emphasis in original), overruled on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516 (D.C.Cir.1988).[20] "[T]he burden is on the fee applicant to produce satisfactory evidencein addition to the attorney's own affidavitsthat the requested rates" align with prevailing rates. Blum, 465 U.S. at 896 n. 11, 104 S.Ct. 1541. See also Covington v. District of Columbia, 57 F.3d 1101, 1107 (D.C.Cir. 1995) ("a fee applicant's burden in establishing a reasonable hourly rate entails a showing of at least three elements: the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community").

a. Wilmer Hale
Relator asks that his attorneys be compensated at their standard billing rates, and he has submitted a declaration from his lead counsel, Robert Bell, that provides these standard rates for Wilmer Hale personnel. (See Bell Decl. ¶ 108, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) As one might expect, Bell avows that the requested rates are within the range of prevailing market rates charged by large law firms in the District of Columbia for lawyers and paralegals of similar experience and qualifications. (See id. ¶¶ 104, 109.)
To supplement Bell's own assertions, relator offers declarations from two local attorneys. The first, Stephen L. Braga, now a partner at Baker Bottslike Wilmer Hale, a large, international law firm has practiced complex, civil litigation in the District since 1982. (Braga Decl. ¶ 1, Ex. 3 to [930].) Since 1993, Braga has also instructed law students on the subject of attorneys' fees as an adjunct professor at the Georgetown University Law Center. (Id. ¶ 1(g).) Beyond arguing that "[u]nder basic economic principles," Wilmer Hale's standard rates must be considered competitive within the D.C. market, Braga compares rates for four Wilmer Hale partners with those charged by his own firm and other large, D.C. litigation firms for partners with similar backgrounds and litigation experience. (Id. ¶ 6.) He asserts that Robert Cultice, Jennifer O'Connor, and Jonathan Cedarbaum could command higher hourly rates, and that Robert Bell's rate "appears to be set right where it should be in the Washington legal market." (Id.) Braga concludes that Wilmer Hale's established rates "fall squarely within the prevailing market rates in the District of Columbia for experienced counsel to handle complex civil litigation." (Id.)
The second attorney declarant, Steven K. Davidson, currently a partner at Steptoe & Johnsonanother large, international law firmhas practiced commercial litigation in the District since 1985. (Davidson Decl. ¶ 2, Ex. 5 to [930].) As a member of his firm's Executive Committee, he has assisted with setting professionals' billing rates. (Id. ¶¶ 2, 16.) Davidson offers an opinion based not only on anecdotal knowledge of his and competitor firms' standard billing rates but also on two external sources. (Id. ¶¶ 19-21.) First, The National Law Journal's 2006 annual survey of billing rates indicates that Wilmer Hale's rates are comparable to those reported by other large firms with D.C. offices. (Id. ¶ 19; see id. Ex. A.) Second, Wilmer Hale's rates also align with those delineated in the Laffey matrix, as updated by relator's economist using the nationwide legal services component of the Consumer Price Index, a methodology approved in Salazar v. District of Columbia, 123 F.Supp.2d 8 (D.D.C.2000) (Kessler, J.).[21] (Id. ¶ 20; see also Kavanaugh Decl. ¶¶ 9-15, Ex. 4 to [930].) Davidson thus concludes that Wilmer Hale's rates "are comparable to the prevailing market rates and [] well within the reasonable range of rates for a law firm such as WilmerHale undertaking matters of the magnitude and complexity of those involved here." (Davidson Decl. ¶ 16, Ex. 5 to [930].)
Relator's evidence demonstrates that Wilmer Hale's established billing rates those charged to all litigation clients align with the established rates of lawyers of reasonably comparable skill, experience, and reputation in the D.C. legal community.[22]See Kattan, 995 F.2d at 278. Thus, the Court will accord these rates a presumption of reasonableness. See Covington, 57 F.3d at 1110.
Defendants' rebuttal to this evidentiary showing rests on a single proposition. Under Blum, a reasonable rate must align with "those prevailing in the community for similar services . . . ." 465 U.S. at 896 n. 11, 104 S.Ct. 1541. Whereas relator appears to define "similar services" in terms of complex, federal-court civil litigation, defendants insist "similar" must be construed more narrowly. (See HII's Opp'n [949] at 30-34.) In their view, the hourly rates typically charged by FCA relators' counsel are the benchmark against which this Court should evaluate relator's requested rates. (Id. at 32-33.)
This contention fails for three reasons. First, the authority on which defendants rely does not support their argument.[23] Second, case law in this Circuit does not support the Balkanized approach to fee calculation that defendants advocate. In 1983, then-Chief Judge Aubrey Robinson adopted an hourly rates scheme for complex, federal litigation under which an attorney's years of experience determined his reasonable hourly rate. Laffey v. Northwest Airlines, Inc., 572 F.Supp. 354, 371-75 (D.D.C.1983). In the ensuing twenty-five years, this scheme, the Laffey matrix, has achieved broad acceptance in this Circuit and has served as a guide in nearly every conceivable type of case. See, e.g., Hansson v. Norton, 411 F.3d 231, 236 (D.C.Cir.2005) (employment discrimination); Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 970 (D.C.Cir.2004) (Administrative Procedures Act); Covington, 57 F.3d at 1110 (civil rights); Judicial Watch, Inc. v. BLM, 562 F.Supp.2d 159, 175 (D.D.C.2008) (Lamberth, J.) (Freedom of Information Act); MacClarence v. Johnson, 539 F.Supp.2d 155, 160 (D.D.C.2008) (Facciola, M.J.) (Clean Air Act). The generic matrix's use in such a diverse range of cases cuts against defendants' argument that reasonable rates can be derived only from data peculiar to a case's legal specialty area.
Third, and most critically, defendants have failed to demonstrate that for purposes of calculating a reasonable hourly rate, qui tam litigation differs in any meaningful way from other complex, civil litigation that occurs in federal court.[24] Defendants contend that "FCA litigation, particularly for relator's counsel, is a specialized, niche practice that is distinct from other types of civil litigation, and certainly differs from the defense-oriented commercial litigation practiced by firms like WilmerHale." (HII's Opp'n [949] at 33.) If, as defendants suggest, qui tam litigation is a "niche" field because FCA-specific treatises and hornbooks, legal symposia, and professional organizations exist, then virtually every type of litigated case could be so characterized. The allegation that some attorneys "dedicate their entire practice to representing relators" is no more persuasive. (Id. at 34.) Defendants contend the rates charged by FCA specialists at Cincinnati's Helmer, Martins, Rice & Popham ("HMRP") establish the benchmark for reasonableness. (Id. at 35-38.) "[E]ven assuming, arguendo, the existence of [] a [FCA litigation] submarket," rates charged by a single, Ohio firm do not constitute "evidence that submarket rates are lower than the prevailing rates in the broader legal market." See Covington, 57 F.3d at 1111.
Defendants point out that HMRP's rates conform almost precisely to those outlined in the Laffey matrix, as updated by the U.S. Attorney's Office ("USAO"), and that using rates from either source would reduce relator's requested fee award by 38%. (HII's Opp'n [949] at 38-39.) This tremendous disparity gives the Court pause. But two factors overcome its skepticism.
First, simple reference to the Laffey matrix cannot defeat the presumption of reasonableness accorded relator's requested rates. Though it "serves as a useful starting point for determining prevailing market rates in the District of Columbia," Cobell, 407 F.Supp.2d at 170, the Laffey matrix is not the only acceptable starting point. Our Court of Appeals has never held that Laffey rates are the only rates that a court may consider reasonable. Instead, it has advised that "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate" aligns with prevailing community rates. Kattan by Thomas v. District of Columbia, 995 F.2d 274, 278 (D.C.Cir.1993). "[F]ee claimants must provide the court with specific evidence of the prevailing community rate." Jordan, 691 F.2d at 521. See also Blum, 465 U.S. at 896 n. 11, 104 S.Ct. 1541 (fee applicant must "produce satisfactory evidencein addition to the attorney's own affidavitsthat the requested rates" align with prevailing rates). This evidence may include the Laffey matrix, in its original form and/or as updated by the USAO. See Covington, 57 F.3d at 1110. But it may also consist of comparable fee awards or affidavits from knowledgeable local practitioners, such as those relator has submitted here. See Jordan, 691 F.2d at 521. If non-conformity with updated USAO Laffey rates could doom a petitioner's request, this would moot the evidentiary showing envisioned by Blum.[25]See 465 U.S. at 896 n. 11, 104 S.Ct. 1541. It would effectively impose a ceiling on the rates courts can award pursuant to fee-shifting statutesa ceiling never endorsed by Congress. Neither it nor the courts have ever "propose[d] ... that all attorneys be remunerated at the same rate, regardless of their competence, experience, and marketability." Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516, 1522 n. 4 (D.C.Cir.1988).
Second, the Supreme Court clarified in Blum that a reasonable hourly rate should ordinarily reflect the quality of counsel's representation. See 465 U.S. at 899, 104 S.Ct. 1541. Defendants balk at the "megalaw firm rates" relator seeks. (HII's Opp'n [949] at 30.) But these rates reflect counsel's "mega-law firm"-quality representation. Having observed more than a few attorneys in the past twenty years, this Court is well-suited to judge the quality of counsel's representation, both in the courtroom and in written submissions. By this Court's assessment, relator's counsel particularly the more junior trial team membersacquitted themselves admirably. Their zealous, polished, and astute advocacy justifies, and is reflected in, their established billing rates. Further, according to government counsel,
[t]he availability of Relator's counsel from WilmerHale was essential in meeting the overwhelming demands of discovery and ultimately of the trial in this matter. Indeed, attorneys and support staff from WilmerHale played a vital role in getting this case ready for trial and ultimately in successfully trying it.
(Morgan Decl. ¶ 7, Ex. 1 to Mot. for Fees, Costs, and Expenses [930].) During the discovery period alone, relator's counsel reviewed 665 boxes of documents, from which they culled over 97,000 documents with over 320,000 pages, attended 40 depositions, taking a leading role in some, and participated in two evidentiary hearings. (Bell Decl. ¶¶ 74-75, 78, 85, Ex. 2 to [930].) Had Wilmer Hale not been able to call on its "mega-law firm" resources, plaintiffs might have struggled to meet these "overwhelming demands." See Wilcox v. Sisson, No. 02-1455, 2006 WL 1443981, *2, 2006 U.S. Dist. LEXIS 33404, at *8 (D.D.C. May 25, 2006) (Collyer, J.) ("The market generally accepts higher rates from attorneys at firms with more than 100 lawyers than from those at smaller firmspresumably because of their greater resources and investments....").
For all these reasons, the Court finds defendants have failed to rebut relator's evidentiary showing that the requested ratesWilmer Hale's established rates align "with those prevailing in [this] community for similar services by lawyers of reasonably comparable skill, experience and reputation." See Blum, 465 U.S. at 896 n. 11, 104 S.Ct. 1541. Wilmer Hale's established billing scale will supply the reasonable hourly rates with which this Court will calculate the lodestar.[26]

b. Wiley Rein
Relator also seeks compensation for work performed by four Wiley Rein attorneys (other than Bell) and two paralegals. (Bell Decl. ¶ 103, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Of these six individuals, only one, Michael Sturm, remains at Wiley Rein. (Id. ¶ 104.) In light of the Court's conclusion concerning Wilmer Hale's rates, Sturm's established billing rate is eminently reasonable.[27]
For the other five professionals, however, relator has provided neither their current billing rates nor those of their Wiley Rein peers. Instead, he asks that their work be compensated at rates derived from economist Kavanaugh's Laffey matrix. (See id. ¶ 104.) Unlike the USAO's matrix, which calculates inflation based on the metropolitan D.C. Consumer Price Index ("CPI"), Kavanaugh's version relies on a legal services sub-component of the broader, national CPI. (See Kavanaugh Decl. ¶ 9, Ex. 4 to Mot. for Fees, Costs, and Expenses [930].)
Kavanaugh's alternative methodology has achieved only limited acceptance in this District.[28] As he did in Salazar, Kavanaugh presents a well-reasoned, if condensed, economic argument for his index's superiority. (See id. ¶¶ 9-14.) Nevertheless, after reviewing his declarations, the Court is not convinced. Kavanaugh's matrix incorporates price inflation data specific to the market for legal services, while the USAO matrix relies on data specific to the Washington, D.C. metropolitan area. (Id. ¶ 9.) Kavanaugh's matrix thus reflects national inflation trends, while the USAO matrix accounts for price inflation within the local communitya crucial distinction. As the Supreme Court and our Court of Appeals have both emphasized, rates used in calculating the lodestar should accord with those "prevailing in the community." Blum, 465 U.S. at 896 n. 11, 104 S.Ct. 1541 (emphasis added); see also Covington v. District of Columbia, 57 F.3d 1101, 1108 (D.C.Cir.1995) ("plaintiff must produce data concerning the prevailing market rates in the relevant community") (emphasis added). Kavanaugh's matrix does not comply with this mandate for geographic specificity. Hence, with due respect to its colleagues, the Court declines to adopt Kavanaugh's methodology. It will thus award fees for the remaining five Wiley Rein professionals at USAO Laffey matrix rates.[29]

2. Current vs. Historical Rates
The time entries included in relator's fee petition span a thirteen-year period: Wiley Rein personnel devoted time to this case from 1995-1999, and Wilmer Hale's involvement has stretched from 1999-2007. (See Exs. B-2, D-2, to Bell Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Relator seeks to recover all fees at current billing rates, (Mot. for Fees, Costs, and Expenses [930] at 12), while defendants favor using historical rates corresponding to the years when the work was performed, (see HII's Opp'n [949] at 40-43; BHIC and HUK's Opp'n [948] at 19-21.)
In 1911, Ambrose Bierce described litigation as "[a] machine which you go into as a pig and come out of as a sausage." AMBROSE BIERCE, THE DEVIL'S DICTIONARY 72 (1979 ed.). Since Bierce's day, the process has become, if anything, more drawn out and contentious. Recognizing that in many cases, an attorney may put in years of effort before realizing any tangible return, the Supreme Court has held that a "reasonable attorney's fee" awarded pursuant to a fee-shifting statute should account for delay in payment. See Missouri v. Jenkins, 491 U.S. 274, 282, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).[30] "Clearly, compensation received several years after the services were renderedas it frequently is in complex [qui tam] litigationis not equivalent to the same dollar amount received reasonably promptly as the legal services are performed. . . ." Id. at 283, 109 S.Ct. 2463. Thus, courts should make "an appropriate adjustment for delay in paymentwhether by the application of current rather than historic hourly rates or otherwise." Id. at 284, 109 S.Ct. 2463.
Courts in this Circuit have frequently employed the Supreme Court's suggested method of adjustment. See, e.g., Murray v. Weinberger, 741 F.2d 1423, 1433 (D.C.Cir.1984) ("Current market rates have been used in numerous cases to calculate the lodestar figure when the legal services were provided over a multiple-year period and when use of the current rates does not result in a windfall for the attorneys."); Muldrow, 397 F.Supp.2d at 4 n. 4 ("Nor does the Court object to plaintiffs use of the Laffey rates for 2005-06 even though much of the litigation took place several years ago. The Supreme Court has held that it is acceptable to use current market rates, rather than historic rates, as a convenient method of compensating prevailing parties for a delay in receiving payment."). See also Copeland v. Marshall, 641 F.2d 880, 893 n. 23 (D.C.Cir.1980) (en banc) (noting that lodestar may be "based on present hourly rates, rather than the lesser rates applicable to the time period in which the services were rendered," to reduce or eliminate "harm resulting from delay in payment").
Several observations are in order. First, though relator seeks compensation for 24,584.6 billable hours, spread over thirteen years, roughly half those hours were billed in 2007, the year for which relator has provided Wilmer Hale's standard billing rates. (See Exs. C-2, C-4 to Bell Supplemental Decl., Ex. 1 to Reply to HII's Opp'n [957].) Indeed, only 1,826.3 hours7.4 percent of the totalwere billed prior to 2006. (See id.) Thus, defendants' "windfall" objection, discussed below, pertains to only a small portion of relator's overall fee request.
Second, according to Robert Bell, Wilmer Hale's billing cycle averages 89 days. (See Bell Supplemental Decl. ¶¶ 23-24, Ex. 1 to [957].) By contrast, here, by the time Wilmer Hale receives payment pursuant to the instant fee award, at least a full year will have passed since it billed the last hours addressed therein.
Third, as relator's economist points out, accounting for delay by applying current rates across the board boasts distinct, practical advantages:
There may be other ways to compensate [for delay in payment]that is, to restore the firm that provided the legal services to the level of wealth it could have obtained had it been paid at the time the service was performedbut the other compensation methods are more complex, have higher transaction costs, raise the specter of interest payments and may not be any better than simply using the current prevailing market rates.
(Kavanaugh Decl. ¶ 18, Ex. 5 to Mot. for Fees, Costs, and Expenses [930].) See also Murray, 741 F.2d at 1433 ("Ease of administration is an important objective... because there is a pressing need for simple rules in attorney's fees cases."). Moreover, Kavanaugh's alternative proposed method of compensating for delay using the historical prime rate to calculate the present value of a timely payment stream for the hours billedproduces a lodestar figure 1.6 percent higher than that requested by relator. (Kavanaugh Supplemental Decl. ¶¶ 6-12, Ex. 4 to Reply to HII's Opp'n [957].)
Notwithstanding these various points, defendants oppose applying current rates to compensate for delay for two reasons.[31] First, they contend that application of current rates will result in a forbidden "windfall" to relator's counsel. (See HII's Opp'n [949] at 40-41; BHIC and HUK's Opp'n [948] at 19-21.) They insist that fee awards must reflect lawyers' experience levels at the time they performed the work, lest they be afforded credit for experience and the heightened skill, productivity, and efficiency that usually accompany itthey did not then possess. (See HII's Opp'n [949] at 40-41; BHIC and HUK's Opp'n [948] at 19-21.) This argument has some superficial appeal, but it misunderstands the rationale behind compensating for delay in payment. "[C]ompensation received several years after the services were rendered ... is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed." Jenkins, 491 U.S. at 283, 109 S.Ct. 2463. Paying counsel at historical, or even current, rates based on their experience levels when they performed the work would not achieve this equivalence because it ignores the time value of money: one dollar received today is more valuable than it would be if received five years from now for two reasonsfirst, because it will buy more now than it will after five years of price inflation, and second, because of the interest that can be earned from it in the interim. Paying counsel at their current, established billing rates does not result in a windfall; it simply takes the this second factor into account.
Second, they contend that relator bears responsibility for the delay, and that consequently, he should not be rewarded with a fees adjustment therefor. (HII's Opp'n [949] at 42-43.) Both components of this argument are flawed. Responsibility for the first period of delay defendants cite June 1995 to March 2001can be laid at the government's feet, but not relator's. Under the FCA's qui tam provisions, once he files his complaint under seal, a relator must simply await the government's decision on intervention. See 31 U.S.C. § 3730(b) (2008). As this Court expressed in an earlier opinion in this case, the government's "unreasonable inaction" precipitated this first period of delay. (See Mem. Op. of June 14, 2007[872] at 30.) All parties contributed to the next, post-seal period of delay: defendants opposed plaintiffs' request to commence discovery in 2003, (see Joint Rule 16.3 Report of Nov. 13, 2003[148] at 2), and plaintiffs repeatedly amended their complaints, (e.g., Relator's Third Am. Compl. [233] (filed Mar. 9, 2006); Government's First Am. Compl. [237] (filed Mar. 9, 2006)).
Moreover, regardless of who caused what period of delay, defendants' authorities for denying the responsible party compensation for delay merely confirm that a court's decision to account for delay in awarding attorneys' fees is discretionary. See Sands v. Runyon, 28 F.3d 1323, 1334 (2d Cir.1994) (finding no abuse of discretion where district court refused to "apply multiplier to the basic hourly rate to account for the delay between the investment of time and the receipt of the fee award" because plaintiff had caused unnecessary delay); Paris v. Dallas Airmotive, Inc., No. 97-0208, 2004 WL 2100227, **11-12, 2004 U.S. Dist. LEXIS 18893, at *35-36 (N.D.Tex. Sept. 21, 2004) (declining to exercise discretion to award fees at current market rates because, but for plaintiffs actions, case could have been concluded at least three years earlier).
Here, having concluded that no "windfall" will result, and in light of the practical advantages to be derived, the Court will exercise its discretion to compensate relator's counsel for delay in payment by applying current rates in calculating the lodestar.
Appendix I delineates the rates the Court will use for both Wiley Rein and Wilmer Hale professionals.

B. Reasonable Hours
Several principles govern the Court's calculation of this second component of the lodestar, "the number of hours reasonably expended on the litigation." See Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). First, the fee petitioner must submit evidence that justifies the hours he claims his counsel have worked. Id. "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." Id. A "fee application need not present the exact number of minutes spent[,] nor the precise activity to which each hour was devoted[,] nor the specific attainments of each attorney." Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319,1327 (D.C.Cir.1982) (internal quotation marks omitted). But where time entries "are so vaguely generic that the Court can not determine with certainty whether the activities they purport to describe were ... reasonable," the petitioner has not met his burden. Cobell v. Norton, 407 F.Supp.2d 140, 158 (D.D.C. 2005) (Lamberth, J.). Instead, "the application must be sufficiently detailed to permit the District Court to make an independent determination whether or not the hours claimed are justified." Nat'l Ass'n of Concerned Veterans., 675 F.2d at 1327.
Second, "[t]he hours reasonably expended are not necessarily equal to the hours actually expended." McKenzie v. Kennickell, 645 F.Supp. 437, 446 (D.D.C.1986) (Parker, J.). "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." Copeland v. Marshall, 641 F.2d 880, 891 (D.C.Cir.1980) (en banc). See also Laffey v. Northwest Airlines, Inc., 572 F.Supp. 354, 369 (D.D.C.1983) (Robinson, C.J.), reversed in part on other grounds by 740 F.2d 1071 (D.C.Cir.1984) ("Counsel is not free ... to exercise its judgment in a fashion that unnecessarily inflates the losing party's fee liability"). The petitioner should exercise billing judgment, making "a good-faith effort to exclude from [his] fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." Hensley, 461 U.S. at 434, 103 S.Ct. 1933.[32] As the Court of Appeals admonished in Copeland, however, a defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." 641 F.2d at 904.
Third, "[c]ompensable time should not be limited to hours expended within the four corners of the litigation." Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1335. The petitioner need only show that the hours for which he seeks compensation were "expended in pursuit of a successful resolution of the case in which fees are being claimed." Id. While "no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail," a reduction in fee is appropriate only when the non-prevailing matters "`are truly fractionable.'" Copeland, 641 F.2d at 891-92 & n. 18 (quoting Lamphere v. Brown Univ., 610 F.2d 46, 47 (1st Cir.1979)).
With this guidance in mind, the Court will analyze relator's claimed hours along with defendants' objections to them. The latter fall into two categories. First, defendants contend that certain tasks for which relator's counsel have billed time in this case are per se non-compensable. Second, they cite several broader defects in relator's counsel's billing statements which they allege warrant across-theboard, percentage reductions in the fee award. The Court will address each category of complaints in turn.

1. Non-Compensable Tasks
Defendants allege a variety of tasks are non-compensable. The Court has grouped their contentions under the following six subheadings.[33]

a. Criminal Case
After relator filed his qui tam complaint, the government delayed its prosecution of the civil case to pursue criminal, antitrust charges against Bilhar, Anderson, and others. (See generally Mem. Op. of June 14, 2007[872] at 18-26 (describing government's deplorable lack of diligence as reason multiple claims must be dismissed as untimely).) During this period, relator's counsel assisted him in securing immunity from criminal prosecution, in complying with obligations incurred as a result, and in responding to subpoenas in the criminal matter. (See Bell Decl. ¶¶ 12-19, Ex. 2 to Mot. for Fees, Costs, and Expenses [930]; Bell Supplemental Decl. ¶¶ 2-15, Ex. 1 to Reply to HII's Opp'n [957].) Defendants argue these efforts are not compensable because the civil and criminal cases were separate and distinct matters, and because relator's immunity deal, not his interest in the qui tam litigation, obliged him to cooperate with the Antitrust Division. (See BHIC and HUK's Opp'n [948] at 3-5; HII's Opp'n [949] at 4-7.)
On the contrary, most of this work is compensable. Relator likely had more than one motivation to appear for depositions, provide documents, and otherwise assist the government with the criminal case. Compliance with the immunity letter's terms was doubtless among them. He also had a strong financial incentive to cooperate: to ultimately secure his relator's share, he needed to maintain good relations with DOJ, with whom he would prosecute the civil case as co-plaintiff, and to assist it in developing evidence that could be used in that case. His motives, however, are irrelevant. The information relator provided to the Criminal Division materially aided its investigation, and the Civil Division later relied on that investigation's fruits in prosecuting the FCA case.[34] (See Bell Decl. ¶¶ 24-27, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Relator's cooperation during this early period ultimately proved crucial to the "successful resolution of the case in which fees are [now] being claimed." See Nat'l Assoc. of Concerned Veterans, 675 F.2d at 1335. In other circumstances, courts have awarded attorneys' fees for hours expended on prior litigation if those efforts also advanced the instant case. See, e.g., Kulkarni v. Alexander, 662 F.2d 758, 766 (D.C.Cir. 1978) (legal services rendered in prior administrative proceedings and litigation pertaining to same claim were compensable because "holding of the first suit . . . [was] a necessary predicate for a large part of [plaintiffs] claim in the present action").[35] This Court has no qualms about following suit and will compensate relator for time his counsel spent assisting him in complying with his immunity obligations and in responding to subpoenas in the criminal matter.
This logic does not extend to time spent securing the government's immunity grant, however. Bell now characterizes the immunity letter as "unnecessary" and insists relator would have aided the government regardless. (See Bell Supplemental Decl. ¶¶ 2, 14, Ex. 1 to Reply to HII's Opp'n [957].) Thus, any work relator's counsel performed to negotiate or effectuate the immunity deal had no impact whatever on plaintiffs' subsequent success in the civil case and is therefore not compensable.

b. Personal Matters
Relator's counsel's billing statements include research and consultation concerning his personal, financial, and employment matters, and defendants contend these efforts in no way contributed to plaintiffs' successful resolution of the instant case. Conceding to some of defendants' objections, relator has excluded from his revised fee request time entries devoted to unrelated personal matters and preparation of counsel's fee agreement. (See Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].) He has not, however, eliminated all challenged entries, and the Court will assess the remaining objections.

i. Relator's Attorney-Client Privilege
Even before relator filed his original complaint under seal, his counsel began researching how to protect relevant documents potentially protected by attorney client privilege or the work product doctrine. Relator claims his counsel were simply being proactive, and that this research "was [] designed primarily to prevent eventual disclosure to the civil defendants in this litigation." (Reply to HII's Opp'n [957] at 21.) He points out that defendants sought and failed to obtain certain privileged documents at trials and that his attorneys had an ethical obligation to preserve his privilege. (Id.) He does not, however, point to any evidence that supports his bald claim that his attorneys' research and discussions in 1995 were primarily directed to protecting his privilege in a case that remained under seal until 2001.
On reviewing the filings associated with defendants' failed motion to compel and the challenged time entries, however, the Court concludes these hours are compensable. In the civil case, the magistrate judge denied defendants discovery of certain privileged materials that relator had voluntarily disclosed to the government, holding that plaintiffs' common interest in the prosecution of common defendants in the then-existing civil case defeated waiver. (See Mem. Op. of Feb. 20, 2007[530] (denying motion to compel); Am. Mem. Op. of Mar. 27, 2007[750] (denying motion for reconsideration).) The subject matter of counsel's earlier research suggests they had anticipated this very issue and wanted to ensure the common interest doctrine would protect disclosed materials in the later qui tam litigation.[36] Rationally, based on the results of these inquiries and discussions, counsel could limit the scope of relator's disclosures to prevent defendants from gaining a tactical advantage in the civil case. Because counsel's early research allowed them to formulate a disclosure strategy focused on the qui tam litigation, the Court concludes these hours were "expended in pursuit of a successful resolution of the case in which fees are being claimed." See Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1335.

ii. Relator's Ongoing Employment at Jones
Relator continued to work at J.A. Jones after filing his complaint under seal, which named his employer as a defendant. In connection with his continued employment at Jones, relator's counsel: (1) analyzed his potential liability for removing confidential and privileged documents from his employer's offices; (2) advised him on how to respond to an internal Jones investigation commenced after Jones received a grand jury subpoena; and (3) counseled him on how to effectuate his eventual resignation from Jones. Relator deems these tasks compensable because they are "related to representation of a whistleblower and the potential conflicts that arise from assisting the Government."[37] (Reply to BHIC and HUK's Opp'n [960] at 8.)
"Related to representation of a whistleblower," however, is not the standard in this Circuit for compensable time. While the Court accepts that "[c]ompensable time should not be limited to hours expended within the four corners of the litigation," to hold that the hours challenged here were "expended in pursuit of a successful resolution" of the qui tam case would render this phrase meaningless. See Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1335. In analyzing his potential liability to his employer, relator's counsel sought to protect their client from a counterclaim in the qui tam action or a collateral lawsuit. This was diligent lawyering, but it had no effect on the qui tam claims.[38] Further, the narratives in counsel's time records indicate they spent substantial time weighing whether relator should refuse to cooperate with his employer's internal investigation. Whatever their substantive advice may ultimately have beenand it appears relator resigned rather than cooperatecounsel's drawn out research and strategy development almost certainly hindered Jones' own investigation of the fraud and may consequently have prolonged this litigation unnecessarily.[39] Finally, advice concerning relator's employment status lacks even a tenuous connection to the qui tam litigation. For example, relator does not attempt to explain, and the Court cannot surmise, how the "resignation script" his attorneys prepared for him could possibly have served to advance the qui tam litigation. (See 2/23/96 MLS.) Hence, the Court will not compensate relator for time his counsel expended on this set of tasks.

iii. Relator's Share and Attorneys' Fees
Even before relator filed his complaint, his counsel had begun estimating his potential bounty, and after DOJ prioritized the criminal case, counsel researched whether relator could claim a share of any criminal fines. When the Civil Division later settled with various defendants, relator's counsel lobbied heavily for his share and sought attorneys' fees from the settling defendants.[40] Defendants object to time entries associated with each of these activities. Relator, of course, asserts that all are compensable.
Fortunately, other courts have weighed these issues before. The Court of Appeals for the Sixth Circuit has considered whether the FCA requires a liable defendant to pay attorneys' fees a prevailing relator incurs in pursuing his relator's share. See Taxpayers Against Fraud, 41 F.3d at 1045-46. Relator Miller offers, in essence, the same argument the court rejected in that case: "`that as between [him] and the wrongdoer [defendant], it is the wrongdoer who should bear the costs.'"[41]See id. at 1046 (quoting Bigby v. City of Chicago, 927 F.2d 1426, 1428 (7th Cir.1991)) (second alteration in original). There, as here, the defendant had no "right to participate" in relator's share negotiations between the relator and the government, and "nothing suggest[ed] that [the defendant] prolonged the [] process or could have hastened its conclusion." Id. Thus, the court concluded, "the defendant [] should not be required to pay the costs incurred by the prevailing plaintiffs in the course of their collateral litigation." Id.[42] This Court finds the Sixth Circuit's reasoning persuasive and will follow it here. Accordingly, hours relator's counsel devoted to recovery of a relator's share from the government are not compensable.[43]
Authority from this Circuit speaks to the second issue presented here: whether a relator may recover attorneys' fees from non-settling defendants for time devoted to obtaining such fees from settling defendants. "It is well settled that hours reasonably devoted to negotiating and/or litigating a statutory fee award are compensable." Laffey v. Northwest Airlines, Inc., 572 F.Supp. 354, 367 n. 21 (D.D.C. 1983), reversed in part on other grounds by 740 F.2d 1071 (D.C.Cir.1984). See also Copeland v. Marshall, 641 F.2d 880, 896 (D.C.Cir.1980) (en banc) ("time spent litigating the fee request is itself compensable"). Thus, the only remaining question is whether liability for attorneys' fees under the FCA is joint and several, such that non-settling defendants share liability for fees incurred in obtaining fees from settling co-defendants.
Though never presented with the precise situation here, other courts have unanimously concluded that fee liability under the FCA is joint and several.[44]See United States ex rel. Greendyke v. CNOS, P.C., No. 04-4105, 2007 WL 2908414, *7, 2007 U.S. Dist. LEXIS 72987, at *21-22 (D.S.D. Sept. 27, 2007) (adhering to "general rule that co-defendants are to be held jointly and severally liable for costs and attorney's fees," where defendants failed to cite authority for departing from it); United States ex rel. Abbott-Burdick v. Univ. Med. Assocs., No. 96-1676, 2002 WL 34236885, **4-5, 2002 U.S. Dist. LEXIS 26986, at *18-20 (D.S.C. May 23, 2002) (holding defendants jointly and severally liable for attorneys fees because FCA's "other provisions dictate a joint and several relationship among culpable parties," and due to "unequivocal congressional intent of encouraging qui tam suits and the unique pro-plaintiff structure of litigation under the [FCA]"); United States ex rel. Wiser v. Geriatric Psychological Servs., Inc., No. 96-2219, 2001 WL 286838, *3, 2001 U.S. Dist. LEXIS 12930, at *11 (D.Md. Mar. 22, 2001) (holding that "attorneys fees awarded under 31 U.S.C. § 3730(d)(1) should [not] be apportioned among defendants [because] all other recovery need not be").
Thus, under a scheme of joint and several liability for attorneys' fees, if hours devoted to obtaining fees are, themselves, compensable, then each and every defendant against whom relator prevails is liable for fees the relator incurred in obtaining fees from each and every other non-prevailing defendant. The hours relator's counsel spent attempting to recover attorneys' fees from settling co-defendants are thus compensable.[45]

c. Settlement Efforts
Relator's petition also includes hours his counsel spent in settlement negotiations with various defendants, both successfully and unsuccessfully, and in court-ordered mediation. Contrary to defendants' protests, these tasks are uniformly compensable. The FCA's qui tam provisions make clear that a prevailing relator may recover fees when settlement efforts succeed. See 31 U.S.C. § 3730(d)(1) (2008). Under the statute, a relator receives a share "of the proceeds of the action or settlement of the claim," and any person who receives such a share "shall also receive ... reasonable attorneys' fees and costs." Id. More broadly, settlement efforts, by their nature, are directed toward "successful resolution of the case." See Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1335. Here, pretrial settlements with some defendants narrowed the trial's scope and yielded cooperation from key players in the conspiracy, whose testimony significantly bolstered plaintiffs' case and doubtless contributed to the jury's verdict.[46] Other settlement negotiations and courtordered mediation in this case did not produce such tangible results, but hours relator's counsel devoted to these efforts were no less "expended in pursuit of a successful resolution."[47]See id. (emphasis added). Moreover, substantial authority supports relator's claim to compensation for his attorneys' pursuit of settlement, whatever the ultimate outcome.[48]

d. Travel
In the course of this litigation, relator's counsel traveled throughout the United States and Europe to meet with Antitrust Division attorneys and to depose witnesses. Defendants contend this time is non-compensable "absent a showing that the time charges relate to work done in transit," and that in any event, productive travel time "is reimbursable at only half the regular rate." (HII's Opp'n [949] at 13.)
Our Court of Appeals has "not specifically addressed whether an attorney's fee award may include travel time." Cooper v. United States R.R. Retirement Bd., 24 F.3d 1414, 1417 (D.C.Cir.1994). In Cooper, the Court first observed that "[o]ther circuits allow payment for attorney travel time, although sometimes at a lower hourly rate," then somewhat cryptically "conclude[d] that travel time in this case will be compensated at half the base hourly rate." Id. (emphasis added). Seizing on the emphasized phrase, relator insists that because the attorney in Cooper billed for thirteen hours spent driving to and from oral argument, only unproductive travel time should be compensated at half the base hourly rate, and that to ensure counsel receive a fully compensatory fee, productive travel time must be compensated at the full rate.[49] (Reply to HII's Opp'n [957] at 23 & n. 37.) Yet other courts in this Circuit have read Cooper as a more definitive statement. See, e.g., Doe v. Rumsfeld, 501 F.Supp.2d 186, 193 (D.D.C. 2007) (Sullivan, J.) ("Travel [ ] time is supposed to be compensated at half the attorney's hourly rate."); Blackman v. District of Columbia, 397 F.Supp.2d 12, 15 (D.D.C. 2005) (Friedman, J.) ("In this circuit, travel time generally is compensated at no more than half the attorney's appropriate hourly rate.").[50] This Court will follow suit and will compensate travel time at half counsel's standard billing rates.[51]

e. Clerical Work
At various times, relator's counsel and paralegals performed clerical tasks, and relator's fee petition includes some time entries embracing these tasks. A prevailing party entitled to "reasonable" attorneys' fees may not recoup fees for time professionals spend on purely clerical tasks because such tasks "ought to be considered part of normal administrative overhead." Michigan v. United States EPA, 254 F,3d 1087, 1095-96 (D.C.Cir. 2001). Cf. Missouri v. Jenkins, 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("Of course, purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them."). Though paralegals, like attorneys, should be compensated at their market rates, they may only recover fees for services that are legal in nature, Cobell, 407 F.Supp.2d at 156, such as "factual investigation, locating and interviewing witnesses; assistance with depositions, interrogatories and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence," Jenkins, 491 U.S. at 288 n. 10, 109 S.Ct. 2463.
Relator insists the clerical duties that appear in his counsel's billing statements are compensable because they "requir[ed] familiarity with the documents, case, and issues." (Reply to BHIC and HUK's Opp'n [960] at 11.) He points to a supplemental declaration from attorney Davidson, who claims that it is customary in the District of Columbia to bill clients for clerical tasks performed by paralegals, and that "much of the `clerical work' ... of which [defendants] complain[ ] is not clerical at all." (See Davidson Supplemental Decl. ¶¶ 32-35, Ex. 2 to Reply to HII's Opp'n [957].)
Because the law in this Circuit is to the contrary, however, neither custom nor post-facto rationalizations will render clerical tasks compensable. The Court recognizes that certain seemingly clerical taskssuch as quality checking and otherwise preparing documents for production, (see, e.g., 5/24/2006 Tillotson, 5/25/2006 Tillotson, 6/1/2006 Tillotson)necessarily involve, or are at least rendered more efficient by, an in-depth understanding of the underlying legal issues. But the Court simply cannot fathom how, for example, telephone calls to obtain corporate addresses can be deemed "legal" in nature.[52] (See, e.g., 6/21/95 FHQ; 6/23/95 FHQ; 6/26/95 FHQ.) Similarly, the notion that filing a change of address notice constitutes substantive legal work strains credulity. (See 4/28/2006 MMB.) The Court will not award fees for such administrative housekeeping.
Defendants have not attempted to identify all time entries that include clerical tasks, and they argue that the Court should either require relator to expunge them from his petition or discount all paralegal fees by 50 percent. (BHIC and HUK's Opp'n [948] at 10.) Relator has declined the former invitation and insists the latter request is excessive. (Reply to BHIC and HUK's Opp'n [960] at 11-12.) Even if the Court were to examine counsel's time entries line by line, their practice of block billing would still obscure the true number of hours devoted to clerical work. In the course of preparing this Opinion, the Court has reviewed many of relator's time entries, and it is convinced that clerical tasks occupied only a very small portion of the hours billed by attorneys and a slightly larger portion of those billed by paralegals. Based on these observations, the Court will discount all attorney hours by one-half percent and all paralegal hours by five percent to ensure the fee award does not include compensation for clerical tasks.

f. Non-Prevailing Claims[53]
While relator achieved a stunning victory on the claims litigated at trial, this Court had previously dismissed several other claims, which were not submitted to the jury.[54] Specifically, it adopted Magistrate Judge Facciola's ruling that this Court had personal jurisdiction over HUK only as to Contract 20A, (Mem. & Order of Mar. 6, 2007[618]), and it dismissed all claims against Bill L. Harbert on statute of limitations grounds, (Order of May 4, 2007[854], at 3). Defendants assert that relator's fee petition improperly includes time devoted to pursuit of these failed claims. (BHIC and HUK's Opp'n [948] at 5-8.); see Copeland, 641 F.2d at 891-92 & n. 18 ("no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail").
Relator has acknowledged that his original fee petition did include some hours devoted solely to his claims against Bill Harbert, and Bell has itemized the time entries now conceded as non-compensable. (See Reply to BHIC and HUK's Opp'n [960] at 10; Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].) To the extent defendants seek to exclude time spent on matters involving Bill Harbert and other defendants, the Court finds this time is compensable. Plaintiffs alleged an overarching conspiracy to rig bids on government contracts of which Harbert was a ringleader. (See, e.g., Order of Mar. 6, 2007[613] at 12.) Their claims against Harbert and against the present defendants were "part and parcel of one matter"those against Harbert were by no means "fractionable." See Lamphere v. Brown Univ., 610 F.2d 46, 47 (1st Cir. 1979). To illustrate their objection, defendants describe counsel's preparation of discovery requests propounded to Harbert and others. (See BHIC and HUK's Opp'n [948] at 5-6.) Even leaving aside relator's claim that he sent "similar or identical written discovery [] to all parties," (see Reply to BHIC and HUK's Opp'n [960] at 10), Harbert's responses to relator's discovery demands almost certainly yielded material helpful to plaintiffs' case against the other defendants.[55] Hence, the Court is satisfied with Bell's redactions.
As to relator's dismissed claims against HUK, defendants contend that discovery requests directed to HUK and time counsel expended on the personal jurisdiction issue should not be compensable in full. (See BHIC and HUK's Opp'n [948] at 7-8.) Defendants misapprehend the law. The Court of Appeals in Copeland v. Marshall did, at one point, state that "no compensation should be given for hours spent litigating issues on which plaintiff did not ultimately prevail." See 641 F.2d at 902 (emphasis added). But the opinion as a whole leaves the court's position quite clear: "no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail." Id. at 891-92 (emphasis added). A reduction in fee is appropriate only when the non-prevailing claims "`are truly fractionable.'" Id. at 892 n. 18 (quoting Lamphere v. Brown Univ., 610 F.2d 46, 47 (1st Cir.1979)). This interpretation accords with positions taken by other Circuits.[56] It also accords with common sense: even efforts directed to non-prevailing issues may be "expended in pursuit of a successful resolution of the case." See Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1335.
The Supreme Court's language in Hensley echoes this standard. There, the Court indicated that the lodestar should be adjusted downward where the plaintiff "fail[s] to prevail on claims that were unrelated to the claims on which he succeeded." 461 U.S. at 434, 103 S.Ct. 1933 (emphasis added). It explained:
In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants . . . counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved."
Id. at 434-35, 103 S.Ct. 1933 (citation omitted). Here, plaintiffs alleged that HUK participated in an overarching conspiracy involving Contracts 20A, 29, and 07. (See, e.g., Order of Mar. 6, 2007[613].) The Contract 20A claims on which they succeeded were closely intertwined with the Contract 29 and 07 claims on which they failed. While these latter claims did involve some "different facts," plaintiffs developed and presented these same facts to the jury in pursuing claims against the other defendants, HUK's co-conspirators, as to Contracts 29 and 07.
Where, as here, a "plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," and the award "should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Hensley, 461 U.S. at 435, 103 S.Ct. 1933. The Court will make no reductions based on the dismissal of relator's Contract 29 and 07 claims against HUK.

g. Summary
For the reasons explained above, the Court will not award fees for the following classes of time entries: hours devoted to securing immunity from prosecution for relator, tasks arising from his ongoing employment at J.A. Jones, research and other efforts to obtain his relator's share, and clerical tasks performed by attorneys and paralegals. For the first three classes, the Court has reviewed the parties' submissions and has made reasonable reductions. Appendix II to this Opinion itemizes these deductions. Percentage reductions for clerical tasks appear in Appendix III, along with other subtractions for broad defects in the fee petition.

2. Broader Defects
Defendants have also identified several pervasive flaws in relator's fee petition, on which basis they seek across-the-board, percentage reductions in the lodestar.[57] (See BHIC and HUK's Opp'n [948] at 11-18; HII's Opp'n [949] at 16-30.)

a. Inadequate Records
As noted above, a fee petitioner must provide sufficient support for his claim to "permit the District Court to make an independent determination whether or not the hours claimed are justified." Nat'l Ass'n of Concerned Veterans., 675 F.2d at 1327. Defendants contend relator has failed at this endeavor in at least two respects: 1) counsel's time entries consistently refer to research, meetings, and telephone conferences without specifying their subject matter; and 2) counsel have followed the practice of block billing.[58] (See BHIC and HUK's Opp'n [948] at 11-13; HII's Opp'n [949] at 23-27.)

i. Vague Descriptions
First, defendants cite several examples of time entries for which counsel's narrative descriptions are so vague as to preclude meaningful review. They point to two of Robert Bell's time entries from March 2001, in which he billed for "telcon Carolyn Mark" and "telcon Carolyn Mark re: tactics." (See HII's Opp'n [949] at 24 (citing 3/13/2001 RBB; 3/14/2001 RBB).) Even more egregiously meaningless are Michael Sturm's time entries for "review and analyze issues re development." (See id. (citing 11/2/1998 MLS; 11/3/1998 MLS; 5/27/1999 MLS).) Similarly, Jennifer O'Connor's time entry for November 8, 2006 includes the wholly uninformative phrases "confer with Mr. Bell, Mr. Connell re strategy questions" and "confer with Mr. Shapiro re same." (See BHIC and HUK's Opp'n [948] at 13 (citing 11/8/2006 JMO).)
As defendants observe, these entries and others in relator's petition are virtually identical to the sorts of descriptions this Court and others have repeatedly deemed inadequate:
For example, many of plaintiffs' time records "provide little or no reference to the substance of the work claimed." Entries such as: "research read cases; searched Westlaw"; "meet with attys"; "prepare for trial"; [and] "further trial preparation and document review" .. . are so vaguely generic that the Court can not determine with certainty whether the activities they purport to describe were ... reasonable.
. . . Other time records make, "no mention. . . of the subject matter of a meeting, telephone conference or the work performed during hours billed." Entries illustrative of this particular problem include: "conference call with Dennis & E. Worliss"; "telephone call to KH re: general update"; "call for Plaintiffs"; "background research for RD"; "confce call and follow-ups."
Similarly infirm are those time entries containing "vague and cryptic designations," such as: "rvw & respond to email inquiry from A. Jarett"; "confer w/RD"; "Discussed strategy w/Dennis, Thad, Bob & Keith"; "Met w/Keith & Bob re: strategy"; "conference with Elliott Levitas regarding strategy and legal issues"; "confer w/RD & RP re: legal strategy."
Cobell, 407 F.Supp.2d at 158-59 (citations omitted). See also Hensley, 461 U.S. at 437 n. 12, 103 S.Ct. 1933 ("at least counsel should identify the general subject matter of his time expenditures"); In re Meese, 907 F.2d 1192, 1204 (D.C.Cir. Spec.Div.1990) (time entries in which "no mention is made of the subject matter of a meeting, telephone conference or the work performed during hours billed" are "not adequately documented"); In re Olson, 884 F.2d 1415, 1428-29 (D.C.Cir. Spec.Div.1989) (decrying time entries "that wholly fail to state, or to make any reference to the subject discussed at a conference, meeting or telephone conference" as well as generic references to "strategy" conferences); Kennecott Corp. v. EPA, 804 F.2d 763, 767 (D.C.Cir.1986) (per curiam) (citing "[a]nalysis of final NSO regulations; first joint petition for review; research" as too generalized to meet fee applicant's burden). The resemblance is uncanny.
Relator characterizes defendants' examples as having been "cherry-picked" from among otherwise "sufficiently detailed" time entries.[59] (See Reply to HII's Opp'n [957] at 13-14.) Had the Court not examined relator's counsel's time entries at some length, it might give credence to this argument. Instead, its review of the entire fee application confirms that counsel's time records are simply rife with ambiguous and nugatory entries.[60] Michael Sturm, for example, has billed time for "review[ing] and analyz[ing] issues re strategy" no fewer than sixteen times, (See 6/26/1995 MLS; 8/14/1995 MLS; 8/30/1995 MLS; 9/8/1995 MLS; 1/19/1996 MLS; 2/14/1996 MLS; 2/28/1996 MLS; 6/25/1997 MLS; 2/26/1998 MLS; 5/7/1998 MLS; 2/25/1999 MLS; 5/28/1999 MLS; 6/15/1999 MLS; 6/24/2999 MLS; 9/8/1999 MLS; 9/13/1999 MLS.) Other gems include "reviewing and revising memorandum to file; research on bid-rigging cases," (1/7/2000 RBB), for which relator's counsel seek $650.00; "review indices, docs; confer with G. Reece," (6/20/2006 MMB), for which counsel billed $1,295.00; and "prepare for trial," (3/14/2007 CR; 3/15/2007 CR; 3/16/2007 CR; 3/17/2007 CR; 3/18/2007 CR), for which counsel charged $30,021.50.
The relevant question is not whether the lodestar should be reduced due to counsel's impenetrable narratives, but by how much. Not all counsel's time entries exhibits such flaws. Indeed, some far exceed the minimum level of detail needed for meaningful analysis. And as relator urges, certain vague descriptions acquire greater substance when considered in context. See Heard v. Dist. of Columbia, No. 02-296, 2006 WL 2568013, **14-16, 2006 U.S. Dist. LEXIS 62912, at *44-46 (D.D.C. Sept. 5, 2006) (Kotelly, J.) (surrounding entries must be taken into account in reviewing allegedly vague time entries). Cf. Cobell, 407 F.Supp.2d at 159 (declining to "cross-reference each of plaintiffs' voluminous time entries to compensate for [counsel's] failure to more fully describe his activities in the first instance" because this "responsibility rests squarely with plaintiffs"). For example, on one of the five consecutive days for which Colin Rushing billed only "prepare for trial," (3/14/2007 CR), Bell's time record indicates he met for some period of time with Rushing and others to discuss "trimming [the] case," (3/14/2007 RBB), and Cedarbaum's entry for that day notes Rushing was present for a meeting regarding "demonstratives," (3/14/2007 JC). It seems unlikely, however, that these two meetings consumed the entire thirteen hours Rushing billed that day. Moreover, contextual analysis saves only a small portion of the problematic time entries.
Accordingly, the Court agrees with defendants that counsel's time entries' ambiguity warrants an across-the-board reduction. Based on the Court's review of the full fee application, it considers 10 percent to be reasonable and appropriate.[61]

ii. Block Billing
Defendants also criticize counsel's use of block billingthat is, their time entries aggregate all tasks performed for this case on a given day, with no indication as to how much time counsel spent on each individual task.[62] As our Court of Appeals has observed, block billing "make[s] it impossible for the court to determine, with any degree of exactitude, the amount of time billed for a discrete activity," leaving the court "to estimate the reduction to be made because of such insufficient documentation." In re Olson, 884 F.2d at 1428-29. See also Role Models Am., Inc., 353 F.3d at 971 (time records that "lump together multiple tasks[ ] mak[e] it impossible to evaluate their reasonableness"). In Cobell, this Court refused to "undertake the futile task of separating plaintiffs' block entries into their constituent tasks and apportioning a random amount of time to each." 407 F.Supp.2d at 160. Instead, it "exercise[d] the discretion accorded it by the Hensley Court and reduce[d] the time requested." Id. (citing Hensley v. Eckerhart, 461 U.S. 424, 437 n. 12, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).[63]
Relator attempts to justify his counsel's block time entries by turning again to fellow attorneys' declarations: Davidson contends block billing is "[t]he most prevalent practice among firms in the Washington, D.C. marketplace," and Braga characterizes it as "standard fare in today's billing world." (Davidson Decl. ¶ 12, Ex. 5 to Mot. for Fees, Costs, and Expenses [930]; Braga Supplemental Decl. ¶ 2, Ex. 3 to Reply to HII's Opp'n [957].) Davidson also insists that more truly contemporaneous time-keeping would be "burdensome" and "disruptive to the flow of work involved." (Davidson Supplemental Decl. ¶8, Ex. 2 to [957].)
Such platitudes fail the common sense test. Wilmer Hale's time records clearly reveal a policy of billing in six-minute increments, while Wiley Rein's counsel seem to have billed in fifteen-minute increments. In several instances, an individual attorney performed only one task on this case in a given day and billed only six or fifteen minutes. (See, e.g., 6/30/2006 HS (0.10 hours billed for "confer with Ms. O'Connor"); 12/9/1998 RBB (0.25 hours billed for "telephone call with Mr. Dillon re status of investigation").) Thus, counsel were clearly able, under both firms' existing record-keeping systems, to document the time spent on individual tasks. The Court acknowledges that more consistently precise time-keeping might prove somewhat disruptive to work-flow, but in a fee-shifting case, it is necessary to facilitate subsequent judicial review. Most saliently, counsel's time entries are riddled with conferences, telephone calls, and meetings involving multiple professionals, but it is impossible to determine how long these conclaves lastedor, as noted above, what subject matter they involved. Without such basic details, the Court simply cannot ascertain whether this time was reasonably expended.
Because relator's counsel's time records "lump together multiple tasks, making it impossible to evaluate their reasonableness," this Court finds that a wholesale reduction in the lodestar is appropriate. See Role Models Am., Inc., 353 F.3d at 971. It will thus reduce the tentative lodestar by a further 10 percent.[64]

b. Unnecessary Work
Defendants next contend that relator's counsel engaged in unnecessary work, gratuitously inflating the fee petition. (BHIC and HUK's Opp'n [948] at 13-14.) Such superfluous time is not compensable. See Hensley, 461 U.S. at 434, 103 S.Ct. 1933 (requiring petitioner "to exclude from [his] fee request hours that are excessive, redundant, or otherwise unnecessary"); Laffey v. Northwest Airlines, Inc., 572 F.Supp. 354, 369 (D.D.C.1983) (Robinson, C.J.) ("Counsel is not free ... to exercise its judgment in a fashion that unnecessarily inflates the losing party's fee liability").
Specifically, defendants claim that "[o]nce the government intervened, there was no need for the Relator to continue to amend his complaint, merely asserting the same claims as those contained in the government's complaints." (BHIC and HUK's Opp'n [948] at 13.) Hence, they argue, the Court should order relator's counsel to identify all time entries associated with these amendments and should exclude them from the fee award. (Id. at 14.)
This demand fails for two reasons. First, defendants again mistake the governing "reasonableness" standard for one of necessity. See Hensley, 461 U.S. at 433, 103 S.Ct. 1933 (lodestar calculated based on "hours reasonably expended on the litigation"). Even an unnecessary amendment might yet be reasonable. Second, in each of the three instances in which relator amended his complaint after the government had intervened, Magistrate Judge Facciola or this Court authorized the amendment. (See Order of Mar. 9, 2006[232] (magistrate judge granted relator's motion for leave to file a third amended complaint); Scheduling Order of Apr. 10, 2006[253] (magistrate judge ordered that parties comply with April 24, 2006 deadline for filing amended complaints); Mem. Op. & Order of Mar. 6, 2007[620] (this Court granted relator's motion for leave to file fifth amended complaint).) The Court will not deny compensation for work it authorized. Cf. Wilkett v. ICC, 844 F.2d 867, 874 (D.C.Cir.1988) ("[a]ny work ordered by this Court is [ ] compensable").

c. Inefficiencies
Next, defendants point to sundry inefficiencies reflected in counsel's time records that fall into two broad categories. Their "too many lawyers" complaints include: (1) an excessive number of meetings and conference calls, many of uncertain duration, involving multiple senior personnel; (2) assignment of a per se unreasonable number of different time-keepers to the case; and (3) assignment of too many high-billing partners to the case. Their "too many hours" complaints include: (1) excessive time spent drafting relator's original complaint; (2) an unreasonable amount of time devoted to basic research; and (3) plaintiffs' continued agreements to seal. The Court will briefly examine each purported inefficiency and will then determine whether, in light of its findings, an across-theboard reduction for "excessive, redundant, or otherwise unnecessary" hours is appropriate. See Hensley, 461 U.S. at 434, 103 S.Ct. 1933.

i. Too Many Lawyers
First, defendants highlight several "team meetings" that illustrate their concern over the innumerable, multi-participant meetings and conference calls that litter counsel's time records. On December 12, 2006, for example, no fewer than eleven people attended a "team meeting." (See 12/12/2006 MB; 12/12/2006 AB; 12/12/2006 RBB; 12/12/2006 MMB; 12/12/2006 JC; 12/12/2006 MG; 12/12/2006 AFM; 12/12/2006 JMO; 12/12/2006 GR; 12/12/2006 HS; 12/12/2006 STS.) Howard Shapiro's time entry indicates the meeting lasted 0.6 hours, and Stephen Smith's time entry reveals it pertained to that day's deposition of plaintiffs' expert, Terry Musika. (See 12/12/2006 HS; 12/12/2006 STS.) The price tag: $4,885.00.
Relator argues "such interactions and collaboration" were necessary in "a case as complex and fast-paced as this one." (Reply to BHIC and HUK's Opp'n [960] at 14.) Indeed, "conferences between attorneys to discuss strategy ... are an essential part of effective litigation" and facilitate "proper supervision and efficient staffing." McKenzie v. Kennickell, 645 F.Supp. 437, 450 (D.D.C.1986) (Parker, J.). This Court recognizes the value of information-sharing and dialogue[65] but it agrees with defendants that "neither preparation for the defense of [Musika's] deposition nor debriefing after[ward] ... justifies" billing $5,000.00 for a thirty-six minute period.[66] (See BHIC and HUK's Opp'n [948] at 15.)
Similarly, the Court cannot condone counsel's June 2006 conference calls with BHIC's counsel. On June 23, four attorneys participated in a teleconference with June Ann Sauntry regarding follow-up questions to defendants' discovery responses. (6/23/2006 MMB; 6/23/2006 JC; 6/23/2006 JMO; 6/23/2006 GR.) Due to counsel's block time entries, the Court cannot ascertain how long this call lasted, but its hourly price tag was a whopping $1,740.00. Four days later, at this same, $1,740.00 per hour rate, these four attorneys conferred by phone again with Sauntry and then held a separate meeting amongst themselves. (6/27/2006 MMB; 6/26/2006 JC; 6/26/2006 JMO; 6/23/2006 GR.)
This troublesome pattern extends to counsel's written work product: seven different attorneys worked on relator's fifth amended complaint. (See, e.g., 1/30/2007 JC; 1/31/2007 JC; 1/31/2007 MB; 12/22/2006 AB; 1/30/2006 AB; 12/26/2006 RBB; 1/30/2006 RBB; 11/25/2006 MMB; 1/31/2007 MMB; 12/22/2006 MG; 1/30/2007 MG; 1/30/2007 JMO; 1/31/2007 JMO.) Relator claims seven lawyers' participation was reasonable "because, as the last Complaint filed before trial, various attorneys needed to review it before it was filed to ensure that facts they knew based on their particular areas of expertise on the case were incorporated." (Reply to BHIC and HUK's Opp'n [957] at 14.) This explanation contradicts his justification for the innumerable "team meetings" that occurred throughout the case: team members shared information so freely and regularly to ensure knowledge would not be compartmentalized. (See id.) Furthermore, this Court granted leave to amend "solely for the purpose of curing the 9(b) deficiency ... pertaining to [HC's] involvement in the alleged fraudulent conspiracy." (Mem. Op. & Order of Mar. 6, 2007[620] at 3.) Satisfying this limited mandate did not call for such excessive drafting manpower. Relator explains that he also sought to add additional facts, (see Reply to BHIC and HUK's Opp'n [960] at 14 n. 14), but given that relator had eleven years to prepare the factual allegations in his fourth amended complaint, the Court finds it difficult to believe seven different drafters were necessary to document any "new" facts. Moreover, while the Court accepts that others must review a drafter's work, drafting by committee is a recipe for inefficiency.
Relator's justification for dispatching three attorneys to certain depositions, also attended by government counsel, is similarly flawed. (See Ex. A to Bell Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) The Court does not dispute that the FCA "contemplates [] continued participation by a relator after the government intervenes in a qui tam action." United States ex rel. Abbott-Burdick v. Univ. Med. Assocs., No. 2:XX-XXXX-XX, 2002 WL 34236885, **14-15, 2002 U.S. Dist. LEXIS 26986, at *47-48 (D.S.C. May 23, 2002). Given relator's status as coplaintiff with the United States, it was perfectly reasonable for his counsel to attend depositions, regardless of government counsel's presence. Further, while the Court questions its necessity, it cannot conclude that dispatching two Wilmer Hale attorneys to each deposition was wholly unreasonable. At three, however, it draws the line.[67] More is not always better.
Having perused counsel's records in full, and having studied the examples defendants cite in detail, the Court concludes that too many attorneys were assigned to discrete tasks. In many circumstances, assigning more than one attorney to a task makes eminent good sense. The work may be burdensome and readily divisible, a deadline may be fast approaching, or as the maxim holds, two heads may prove better than one. But relator's counsel, quite simply, went overboard.
Second, HII contends it was per se unreasonable for Wilmer Hale to assign fiftytwo attorneys and thirty paralegals to this case.[68] (See HII's Opp'n [949] at 19.) As they point out, relator's co-plaintiff, the United States, devoted only five attorneys to the case, and they managed to perform substantially the same volume and types of tasksattending and defending depositions, responding to discovery requests, filing pleadings, and advocating at trial for which Wilmer Hale needed more than ten times the staff. (See id. at 20-21.)
As relator notes, however, HII has not identified specific time entries it believes reflect duplication of effort. (See Reply to HII's Opp'n [957] at 13.) Furthermore, in calculating the lodestar, the Court's duty is to ascertain "the number of hours reasonably expended on the litigation," not the number of lawyers reasonably assigned. See Hensley, 461 U.S. at 433, 103 S.Ct. 1933; Donnell v. United States, 682 F.2d 240, 250 n. 27 (D.C.Cir.1982) ("The issue is not whether [petitioners] used too many attorneys, but whether the work performed was unnecessary.").
Moreover, defendants' attack on the number of Wilmer Hale attorneys who assisted the government with the "overwhelming[ly] demand[ing][] discovery" that occurred in this case, (see Morgan Decl. ¶ 7, Ex. 1 to Mot. for Fees, Costs, and Expenses [930]), rings hollow, see Copeland v. Marshall, 641 F.2d 880, 904 (D.C.Cir.1980) (en banc) (defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response"). Wilmer Hale's ability to leverage additional human resources as the case's demands changed may actually have rendered its representation more efficient. Moreover, both partners and associates frequently change firms or move between public and private practice; consequently, one would expect some turnover in assigned personnel over the course of twelve years. Hence, the Court cannot conclude Wilmer Hale's aggregate staffing was per se inefficient.
Third, and in the same vein, defendants contend Wilmer Hale's assignment of five different partnersnone with prior FCA litigation experienceto the case was unreasonable reasonable, leading to inflated billings. (See HII's Opp'n [949] at 29-30.) In total, partners Robert Bell (1980 law graduate), Jonathan Cedarbaum (1996), Robert Cultice (1978), Jennifer O'Connor (1997), and Howard Shapiro (1985); billed 7,667.05or about 31 percentof the 24,626.5 hours listed in relator's original fee petition. (See Exs. B-1, D-1 to Bell Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) This equates to $4,310,980.00or about 43 percentof the $10,014,707.00 in fees sought in that petition. (See Exs. B-1, 1 to Bell Decl.)
Defendants style this objection as one concerning "duplication of work," (see HII's Opp'n [949] at 29), and indeed, Hensley prescribes exclusion of "redundant" efforts from a fee petition, 461 U.S. at 434, 103 S.Ct. 1933. Yet defendants do not identify any specific areas in which they believe Wilmer Hale's efforts, or those of an individual partner, were truly duplicative of others.[69] Perhaps some of the work performed by the five partnersat $495 per hour and upmight have been delegated to associates with lower hourly rates, but defendants have neither made this argument explicitly nor endeavored to identify examples. The Court finds the previous paragraph's calculations rather troubling: despite the involvement of so many different attorneys and the assignment of associates to the "core" team, five partners' time accounts for nearly half the fees relator seeks. Nonetheless, without evidence of duplication, the Court will not speculatively second-guess Wilmer Hale's staffing decisions in the invited manner.

ii. Too Many Hours
Defendants' first "too many hours" objection concerns relator's original complaint: by their count, counsel devoted 141.50 hours to drafting, reviewing, and revising this document. (HII's Opp'n [949] at 27.) A single sentence encapsulates their argument: "After three years of being involved in the case, it is hard to imagine how Wiley Rein could spend 141.5 hours in drafting a Complaint which thereafter required five successive amendments...." (Id.) Relator's counsel's practice of block billing has inflated defendants' figure: attorney time entries listing work on the complaint also include other, unrelated tasks. (See, e.g. 6/21/1995 LD; 6/21/2005 CRY.) Further, counsel drafted a thirty-page, factually detailed confidential disclosure statement along with the complaint, preparation of which required document review and privilege considerations. (See, e.g., 6/21/2005 MLS; 6/21/2005 RBB.) Hence, the Court cannot conclude counsel devoted excessive time to drafting the complaint and accompanying disclosure statement. Cf. Cobell, 407 F.Supp.2d at 161 (finding excessive 20.7 hours spent "drafting a two-page filing containing no legal analysis or discussion," 122.33 hours spent "drafting a nine-page filing entitled Plaintiffs' Reply to Defendants' Opposition to Setting a Trial Date," and 852.47 hours spent "drafting Appellee's 66-page Response Brief").
Second, defendants contend relator's counsel spent 300.55 hours on "the most basic `getting up to speed'" research. (HII's Opp'n [949] at 27-28.) Again, this figure is inflated due to counsel's block time entries, and defendants' examples are ill-chosen. They highlight, for instance, that on June 13, 1995, Robert Bell reviewed an ABA publication on the False Claims Act. (Id. (citing 6/13/1995 RBB).) Yet the Court suspects that even an attorney with prior FCA experience would wish to ensure his familiarity with recent developments in the field. (Accord Braga Supp. Decl. ¶ 3, Ex. 3 to Reply to HII's Opp'n [957] ("it is prudent for even the most expert counsel ... to perform additional research on topics they are otherwise familiar with in order either to confirm their beliefs in the state of the law or to ascertain any changes in the state of the law as a result of recent developments").) On June 12, 1995, Luis de la Torrein addition to reviewing a memo from a colleagueresearched cases interpreting the FCA's statute of limitations and drafted a memo on the subject. (6/12/1995 LD.) Given that timeliness proved a significant and fiercely contested issue in this case, this research seems entirely justified.
More broadly, the Court finds attorney declarant Davidson's pragmatic comments on this point particularly apt:
Experts in substantive practice areas are still required to conduct "research" (indeed, a lawyer would be negligent if he or she did not conduct "research") to determine the current state of the law[,] and no practitioner would be expected to know all answers to legal questions, even within the practitioner's area of expertise. Moreover, regardless of an attorney's level of expertise, the pertinent authorities need to be referenced and researched when briefing or considering the legal issues in the case. This time will be described as "research." Undertaking "research" does not mean that the attorney involved is undertaking basic research on the substantive law. In my opinion, and in my practice, it is customary for attorneys at all levels to review case lawto do "research" as it becomes relevant for the task they are performing.
(Davidson Supplemental Decl. ¶29, Ex. 2 to Reply to HII's Opp'n [957].) Having reviewed the supposedly offensive time entries, (see Ex. 1 to HII's Opp'n [949]), the Court concludes defendants' objection to counsel's "basic" research is unfounded.
Finally, defendants argue plaintiffs' repeated agreements to extend the sealed period in this case were unreasonable because they unduly prolonged the litigation.[70] (See HII's Opp'n [949] at 28-29.) This Court has stated, and still believes, that relator did himself a grave disservice by conceding to the government's numerous motions to extend the seal. (See Apr. 27, 2007 PM Tr. at 165-66; Mem. Op. [872] at 29.) Nevertheless, in each instance, the government sought, and a judge granted, the extension. The Court will not deny relator's counsel compensation for work it authorized.[71]Cf. Wilkett v. ICC, 844 F.2d 867, 874 (D.C.Cir.1988) ("[a]ny work ordered by this Court is [] compensable").

iii. Inefficiencies Summary
To summarize, the Court has considered each alleged inefficiency identified by defendants and concludes that counsel's time records do evince one problematic trend. At least during the litigation's later stages, too many attorneys were assigned to discrete tasks. The Court does not propose to dictate law firms' staffing, and it acknowledges the benefits of a division of labor. But it is common knowledge that at some point, allocating portions of a task among group members ceases to raise productivity and instead begins to hinder it. As illustrated above, relator's counsel passed this equilibrium point. The Court finds the resulting inefficiency unreasonably inflated counsel's billing statements and thus warrants an across-the-board reduction of five percent.[72]

C. Lodestar
Relator originally sought $599,351.00 as compensation for 1054.5 hours worked by Wiley Rein personnel. (See Ex. B-2 to Bell's Decl., Ex. 2 to Petition for Fees, Costs, and Expenses [930].) His supporting documents reflect a slightly lesser total of 1054.25 hours. (See Ex. B-3 to Bell's Decl.) The time entry-specific deductions detailed in Appendix II, infra, along with relator's voluntary withdrawals for inadvertently included time, reduce the Wiley Rein total to 936.05 hours. At the rates set forth in Appendix I, infra, fees for these hours amount to $497,763.30 $3,875.00 for paralegal work, and $493,888.30 for attorney work.
For Wilmer Hale personnel, relator originally sought $9,415,356.00 as compensation for 23,572 hours' work. (See Ex. 2 to Bell's Decl.) After the Appendix II deductions and relator's voluntary withdrawals, Wilmer Hale's total compensable hours amount to 23,283 hours. At Appendix I rates, fees for this time run to $9,268,467.75$677,748.75 for paralegal work, and $8,590,719.00 for attorney work.
As set forth in Appendix III, the Court has concluded that systematic defects in relator's fee petition warrant across-theboard reductions in these subtotals: ten percent for ambiguous time entries, ten percent for block billing, and five percent for inefficient staffing. Further, the Court will discount all attorney hours by one-half percent and all paralegal hours by five percent to omit compensation for clerical work. The Court will apply the total percentage reductions25.5 percent of attorney fees and 30 percent of paralegal fees to fees for compensable time, computed above, vice requested time. For Wiley Rein, these percentages translate to reductions of $1162.50 in paralegal fees and $125,941.52 in attorney fees. Subtracting these amounts from the fees for compensable hours, calculated above, yields lodestar values of $2,712.50 for Wiley Rein paralegals and $367,946.78 for Wiley Rein attorneys. For Wilmer Hale, these percentages translate to reductions of $203,324.62 in paralegal fees and $2,190,633.34 in attorney fees. Subtracting these amounts from the fees for compensable hours, calculated above, yields lodestar values of $474,424.13 for Wilmer Hale paralegals and $6,400,085.66 for Wilmer Hale attorneys.
The resulting lodestar sub-components appear in the table below:

 Wiley Rein Wilmer Hale
Attorney Fees $367,946.78 $6,400,085.66
Paralegal Fees $ 2,712.50 $ 474,424.13
Total Lodestar $370,659.28 $6,874,509.79

The total lodestar value"the number of hours reasonably expended on the litigation times a reasonable hourly rate," Blum v. Stenson, 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)thus equals $7,245,169.07.

D. Enhancement
A "strong presumption" exists that the lodestar figure, without more, constitutes a reasonable fee award. City of Burlington v. Dague, 505 U.S. 557, 562,112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Yet in "rare" and "exceptional" cases, a fee applicant may rebut this strong presumption against upward adjustments to the lodestar by producing "specific evidence" that shows "an adjustment is necessary to the determination of a reasonable fee." Blunt, 465 U.S. at 898-99, 104 S.Ct. 1541 (emphasis added).
Relator must believe his case to be exceedingly rare, indeed: he claims his counsel's quality of representation and the "exceptional results" achieved "entitle[ ]" them to double the lodestar amount. (Mot. for Fees, Costs, and Expenses [930] at 27.) He further suggests the FCA's incentive structure supports his eye-watering request. (Id. at 38-40.) The Court will evaluate each of these three proposed bases for a 100 percent lodestar enhancement in turn, but first, it will set out the applicable law.
In his fee petition, relator relies principally on Blum, one of the Supreme Court's early pronouncements on the subject of fee enhancements. (See Mot. for Fees, Costs, and Expenses [930] at 27-28.) There, the district court had granted a fifty percent enhancement for, inter alia, quality of representation and result obtained, and the Supreme Court deemed this an abuse of discretion. 465 U.S. at 891, 902, 104 S.Ct. 1541. It left the door open to lodestar multipliers, noting that "in some cases of exceptional success an enhanced award may be justified," but it instructed that the lodestar amount "is presumed to be the reasonable fee." Id. at 897, 104 S.Ct. 1541 (quotation marks and citation omitted). Of particular relevance here, it observed that
[t]he "quality of representation" . . . generally is reflected in the reasonable hourly rate. It, therefore, may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional."
Id. at 899, 104 S.Ct. 1541. Absent such "specific evidence," an enhancement for quality of representation would constitute "a clear example of double counting." Id. Additionally, though relevant, the result obtained "normally should not provide an independent basis for increasing the fee award." Id. at 900, 104 S.Ct. 1541. Indeed, as another court in this district has observed, these two factors are necessarily intertwined: "a review of [] exceptional results is integral to an analysis of the quality of representation." McKenzie v. Kennickell, 684 F.Supp. 1097, 1106 (D.D.C. 1988) (Parker, J.)
Two years later, the Court adopted an even less permissive stance with respect to lodestar enhancements. See Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). There, the Court elevated Blum's presumption that the lodestar represents the reasonable fee to a strong presumption, explaining that feeshifting statutes "were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client." Id. at 565, 106 S.Ct. 3088. To that end, both quality of representation and results obtained "are presumably fully reflected in the lodestar amount." Id. Fundamental ethical principles dictate this conclusion:
[W]hen an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance.
Id. at 565-66, 106 S.Ct. 3088. Thus, to avoid double counting, "the overall quality of performance ordinarily should not be used to adjust the lodestar." Id. at 566, 106 S.Ct. 3088. See also Donnell, 682 F.2d at 254 ("We have found it all too common for the district courts to adjust the lodestar upward to reflect what the courts view as a high ... quality of representation. This trend should stop.").
With these principles in mind, the Court will weigh relator's enhancement arguments.

1. Results Obtained
In this qui tam action, the jury returned a total verdict of $34.4 million against six defendants after several others agreed to pretrial settlements. Relator and his "experts" dwell effusively on its aggregate size. (See Mot. for Fees, Costs, and Expenses [930] at 28 ("this is one of the three largest jury verdicts in the almost 200-year history of the FCA, and the fourth largest U.S. jury verdict in 2007 at the time it was handed down"); Braga Decl. ¶ 6, Ex. 3 to [930] (calling verdict "historical"); Davidson Decl. ¶ 34, Ex. 5 to [930] ("this size of a verdict from a jury in the District of Columbia is rare and demonstrates exceptional success").) The Court does not dispute that $90 millionthe trebled damages valueis a staggering sum.
But this result must also be placed in perspective. Plaintiffs sought up to $60.8 million in damagesnearly twice the jury's ultimate award. (See May 1, 2007 PM Tr. at 73 (seeking $42 million in damages on Contract 20A); Mar. 23, 2007 AM Tr. at 84 (original Contract 29 bid was $137.3 million); May 1, 2007 PM Tr. at 76 (arguing fair and reasonable Contract 29 bid would have been $120 million); id. (suggesting $1.5 million damages award on Contract 07).) Given the sum sought, the jury verdict's magnitude is far from astounding.
Relator also insists the criminal case's resultsfour guilty pleas, one conviction, and over $140 million in finesare "highly relevant in awarding an enhancement." (Mot. for Fees, Costs, and Expenses [930] at 28.) The Court fails to see how. As BHIC and HUK point out, relator cites no authority for awarding a fee enhancement to counsel in a civil action based on the outcome of other litigation.[73] (See BHIC and HUK's Opp'n [948] at 22.) As discussed above, counsel will be compensated for their representation of relator throughout his assistance with the government's criminal investigation. See supra part III.B. 1.a. But the Court does not believe they deserve a bonus for Government counsel's success in translating the information relator provided into a full-fledged antitrust investigation that culminated in criminal penalties.[74]
Next, relator emphasizes that the jury's damages award here "goes directly to benefit the public interest by compensating the Government for Defendants' proven fraud." (Mot. for Fees, Costs, and Expenses [930] at 29.) Yet this is true of every damages award in False Claims actions: any recovery always goes to the government. By relator's logic, successful qui tam relators' counsel would receive lodestar enhancements in every case.[75] The Supreme Court's admonition that the result obtained "normally should not provide an independent basis for increasing the fee award" forecloses this outcome. See Blum, 465 U.S. at 900, 104 S.Ct. 1541.
All in all, the Court finds the result obtained, while laudable, does not weigh strongly in favor of awarding a fee enhancement in this case.

2. Representation Quality
Relator next argues the quality of his counsel's performance merits a lodestar enhancement, and he identifies three separate facets of this performance as establishing its superiority: (1) his counsel's "essential" and "vital" role, and their coordination with the government, produced efficiencies not reflected in the lodestar; (2) Bell's cradle-to-grave involvement in the case also yielded such efficiencies; and (3) a small core of young lawyers who performed well beyond their seniority levels bore principal responsibility for relator's representation. (Mot. for Fees, Costs, and Expenses [930] at 30, 32, 33.) Because relator's first two justifications both take aim at the strong presumption that the lodestar adequately reflects representation quality, Delaware Valley, 478 U.S. at 565, 106 S.Ct. 3088, the Court will address them together.

a. Unaccounted-for Efficiencies
To support his contention that the lodestar fails to capture certain efficiencies achieved by his counsel, relator turns to two sources: government counsel Keith Morgan's affidavit, and his "expert" declarations. (See Mot. for Fees, Costs, and Expenses [930] at 30-33.)
He begins with the proposition that
[b]ut for relator's counsel's active and integral participation in this suit, it would have been extremely difficult for the Government to prevail because it may not have been able to respond to the plethora of motions effectively, meet the highly intense demands of discovery, and present this case as effectively at trial.
(Id. at 30-31.) To support this characterization of his counsel's role, he relies on Morgan's declaration:
The availability of Relator's counsel from Wilmer Hale was essential in meeting the overwhelming demands of discovery and ultimately of the trial in this matter. Indeed, attorneys and support staff from Wilmer Hale played a vital role in getting this case ready for trial and ultimately successfully trying it. . . . Throughout this period counsel for the United States and Relator's counsel met regularly to coordinate our efforts to ensure that there was no duplication of efforts and that we worked as an integrated team.
(Morgan Decl. ¶¶ 7-8, Ex. 1 to [930].)
Relator and his attorney declarants cast this straightforward prose as effusive praise, repeatedly quoting the words "essential" and "vital" from Morgan's otherwise terse narration of the case's progress. (See Mot. for Fees, Costs, and Expenses [930] at 31; Braga Decl. ¶ 6, Ex. 3 to [930] ("The fact that the Civil Division of the United States Attorney's office is willing to recognize that Wilmer Hale's role in this case was both `essential' and `vital' to the successful preparation and trial of this `overwhelming' case speaks volumes"); Davidson Decl. ¶ 46, Ex. 5 to [930] ("The statements by the Government in support of Wilmer Hale's efforts are not at all typical and reflect the extraordinary contribution the Wilmer Hale team provided for the public benefit.").)
Read objectively, however, Morgan's two-page affidavit offers only faint praise. His first statement, concerning counsel's "availability," reveals nothing about the quality of counsel's performanceit merely suggests Wilmer Hale provided additional warm bodies to supplement the government's resources. His second statement does reflect significant credit on the Wilmer Hale team: their participation was "vital" to successful prosecution of the government's claims. But starting from relator's premisethat the government could not have handled this case without Wilmer Hale's assistance counsel owed a duty to their client to offer up the additional resources needed to permit success, lest relator walk away with nothing. See Delaware Valley, 478 U.S. at 565, 106 S.Ct. 3088 ("When an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests."). The same logic applies to Morgan's third statement: that relator's counsel coordinated their efforts with the government to avoid duplication merely indicates they endeavored to avoid inefficiency; such conduct should serve as a baseline in client representation and does not justify a bonus.
Relator's arguments concerning Bell's continuous involvement are similarly unpersuasive. His attorney declarants' praise for Bell's loyalty to his client, "over a total of 16 years and across his shift in law firms," borders on hyperbole. (See Braga Decl. ¶ 6 (relator was "blessed to have complete continuity of his lead counsel, Robert Bell," and such long-term attorney-client relationships are "rare indeed in this modern legal world"); Davidson Decl. ¶ 42 (Bell's continuous involvement was "invaluable and result[ed] in substantial savings").) Likewise, where plaintiffs' lead counsel "remain[ed] at the helm" throughout fifteen years of litigation, another court in this district observed that "[s]uch continuity promotes tremendous efficiency and necessarily reduces the ultimate expenditure of hours." McKenzie v. Kennickell, 684 F.Supp. 1097, 1107 (D.D.C. 1988) (Parker, J.). See also Hartman v. Duffey, 973 F.Supp. 199, 202 (D.D.C.1997) (Robertson, J.) (awarding enhancement in part due to continuity of lawyers' efforts, which promoted efficiency and reduced overall time expenditure).
Ordinarily, this Court would concur. Here, however, the Court has already concluded that counsel's time records reveal substantial inefficiencies caused by assignment of too many attorneys to discrete tasks. See supra part III.B.2.c.i. Though nominally "lead counsel," Bell was one of five Wilmer Hale partners, and fifty-two attorneys total, to work on this case, and he did not represent relator at trial. Bell, who claims he "only added people to our team when necessary," managed the Wilmer Hale battalions, "set strategy for the team," and "supervise[d] and direct[ed][his] colleagues so that they could use their time more effectively." (Bell Decl. ¶ 66, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Bell, then, presumably bears responsibility for the staffing overkill.
This Court does not doubt that Bell's knowledge of the case history and his relationships with government counsel contributed to plaintiffs' win. But the Court believes the lodestar adequately accounts for Bell's lengthy involvement: he will be compensated at his standard, partner's billing rate of $650.00 for each of the 1,991.55 hours he reasonably expended. Presumably, he will also benefit from the contingency fee Wilmer Hale will receive once the government pays relator his bounty. (See Ex. 2 to Mot. for Leave to File Surreply [937] at 3.) But the Court will not reward him for phantom "efficiencies" belied by the record.[76]
Consequently, the Court concludes neither efficiency for which relator alleges the lodestar fails to account overcomes the "strong presumption" against fee enhancements for quality of representation. See Delaware Valley, 478 U.S. at 565-66, 106 S.Ct. 3088.

b. Beyond-Paygrade Performance
Relator proposes one further basis for a lodestar enhancement based on quality of representation. Specifically, he contends that "young" lawyers comprised the bulk of the Wilmer Hale team, and that these attorneys performed "well beyond the standards expected of attorneys of similar experience."[77] (Mot. for Fees, Costs, and Expenses [930] at 33.) He offers that Gottlieb, Bunch, Baumgartner, and Reece "functioned in rolessitting at counsel table, examining witnesses at trial, taking depositions, interviewing witnesses, and preparing witnessesin which much more senior lawyers typically engage." (Id. at 34 (citing Bell Decl. ¶ 114, Ex. 2 to [930]).) Attorney declarant Braga emphasizes that
[o]rdinarily traditional law firm staffing would have involved a lesser number of junior associates and a greater number of senior associates.... Wilmer Hale's standard hourly rates for these junior associates do[] not fairly capture the degree of difficulty and level of responsibility at which they performed their services in this case.
(Braga Decl. ¶ 6, Ex. 3 to [930].) Similarly, relator contends that O'Connor and Cedarbaum, "both young partners," excelled beyond their paygrades. (Mot. for Fees, Costs, and Expenses [930] at 34.) O'Connor served as lead counsel in discovery and other pretrial matters and played a major role at trial, while Cedarbaum served as "lead motions attorney." (Id.) Both were far junior to defendants' lead trial counsel. (Id.) At Wilmer Hale, more junior partners typically bill "at lockstep rates on the basis of seniority," so relator contends O'Connor and Cedarbaum's rates do not accurately reflect their superior skill levels. (Id. at 35.)
This Court heartily agrees that relator's counsel generally, and the more junior team members in particular, performed at a consistently high standard throughout this litigation. Nothing in this Opinion should be read as dismissing the Wilmer Hale associates' outstanding written and oral advocacy for their client. They are to be commended. Similarly, young partners O'Connor and Cedarbaum acquitted themselves creditably in their leadership roles. But as this Court observed above, Wilmer Hale's established billing rates are "reasonable" precisely because they align with those of other highly skilled attorneys in the District of Columbia legal community. See supra part III.A.1. Simply put, these superstars already bill at superstar rates.
Relator's declarations do not alter this assessment. His attorney declarants' pronouncements are too superficial to be of much evidentiary value. For example, Braga asserts that O'Connor and Cedarbaum "provided services at a level significantly above that contemplated by their standard hourly rates." (Braga Decl. ¶ 6, Ex. 3 to [930].) But he does not then explain what sort of services he believes a client can reasonably expect for $510 or $495 per hour. Nor does he indicate what rates would be reasonable for the level of service provided. Another assertion in relator's motion is equally bewildering: he declares that certain young Wilmer Hale associates "functioned in roles ... in which much more senior lawyers typically engage." (Mot. for Fees, Costs, and Expenses [930] at 34 (citing Bell Decl. ¶ 114, Ex. 2 to [930]).) This implies that Wilmer Hale would not ordinarily permit a fourthyear associate and former U.S. Supreme Court clerk, such as Gottlieb, to sit at counsel table, take depositions, or examine, interview, or prepare witnesses. Relator does not, however, describe the tasks that would typically fall to Wilmer Hale associates of Gottlieb's seniority and credentials. In sum, relator's evidence that counsel's established billing rates do not adequately reflect the quality of their performance is simply too paltry to overcome the "strong presumption" against fee enhancements for quality of representation. Delaware Valley, 478 U.S. at 565-66, 106 S.Ct. 3088. Absent amplifying details, this "evidence" consists of nothing more than superlativeladen platitudes.[78]
As the Supreme Court has cautioned, "the overall quality of performance ordinarily should not be used to adjust the lodestar." Id. at 566, 106 S.Ct. 3088. When they agreed to represent relator, Bell and his colleagues obligated themselves "to perform to the best of [their] abilit[ies] and to produce the best possible results commensurate with [their] skill and [their] client's interests." Id. at 565, 106 S.Ct. 3088. Their having fulfilled this duty to entitles them only to compensation at a reasonable rate for the hours they reasonably expendedno more.[79]

3. Statutory Purpose
Finally, relator argues that awarding an enhancement here would "satisfy" the FCA's "incentive structure." (Mot. for Fees, Costs, and Expenses [930] at 38.) Even if true, this contention would not provide an independent basis for awarding an enhancement absent other, recognized factors (such as quality of representation, discarded above) weighing in favor. Hence, the Court will treat it only briefly.
Relator begins with the uncontroversial proposition that Congress enacted the FCA's fee-shifting and relator's share provisions to encourage private citizens to expose fraud against the government through lawsuits on its behalf. (See id.) In particular, he argues, Congress wanted to enable prospective qui tam relators to retain private counsel whose assistance would prevent "resource mismatch" situations, in which "the Government's enforcement team is overmatched by the legal teams major contractors retain[]." See S. Rep. 99-345, at 8 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5273.[80] Thus, relator reasons, "Congress's goal was for relators to be equally [ ] well-represented as FCA defendants, and therefore, the feeshifting provision is intended to attract counsel of the highest quality." (Mot. for Fees, Costs, and Expenses [930] at 39.)
Here, relator's logic begins to break down. The Senate Report indicates Congress believed relators' counsel could supplement the government's efforts, ameliorating any resource disadvantage. Construed extremely liberally, it could be read to endorse resource parity between plaintiffs and defendants. But both the Report and the statutory text clearly view relator's efforts, and those of his counsel, as secondary to those of the federal government. See 31 U.S.C. § 3730 (2008) ("[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action"); S. Rep. 99-345, at 8 (1986), 1986 U.S.C.C.A.N. 5266, 5273 (qui tam relators and their counsel will "bolster[] the Government's fraud enforcement effort"). The fee-shifting provision thus aims to top up the government's formidable resources,[81] not to bankroll relators' recruitment of private counsel of equal caliber to defendants' counsel.
Even were the Court to disregard this flaw in relator's reasoning, his ultimate conclusion rests on shaky factual ground. He contends that "[w]ithout an enhancement, large firms like Wilmer Halewhich are necessary to match talented defense counsel . . . would have little reason to take on such contentious, long-running cases." (Mot. for Fees, Costs, and Expenses [930] at 39; accord Davidson Decl. ¶ 36, Ex. 5 to [930].) First, while large law firms frequently offer high-quality representation, "mega-firm" attorneys are not the only lawyers equipped to "match talented defense counsel." More than a few talented attorneys have practiced before this Court, among them solo practitioners, government attorneys, and lawyers at small and medium-sized firms. Second, in this very case, Wilmer Hale accepted representationand indeed, has continued it for nine years, with no guarantee of a fee enhancement. To the extent that relator suggests his counsel assumed from the beginning that they would receive a bonusotherwise, they "would have [had] little reason to take on such [a] contentious, long-running case[]," (see Mot. for Fees, Costs, and Expenses [930] at 39) this was foolishly presumptuous.
Furthermore, the Supreme Court's opinion in Delaware Valley forecloses this line of argument: "In short, the lodestar figure includes most, if not all, of the relevant factors constituting a `reasonable' attorney's fee, and it is unnecessary to enhance the fee ... in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance." 478 U.S. at 566, 106 S.Ct. 3088 (emphasis added).[82]

4. Enhancement Summary
For the reasons discussed above, the Court concludes no fee enhancement is warranted in this case. Without minimizing the significance of the result obtained, the Court does not find it so extraordinary as to justify a bonus for relator's counsel. Further, the FCA's incentive structure supports only compensation at a reasonable rate for hours reasonably expended without any additional enhancementin this case. Finally, though the Court commends counsel's performanceparticularly that of the more junior attorneysit concludes the lodestar, calculated using counsel's established billing rates, adequately reflects this superior quality of representation. In Donnell, our Court of Appeals lamented district courts' increasing predilection for "adjust[ing] the lodestar upward to reflect what the courts [subjectively] view as a high ... quality of representation," urging that "[t]his trend should stop." 682 F.2d at 254. It stops here.

IV. Relator's Litigation Expenses
In addition to attorneys' fees, the FCA entitles a prevailing relator to an award against the defendant of "an amount for reasonable expenses which the court finds to have been necessarily incurred." 31 U.S.C. § 3730(d)(1) (2008). Relator seeks $511,723.06 under this provision. (See Bell Supplemental Decl. ¶¶ 26-28, Ex. 1 to Reply to HII's Opp'n [957]).
Defendants contend this award must be limited to costs and expenses reimbursable under the Equal Access to Justice Act ("EAJA"), because the FCA's wording is similar to the EAJA's. (BHIC and HUK's Opp'n [948] at 27-28.)
This argument is a non-starter. Having compared the statutes side-by-side, the Court sees no similarity whatsoever. The EAJA refers to "other expenses, in addition to any costs awarded pursuant to subsection (a), incurred ... in any civil action... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A) (2008). By contrast, the FCA refers to "reasonable expenses which the court finds to have been necessarily incurred." 31 U.S.C. § 3730(d)(1) (2008). Cf. id. § 3730(g) (EAJA governs award of fees and expenses to prevailing defendant in FCA action). The FCA's statutory text requires the court to determine whether the expenses are "reasonable" and "necessarily incurred"not whether defendants' position "was substantially justified," nor whether "special circumstances [exist that] make an award unjust." Compare 31 U.S.C. § 3730(d)(1) (2008), with 28 U.S.C. § 2412(d)(1)(A) (2008).
Moreover, defendants have cited no precedent for applying the EAJA's limitations to a costs award under the FCA. Rather, as they explicitly recognize, courts commonly look to judicial interpretations of 42 U.S.C. section 1988 for guidance as to FCA expenses awards. See, e.g., United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Group, Inc., 422 F.Supp.2d 225, 237-38 & n. 17 (D.D.C. 2006) (Urbina, J.); United States ex rel. Coughlin v. IBM, 992 F.Supp. 137, 145-46 (N.D.N.Y.1998). Cf. Neal v. Honeywell, Inc., 191 F.3d 827, 834 (7th Cir.1999) ("Having assimilated § 3730(h)[, FCA attorneys' fees and costs provision applicable in whistleblower retaliation cases,] to § 1988 on fee issues, we finish the job by assimilating it to § 1988 on cost issues.").
Under section 1988, compensable expenses include "those reasonable out-ofpocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." Laffey v. Northwest Airlines, Inc., 746 F.2d 4, 30 (D.C.Cir.1984), overruled on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516 (D.C.Cir.1988). See also Salazar v. District of Columbia, 123 F.Supp.2d 8, 16-17 (D.D.C.2000) (Kessler, J.) (finding "out-of-pocket litigation expenses for postage, photocopying, telephone calls, facsimile transmissions, messengers, local travel, Westlaw, transcripts, medical records and miscellaneous [items] ... eminently reasonable in light of the extensive legal services performed"). Applying this standard in FCA cases, where the court must find the expenses to have been necessarily incurred, courts have held that "relators are under a duty to minimize their expenses," and that "those expenses incurred without proper documentation should be disallowed." United States ex rel. Abbott-Burdick v. Univ. Med. Assocs., No. 2:XX-XXXX-XX, 2002 WL 34236885, *23, 2002 U.S. Dist. LEXIS 26986, at *75 (D.S.C. May 23, 2002) (citations omitted). Further, they have limited recovery to "those costs which are 'incidental and necessary' to the representation of the client." Coughlin, 992 F.Supp. at 145. "[C]osts are not allowed if they cannot be attached to the advancement of a specific claim, or if they are so general that they could be placed under the cost umbrella of overhead or office expense." Id. This Court will review relator's expenses according to these standards.[83]
First, costs and expenses associated with time entries this Court has determined to be non-compensable are, likewise, non-compensable. Where hours were not "expended in pursuit of a successful resolution of the case in which fees are being claimed," Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1335 (D.C.Cir.1982), associated costs cannot have been "necessarily incurred," see 31 U.S.C. § 3730(d)(1) (2008). Thus, the Court must exclude costs associated with efforts to secure immunity from prosecution for relator, tasks arising from his ongoing employment at J.A. Jones, and research and other efforts to obtain his relator's share.[84]
The Court has cross-referenced the time entries including immunity-related work with relator's itemized expenses, and it finds that no expenses need be excluded on this basis. (Compare infra Appendix II, with Ex. C-2 to Bell Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) For expenses arising from relator's ongoing employment at Jones and efforts to secure his relator's share, Bell has proposed cost reductions the Court may apply should it conclude time associated with these activities is not compensable. (See Ex. F to Bell Supplemental Decl., Ex. 1 to Reply to HII's Opp'n [957].) Bell's proposed cost reductions correspond to his proposed fee reductions. (Id.) While the Court adopted Bell's proposals with respect to numerous time entries, it also deducted time from entries Bell did not address. (See infra Appendix II.) Rather than comb through counsel's cryptic expenses documentation and speculate about line items' purposes, the Court will adopt Bell's proposed deductions, with proportional adjustments.[85] Of the 89.55 hours the Court deducted for relator's share recoupment efforts, Bell identified 65.80 hours, and the Court identified a further 23.75 hours. (See id.) Bell recommends a corresponding expenses reduction of $745.61, (Ex. F to Bell Supplemental Decl., Ex. 1 to [957]), which the Court will adjust proportionally to $1,014.73. Of the 67.35 hours the Court deducted as arising from relator's ongoing employment, Bell identified 47.00 hours, and the Court identified a further 20.35 hours. (See infra Appendix II.) Bell recommends a corresponding expenses reduction of $250.18, (Ex. F to Bell Supplemental Decl., Ex. 1 to [957]) which the Court will adjust proportionally to $358.50. The total reduction for these three categories sums to $1,373.23.
Second, defendants contend certain chargesfor books and other publications, office supplies, and offsite storageshould be deemed non-compensable "overhead" expenses.[86] (BHIC and HUK's Opp'n [948] at 32.) They do not, however, direct the Court to the specific line items they consider problematic. Moreover, in his declaration, Bell avers that Wiley Rein and Wilmer Hale "incurred . . . [the requested expenses] in connection with this litigation." (Bell Decl. ¶¶ 106, 116, Ex. 1 to Mot. for Fees, Costs, and Expenses [930].) He further declares the costs he claims "are typical of the costs that law firms incur in this type of complex and protracted litigation, and typical of costs that law firms reasonably charge to their clients, separately, and not part of their overhead expenses." (Id. ¶ 116.) Defendants do not specifically rebut Bell's claims or cite to any relevant case law. Hence, the Court will take Bell at his word.
Finally, defendants argue that relator's expenses documentation is inadequate in two respects. (See BHIC and HUK's Opp'n [948] at 30-31.) First, they note that relator's records do not associate charges for computerized research, copying, freight, and courier services, with any particular subject matter. Second, and relatedly, many of these charges do not correspond to attorneys' time entries. In theory, one could look to an attorney's time entry for the day the cost was incurred to determine the subject matter of his research. But in several instances, relator has not billed any time, or time on the relevant days, for the attorney who conducted the research. (See, e.g., Ex. C-2 to Bell Decl., Ex. 2 to [930], at 2 ($55.88 Westlaw research charge for Sam Dickson on June 29, 1995); Ex. E-2 to Bell Decl., Ex. 2 to [930], at 11 ($633.00 Westlaw research charge for Michael Gottlieb on April 23, 2006).) Because these charges are so vaguely described, defendants argue, the Court cannot meaningfully assess whether they were "necessarily incurred" in pursuing this litigation. See 31 U.S.C. § 3730(d)(1) (2008).
Relator defends his time entries in three ways: (1) as a matter of standard practice, law firms charge their clients for research and photocopies without identifying, or even keeping track of, their subject matter; (2) keeping more detailed records would be "unduly cumbersome and [would] waste valuable attorney time"; and (3) the discrepancies between research charges and time records stem from Bell's voluntary exclusions and from simple imprecision. (See Reply to BHIC and HUK's Opp'n [960] at 23-24.)
This last defense proves most compelling. Bell's original declaration explained that he had excluded time for twelve lawyers and six paralegals from Wiley Rein, and 34 lawyers and 27 paralegals from Wilmer Hale, "to avoid litigation over the reasonableness of [the firms'] hours." (Bell Decl. ¶¶ 105, 112, Ex. 2 to [930].) He did not, however, pledge that he had omitted any charges for expenses they incurred, so the presence of charges by mystery researchers is perfectly explicable. More broadly, lawyers regularly use research tools to perform substantive tasks, and some might reasonably have listed only the broader task, such as drafting a motion, without itemizing the computer and print-resource research, writing, and editing which that task entailed. Hence, the discrepancies defendants cite do not render counsel's expenses unreasonable.
Relator's other two justifications, however, lack equal logical force. Attorney declarant Davidson insists "[i]t is not customary to provide the details concerning every item of expense in a major litigation," nor "to identify each piece of paper copied." (Davidson Supplemental Decl. ¶ 39, Ex. 2 to Reply to HII's Opp'n [957].) Requiring a fee petitioner to identify each sheet of paper copied would, as relator suggests, be "unduly cumbersome." But the Court does not believe it would "waste valuable [] time" to briefly indicate that the copied documents were, for example, "motions in limine," "exhibits," or "research memos." The same logic applies to research charges. Some substantive information would permit the Court to ascertain that these expenses were "necessarily incurred." See 31 U.S.C. § 3730(d)(1) (2008). Relator's counsel's records list only "duplicating" or "photocopyDCfor [date]," followed by the number of pages, or "computerized research Westlaw," followed by the researcher's name and the date. (See generally Ex. E-2 to Bell Decl., Ex. 2 to [930].) To, "find" that such vaguely described charges "were necessarily incurred," this Court would have to function as a rubber stamp. This, it will not do.[87]
This Court imposed a ten percent across-the-board reduction on relator's billed hours due to generic and ambiguous narrative descriptions. See supra part III.B.2.a.i. Vague entries are scattered throughout relator's time records, but in their expense records, such entries are downright ubiquitous. Accordingly, the Court concludes a forty percent acrossthe-board reduction in compensable expenses is appropriate.
Relator seeks $511,723.06 in litigation expenses. (See Bell Supplemental Decl. ¶¶ 26-28, Ex. 1 to Reply to HII's Opp'n [957]). Subtracting non-compensable charges from this total, and accounting for the acknowledged duplication with relator's bill of costs, see supra note 17, leaves $478,375.87. Applying the forty percent wholesale reduction brings relator's total compensable expenses to $287,025.52.

CONCLUSION
For the reasons set forth above, the Court shall grant in part and deny in part relator's motion for attorneys' fees, costs, and expenses [930]. Pursuant to 31 U.S.C. section 3730(d)(1), the Court shall order defendants BHIC, HUK, Bilhar, HII, and HC to pay relator $7,245,169.07 in reasonable attorneys' fees, and $287,025.52 in reasonable expenses, which this Court finds were necessarily incurredin total, $7,532,194.59.
Further, the Court shall grant plaintiffs' bills of costs [928, 929]. Pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Civil Rule 54. 1, the Court shall direct the Clerk to tax $54,437.87 in costs to all defendants, including Anderson, on the United States' behalf. It shall further direct the Clerk to tax $31,973.96 to defendants BHIC, HUK, Bilhar, HII, and HC on relator's behalf.
A separate order shall issue this date.

ORDER
The Court has considered plaintiffs' bills of costs [928, 929, 933], relator's motion for attorneys' fees, costs, and expenses [930], the entire record herein, and the applicable law. For the reasons set forth in the accompanying memorandum opinion, it is hereby:
ORDERED that the United States' initial and supplemental bills of costs [928, 933] are GRANTED. Pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Civil Rule 54. 1, the Clerk is directed to tax $54,437.87 in costs to all defendants. It is further
ORDERED that relator's bill of costs [929] is GRANTED. The Clerk is directed to tax $31,973.96 to defendants BHIC, HUK, Bilhar, HII, and HC. It is further
ORDERED that relator's motion [930] is GRANTED in part and DENIED in part. Pursuant to 31 U.S.C. section 3730(d)(1), defendants BHIC, HUK, Bilhar, HII, and HC shall pay relator $7,245,169.07 in reasonable attorneys' fees, and $287,025.52 in reasonable expenses, which this Court finds were necessarily incurredin total, $7,532,194.59.
SO ORDERED.

APPENDIX I
The following table lists the billing rates applied in calculating the lodestar, per the discussion in part III.A, supra.

------------------------------------------------------------------------------------------------------
 Hourly
 Name Firm Rate Source
------------------------------------------------------------------------------------------------------
Yaa A. Apori Wilmer Hale $485 Bell Decl. ¶ 108, Ex. 2 to [930]
------------------------------------------------------------------------------------------------------
Matthew Baumgartner Wilmer Hale $350 Bell Decl. ¶ 108, Ex. 2 to [930]
------------------------------------------------------------------------------------------------------
Ashley Baynham Wilmer Hale $350 Bell Decl. ¶ 108, Ex. 2 to [930]
------------------------------------------------------------------------------------------------------
Robert B. Bell Wilmer Hale $650 Bell Decl. ¶ 108, Ex. 2 to [930]
------------------------------------------------------------------------------------------------------
David Bowsher Wilmer Hale $485 Bell Decl. ¶ 108, Ex. 2 to [930]
------------------------------------------------------------------------------------------------------
Monya M. Bunch Wilmer Hale $350 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Mary Beth Caswell Wilmer Hale $210 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Jonathan Cedarbaum Wilmer Hale $495 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Annie L. Chelovitz Wiley Rein $125 USAO Laffey Matrix 2007-08[88]
-------------------------------------------------------------------------------------------------------
Robert Cultice Wilmer Hale $625 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Michael Gottlieb Wilmer Hale $385 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Keven C. Heffel Wilmer Hale $315 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Monika Moore Wilmer Hale $385 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Allison F. Murphy Wilmer Hale $275 Bell Decl. ¶ 108, Ex. 2 to [930]

-------------------------------------------------------------------------------------------------------
Jennifer M. O'Connor Wilmer Hale $510 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
F.H. Quaynor Wiley Rein $125 USAO Laffey Matrix 2007-08
-------------------------------------------------------------------------------------------------------
Gregory Reece Wilmer Hale $385 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Colin Rushing Wilmer Hale $485 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Howard Shapiro Wilmer Hale $750 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Milton R. Shook Wilmer Hale $210 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Stephen T. Smith Wilmer Hale $385 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Stanley R. Soya Wiley Rein $440 USAO Laffey Matrix 2007-08
-------------------------------------------------------------------------------------------------------
Michael L. Sturm Wiley Rein $495 Bell Decl. ¶ 104, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Laura K. Terry Wilmer Hale $485 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Nancy Tillotson Wilmer Hale $175 Bell Decl. ¶ 108, Ex. 2 to [930]
-------------------------------------------------------------------------------------------------------
Luis de la Torre Wiley Rein $390 USAO Laffey Matrix 2007-08
-------------------------------------------------------------------------------------------------------
Chris R. Yukins Wiley Rein $390 USAO Laffey Matrix 2007-08
--------------------------------------------------------------------------------------------------------

APPENDIX II
The tables below include all time entries from which the Court has deducted specific amounts of time spent on noncompensable tasks, as discussed in part III.B.1, supra. The far right column lists the reason for each reduction and its sourcethat is, whether the particular number of hours deducted was proposed by Bell, in the attachments to his supplemental declaration, or calculated by the Court. For certain travel-related reductions, the Court has applied Bell's estimates for travel to or from a particular city to entries for which Bell did not propose any reduction; for these entries, the source is listed as "Court/Bell." Finally, to the extent possible, the Court has attempted to highlight the non-compensable tasks listed in the "Narrative" column in boldface type.

A. Wiley Rein
 Date Attorney Billed Net Narrative Reduction Reason for
 Hours Hours Reduction
 (Source)
 06/16/1995 RBB 5.00 3.00 Review and revise complaint; meet with Mr. 2.00 Fee Agreement
 Soya re strategy; meet with team to review (Bell)
 and assign tasks; review and revise draft
 disclosure statement; revise fee agreement.

06/23/1995 LD 7.25 6.25 Review and edit latest versions complaint 1.00 Relator's Share
 and disclosure statement; research issue of (Court)
 relator's entitlement to share of recovery
 from defendant not named in relator's
 complaint; research issue of discoverability
 of disclosure statement; draft memo
 regarding these two issues; review messages
 from Mr. Yukins regarding business done by
 the various defendants in Washington, D.C.;
 review monograph regarding causes of action
 by companies being investigated or charged
 with fraud and discuss with Mr. Yukins;
 discuss complaint, disclosure statement, and
 jurisdictional issue with Mr. Bell, Mr. Sturm,
 and Mr. Yukins.
 06/24/1995 RBB 0.25 0.00 Read memorandum from de la Torre 0.25 Relator's Share
 on whether relator can be awarded part of (Bell)
 recovery from a defendant not initially
 named in relators complaint.

06/25/1995 LD 8.25 7.25 Draft alphabetical list of relevant persons and 1.00 Fee Agreement
 entities; prepare chart showing profits on (Bell)
 international contracts of Jones Construction;
 review documents and information furnished
 by Mr. Miller for purposes of editing latest
 draft of complaint and disclosure statement
 and determining which exhibits to use for
 disclosure statement; leave messages for Mr.
 Sturm and Mr. Yukins regarding revisions to
 the disclosure statement; review proposed
 retention letter and correspondence with
 Mr. Miller
 06/28/1995 LD 5.50 5.25 Review disclosure statement and exhibits 0.25 Employment
 thereto for accuracy of citation to exhibits; (Court)
 edit exhibit list; draft memo regarding
 proposed edits to complaint and disclosure
 statement; discuss finalizing and serving the
 complaint and disclosure statement, including
 possible counterclaims and privilege issues
 regarding exhibits, with Mr. Bell and Mr.
 Sturm; review recent False Claims Act
 cases involving counterclaims; review
 Federal Rules, local court rules, and confirm
 with clerks office information regarding
 forms, procedure, and fee required for filing
 complaint under seal.

06/29/1995 RBB 3.00 2.75 Prepare for meeting and meeting with Mr. 0.25 Immunity
 Klein and Mr. Spratling (DOJ); draft letter (Court)
 to Mr. Klein and letter to Mr. Hertz
 06/29/1995 MLS 2.50 2.25 Meeting at Antitrust Division; preparation 0.25 Immunity
 for same; telephone conference with Mr. (Court)
 Miller re same.
 07/07/1995 RBB 4.00 0.00 Review memorandum from Mr. Lab on 4.00 Employment
 counterclaims in qui tam cases and read (Court)
 cases cited therein; review memorandum
 from Ms. Ben-David on possible common
 law claims J.A. Jones, Inc. might seek to
 assert against Mr. Miller; meet with Mr.
 Luh and Ms. Ben-David.
 07/20/1995 SRS 0.25 0.15 Telephone conference with Mr. Bell re 0.10 Employment
 possible Government use of covert (Court)
 investigative techniques in connection with
 anti-trust investigations and advice to Mr.
 Miller re possible questions from corporate
 management once the investigation
 becomes public.
 08/03/1995 RBB 9.00 8.00 Meet with Mr. Miller and Mr. Sturm; all day 1.00 Immunity
 meeting at DOJ with Messrs. Dillon, Kindred, (Court)
 Morgan, and Ms. Mark; review leniency
 letter.
 08/03/1995 MLS 9.00 8.00 Meeting with Mr. Miller; meeting at DOJ; 1.00 Immunity
 review and analyze issues re outcome of (Court)
 same.

08/04/1995 RBB 0.75 0.25 Draft letter to Mr. Spratling; telephone call 0.50 Immunity
 with Mr. Miller re yesterday's meeting (Court
 08/04/1995 LD 0.25 0.15 Review and file correspondence regarding 0.10 Immunity
 Antitrust Division's investigation to date and (Court)
 grant of leniency; review complaint and
 disclosure statement.
 08/29/1995 RBB 8.00 6.50 Review notes of prior meetings with DOJ: 1.50 Travel
 travel to Charlotte; meet with Mr. Miller; (Court/Bell)
 meet with DOJ
 08/29/1995 MLS 8.00 6.50 Prepare for and meet with Messrs. Miller, 1.50 Travel
 Dillon, and Kindled; prepare Mr. Miller for (Court/Bell)
 meeting; travel to Charlotte for meeting
 09/18/1995 MLS 0.75 0.00 Review and analyze issues re relators 0.75 Relator's Share
 entitlement to portion of criminal fine; (Bell)
 conferences with Ms. Faunce re same.
 09/19/1995 RBB 9.00 7.50 Travel to Charlotte; review memorandum 1.50 Travel (Bell)
 describing previous meeting; meet with Mr.
 Sturm; meet with Messrs. Dillon, Miller and
 Sturm, and Ms. Mueller; post-mortem with
 Mr. Miller, post-mortem with Mr. Sturm
 09/19/1995 MLS 8.50 7.00 Meeting with FBI, US Attorney's Office and 1.50 Travel (Bell)
 DOJ in Charlotte; prepare for same; travel to
 Charlotte for same.

09/20/1995 RBB 9.00 7.50 Meet with Mr. Dillon; meet with Messrs. 1.50 Travel (Bell)
 Miller and Dillon and Ms. Mueller, travel.
 09/20/1995 MLS 9.50 8.00 Meetings in Charlotte with DOJ and FBI; 1.50 Travel (Bell)
 lunch with Mr. Dillon; review and analyze
 complaint against Jones, et al.; return travel
 from Charlotte
 10/17/1995 RBB 13.00 9.00 Travel to and from Atlanta; meet with Mr. 4.00 Travel (Bell)
 Miller; meet with Messrs. Dillon, Kindred,
 and Miller; conference with Mr. Sturm
 10/17/1995 MLS 12.50 8.50 Prepare for meeting with Messrs. Dillon, 4.00 Travel (Bell)
 Miller, et al.; travel to Atlanta for meeting;
 meeting in Atlanta re document review;
 return travel from Atlanta
 11/07/1995 RBB 10.50 9.00 Review documents sent to me by Mr. Miller; 1.50 Travel (Bell)
 prepare exhibits to submit to the government;
 travel to Charlotte; meet with Messrs.
 Miller, Sturm, Dillon, Kindred, and Ms.
 Mueller; meet with Messrs. Miller and Sturm
 11/07/1995 MLS 8.50 7.00 Prepare for meeting and meet with Messrs 1.50 Travel (Bell)
 Miller, Dillon, and Kindred and Ms. Mueller;
 travel to Charlotte for same; conference
 with Mr. Bell re outcome of meeting

11/08/1995 RBB 4.00 2.50 Breakfast meeting with Messrs. Sturm, 1.50 Travel (Bell)
 Dillon, and Kindred; travel to Washington;
 attempt to reach Mr. Miller; meet with Mr.
 Sturm
 11/08/1995 MLS 4.50 3.00 Meeting with Messrs. Dillon and Kindred re 1.50 Travel (Bell)
 strategy; return travel from Charlotte;
 conference with Mr. Bell re status and
 strategy.
 11/09/1995 MLS 1.00 0.75 Telephone conference with Mr. Miller re 0.25 Relator's Share
 issues raised by DOJ; conference with Mr. (Court)
 Bell re same; review and analyze
 memorandum re qui tam awards
 01/14/1996 RBB 0.75 0.00 Telecon Rick Miller re: strategy 0.75 Employment
 concerning possible interviews by company (Court)
 lawyers
 01/17/1996 RBB 2.75 0.00 Telephone call with Mr. Miller re request 2.75 Employment
 that he be interviewed by outside counsel; (Bell)
 meet with Mr. Sturm re same; separate
 meetings with Messrs. Brunner and
 Gordon, telephone call with Mr. Douglas,
 all re strategy for whether or not to
 cooperate with company investigation
 01/17/1996 MLS 0.50 0.00 Review and analyze issues and response to 0.50 Employment
 interview request; conference with Messrs. (Court)
 Bell and Gordon re same

01/18/1996 RBB 2.00 1.50 Finalize arrangements for meeting with Mr. 0.50 Employment
 Miller; conference with Mr. Soya re status (Court)
 of case; outline alternative strategies
 01/18/1996 SRS 0.50 0.00 Telephone conference with Mr. Bell re 0.50 Employment
 status and consideration of issues in (Bell)
 connection with the company's request to
 interview Mr. Miller
 01/19/1996 RBB 8.00 0.00 Prepare flip charts for meeting with Mr. 8.00 Employment
 Miller; dinner meeting with Messrs. De la (Bell)
 Torre, Gordon, Douglas, and Soya; lengthy
 meeting with Messrs. Miller, Sturm, de la
 Torre, Soya, Gordon, and Douglas to
 discuss whether to submit to interviews
 with company counsel, refuse to be
 interviewed, announce whistleblower
 status, or resign
 01/19/1996 LD 4.75 4.25 Review documents provided by Mr. Miller 0.50 Employment
 and qui tam disclosure statement and meet (Bell)
 with Mr. Miller, Mr. Bell, Mr. Gordon, Mr.
 Soya, and Mr. Douglas to discuss status of
 criminal investigation and its impact on Mr.
 Miller's employment, and handling of
 document issues; discuss status of case with
 Mr. Yukins

01/19/1996 SRS 4.00 0.00 Office conference with Mr. Miller and 4.00 Employment
 Messrs. Bell, Douglas, Gordon and Soya re. (Bell)
 strategy; review and analyze issues re
 same; telephone conference with Mr. Bell
 re same.
 01/23/1996 RBB 0.50 0.00 Telephone call with Mr. miller re 0.50 Employment
 documents and re resignation plans (Bell)
 01/24/1996 RBB 0.25 0.00 Conference with Mr. Sturm re my 0.25 Employment
 discussion last night with Mr. Miller (Court)
 01/24/1996 MLS 0.25 0.00 Conference with Mr. Bell re developments 0.25 Employment
 (Court)
 02/13/1996 RBB 1.00 0.50 Telephone call with Mr. Dillon re status; 0.50 Employment
 telephone call with Mr. Miller re outside (Bell)
 counsel seeking to interview him
 02/14/1996 RBB 4.00 3.00 Meet with Messrs. Sturm, Douglas, 1.00 Employment
 Gordon, and de la Torre re strategy for (Bell)
 Mr. Miller resigning; telephone call with
 Mr. Dillon re grand jury subpoena to be
 served on Mr. Miller; lengthy telephone call
 with Mr. Miller re grand jury subpoena,
 strategy for resigning from company, and
 strategy for dealing with questions from
 lawyers and co-workers

02/14/1996 LD 2.25 0.50 Review notes of January 19 meeting with Mr. 1.75 Employment
 Miller and discuss status of criminal (Bell)
 investigation and of Jones Construction's
 in-house investigation, Mr. Miller's
 response thereto, and the impact of the
 investigations on Mr. Miller's employment
 with Mr. Bell, Mr. Gordon, Mr. Sturm,
 and Mr. Douglass
 02/14/1996 MLS 3.00 2.50 Conference with Bell, et al. re strategy; 0.50 Employment
 review and analyze issues re same; (Court)
 conference with Mr. Bell re issues raised by
 Mr. Dillon; conference with Mr. Bell re
 subpoena
 02/19/1996 RBB 0.75 0.50 Telephone call with Mr. Miller re voice 0.25 Employment
 mail from Mr. Flexner and re grand jury (Court)
 subpoena
 02/20/1996 RBB 3.00 1.00 Telephone call with Mr. Flexner re his 2.00 Employment
 request to interview Mr. Miller; draft (Court)
 memorandum to file; conferences with
 Messrs. Sturm, Gordon, and Douglas re
 options; telephone call with Mr. Miller;
 telephone call with Ms. Mark re extending
 sealed period for qui tam action
 02/20/1996 MLS 1.50 0.75 Telephone conferences with Mr. Bell re 0.75 Employment
 service of subpoena, response to request for (Court)
 interview and strategy

02/21/1996 RBB 2.25 0.00 Meet with Miller team re strategy; draft 2.25 Employment
 scripts for telephone calls with Mr. (Bell)
 Flexner; conference call with Messrs.
 Miller and Sturm; meet with Mr. Brunner
 02/21/1996 LD 3.25 1.25 Research and review recent False Claims Act 2.00 Employment
 decision regarding the qui tam provisions; (Bell)
 review memo to file prepared by Mr. Bell
 regarding Jones Construction's request for
 interview with Mr. Miller; discuss status of
 criminal investigation and of Jones in-house
 investigation and the impact of the
 investigations on Mr. Miller's employment
 with Mr. Bell, Mr. Gordon, Mr. Sturm,
 and Mr. Douglass; discuss status of case
 with Mr. Yukins
 02/21/1996 MLS 1.75 0.75 Telephone conference with Mr. Miller re 1.00 Employment
 developments and strategy; conferences with (Bell)
 Mr. Bell re approach from Jones counsel
 02/22/1996 RBB 4.50 2.00 Telephone calls with Mr. Flexner, Mr. 2.50 Employment
 Dillon, Ms. Mueller, and Mr. Gardner; (Bell)
 conferences with Messrs. Sturm, Douglas,
 and Gordon re strategy; lengthy telephone
 call with Mr. Miller a resignation

02/22/1996 MLS 2.00 0.50 Telephone conference with Ms. Mueller re 1.50 Employment
 progress of investigation; review and (Bell)
 analyze issues re response to request for
 interview; conferences with Mr. Bell re
 same
 02/23/1996 RBB 3.00 2.00 Two telephone calls with Mr. Flexner re 1.00 Employment
 Miller's resignation; telephone call with Ms. (Bell)
 Mueller; telephone calls with Mr. Miller;
 telephone call with Mr. Gordon.
 02/23/1996 LD 2.25 0.00 Review draft letter and talking points 2.25 Employment
 regarding Mr. Miller's resignation (Bell)
 prepared by Mr. Bell; review reference
 materials regarding claims against
 employees for breach of duty of loyalty;
 discuss status of criminal investigation and
 of Jones in-house investigation, the impact
 of the investigations on Mr. Miller's
 employment, and potential resignation of
 Mr. Miller, with Mr. Bell, Mr. Gordon,
 Mr. Walker, Mr. Sturm, and Mr.
 Douglass.

02/23/1996 MLS 4.75 0.00 Review and revise resignation script and 4.75 Employment
 letter; conference with Mr. Bell, et al. re (Bell)
 same; telephone conference with Mr. Bell
 re developments; telephone conferences
 with Mr. Miller re resignation; final
 revision of documents; telephone
 conference with Ms. Mueller re resignation
 02/24/1996 LD 7.75 0.00 Research, review, and take notes on case 7.75 Employment
 law and journal articles regarding breach (Court)
 of duty of loyalty under North Carolina
 law
 02/26/1996 RBB 5.50 5.00 Telephone call with Mr. Dillon and Mr. 0.50 Employment
 Gordon re Miller's resignation and re his (Bell)
 discussion with Mr. Corley; telephone call
 with Mr. Miller; conference call with Messrs.
 Miller, Dillon, and Gordon re knowledge of
 four witnesses government will interview this
 week; draft memo to file
 02/26/1996 MLS 0.50 0.00 Telephone conference with Mr. Bell re 0.50 Employment
 resignation issues and developments (Bell)
 02/27/1996 MLS 0.50 0.00 Telephone conference with Mr. Miller re 0.50 Employment
 developments; review and analyze draft (Bell)
 file memorandum re telephone conference
 with Mr. Flexner; telephone conference
 with Mr. Bell re status

02/28/1996 RBB 3.00 1.50 Telephone call with Mr. Ashcraft (attorney 1.50 Employment
 for Fritz Beseecher); telephone call with Mr. (Bell)
 Miller re status; telephone call with Mr.
 Flexner; draft memo to file re conversation
 with Mr. Flexner; telephone call with Mr.
 Miller re Flexner conversation
 02/29/1996 RBB 4.00 3.50 Telephone call with Mr. Dillon; draft letter 0.50 Employment
 to Messrs. Flexner and Burdette; telephone (Court)
 call with Mr. Burdette re Miller talking to
 Mr. Bowden about issues raised in
 February 23 letter; telephone call with Mr.
 Miller re meeting with Mr. Bowden;
 conferences with Messrs. Sturm and Gordon
 02/29/1996 LD 0.50 0.00 Review and take notes on memo to file 0.50 Employment
 prepared by Mr. Bell concerning Mr. (Bell)
 Flexner's requests for Information
 regarding any participation by Mr. Miller
 in government's investigation and Mr.
 Miller's resignation
 02/29/1996 MLS 1.25 0.00 Review and analyze issues re resignation; 1.25 Employment
 telephone conferences with Mr. Miller re (Bell)
 same; review and analyze memorandum re
 telephone conferences with Mr. Flexner;
 conference with Mr. Bell re same

03/01/1996 RBB 2.00 1.00 Telephone call with Mr. Miller re his 1.00 Employment
 meeting with Mr. Bowden; telephone calls (Court)
 with Ms. Mueller and Mr. Gordon; telephone
 call with Mr. Miller re grand jury appearance
 03/08/1996 RBB 1.00 0.00 Telephone call with Mr. Miller re strategy 1.00 Employment
 for his meetings today with Messrs. (Bell)
 Bowden and Davidson; telephone calls
 with Mr. Miller re outcome of his meeting
 with Mr. Bowden and re not saying
 anything to bankers that could harm
 Jones' business relationships
 03/12/1996 RBB 1.00 0.50 Telephone call with Mr. Dillon re Miller's 0.50 Employment
 last day; telephone call with Ms. Mueller; (Court
 telephone call with Mr. Miller
 05/31/1996 MLS 0.50 0.00 Review and analyze issues re responses to 0.50 Employment
 inquiries re job departure (Bell)
 06/03/1996 RBB 1.50 0.00 Meet with Mr. Sturm; telephone call with 1.50 Employment
 Mr. Dillon re language to be used by Mr. (Bell)
 Miller; telephone call with Mr. Miller

06/03/1996 MLS 1.25 0.00 Review and analyze issues re responses to 1.25 Employment
 inquiries re job departure; review and (Bell)
 revise memorandum re same; telephone
 conferences with Messrs. Miller and Dillon
 re same and case status
 06/04/1996 RBB 0.75 0.00 Draft letter to Mr. Miller suggesting two 0.75 Employment
 responses to questions about resigning (Bell)
 from prior employment; telephone call
 with Mr. Miller
 06/04/1996 MLS 0.25 0.00 Review and revise letter to Mr. Miller re 0.25 Employment
 job inquiries (Bell)
 09/04/1996 RBB 7.50 6.00 Travel to Charlotte, NC; lunch meeting with 1.50 Travel
 Mr. Miller; meet with Mr. Dillon and Mr. (Court/Bell)
 Gordon to answer their questions and prepare
 for grand jury appearance
 09/05/1996 RBB 8.00 6.50 Breakfast meeting with Mr. Miller re grand 1.50 Travel
 jury testimony; meet with Messrs. Dillon and (Court/Bell)
 Gordon; wait for grand jury appearance;
 travel to D.C.
 02/26/1997 RBB 1.50 1.00 Telephone call with Mr. Miller re 0.50 Employment
 consulting offer from Womble Carlyle; (Court)
 telephone call with Mr. Dillon re additional
 day of testimony and re various document
 issues; conference with Mr. Sturm re strategy

03/04/1997 RBB 13.00 11.50 Travel to Charlotte; meet with Messrs. 1.50 Travel
 Sturm, Dillon, and Baker to prepare for grand (Court/Bell)
 jury appearance; post-meeting conference
 with Mr. Sturm
 03/04/1997 MLS 13.50 12.00 Meeting with Messrs. Miller and Dillon re 1.50 Travel
 grand jury testimony preparation; travel to (Court/Bell)
 Charlotte for same
 03/05/1997 RBB 10.00 8.50 Meet with Messrs. Sturm, Miller, Dillon, and 1.50 Travel (Bell)
 Baker to prepare for grand jury; meet
 privately with Mr. Miller to prepare; confer
 with Mr. Miller during breaks from grand
 jury testimony; meet with Mr. Miller after
 testimony; travel
 03/05/1997 MLS 10.00 8.50 Additional witness preparation; provide 1.50 Travel
 counsel for grand jury testimony; return (Court/Bell)
 travel to Washington
 03/12/1997 RBB 0.25 0.00 Telephone call with Mr. Flexner re his 0.25 Employment
 request to be briefed on Mr. Miller's grand (Bell)
 jury testimony
 07/10/1997 RBB 6.00 4.50 Travel to Charlotte; meet with Mr. Miller; 1.50 Travel
 meet with Messrs. Miller and Dillon to (Court/Bell)
 prepare for grand jury testimony
 07/11/1997 RBB 8.00 6.50 Represent Mr. Miller before grand jury; 1.50 Travel
 return travel (Court/Bell)
 TOTAL 223.55 110.70

B. Wilmer Hale
 Date Attorney Billed Net Hours Narrative Reduction Reason for
 Hours Reduction
 (Source)
 1/20/2000 RBB 2.00 1.00 TELECONS WITH RICK MILLER, BILL DILLON 1.00 Relator's Share
 RE FRUCON SETTLEMENT; JEFF GREEN RE (Bell)
 FRUCON SETTLEMENT; CAROLYN MARK RE
 RELATORS SHARE.
 1/22/2000 RBB 1.00 0.00 BEGIN DRAFTING LETTER TO CAROLYN 1.00 Relator's Share
 MARK RE WHY RELATOR SHOULD (Bell)
 RECEIVE 25% SHARE.
 1/25/2000 RBB 3.00 0.00 DRAFTING LENGTHY LETTER TO CAROLYN 3.00 Relator's Share
 MARK DESCRIBING WHY MILLER SHOULD (Bell)
 RECEIVE 25% SHARE.
 1/26/2000 RBB 0.50 0.00 REVISING LETTER TO CAROLYN MARK; 0.50 Relator's Share
 TELECON WITH RICK MILLER RE SAME. (Bell)
 1/28/2000 RBB 0.40 0.00 TELECON WITH RICK MILLER RE HIS 0.40 Relator's Share
 COMMENTS ON LETTER TO CAROLYN (Bell)
 MARK.
 1/31/2000 RBB 0.20 0.00 TELECON WITH CAROLYN MARK; 0.20 Relator's Share
 FINALIZING LETTER TO CAROLYN MARK. (Bell)
 2/4/2000 RBB 0.20 0.00 TELECON WITH MILLER; SENDING COPY 0.20 Relator's Share
 OF LETTER TO CAROLYN MARK TO JIM (Bell)
 GRIFFIN (ANTITRUST DIVISION).

7/6/2000 RHO 2.00 1.50 TELCON MILLER RE: STATUS AND RE; 0.50 Relator's Share
 EXTENSION OF TIME; LEAVING MESSAGE FOR (Bell)
 MORGAN RE: AGREEMENT TO THREE MONTH
 EXTENSION OF TIME, TELCON DILLON,
 TELCON MARK RE: RELATOR'S SHARE.
 9/20/2000 ROB 0.50 0.00 TELCON CAROLYN MARK RE: RELATOR'S 0.50 Relator's Share
 SHARE; TELCON MILLER RE: SAME. (Bell)
 10/19/2000 RBB 2.50 0.50 MEETING WITH KEITH MORGAN AND 2.00 Relator's Share
 CAROLYN MARK TO DISCUSS RELATOR'S (Bell)
 SHARE; TELCONS RICK. MILLER, BILL DILLON
 AND WALTER KINDRED.
 10/25/2000 RBB 0.30 0.00 TELCON JIM GRIFFIN RE: RELATORS' 0.30 Relator's Share
 SHARE; TELCON FROM KEITH MORGAN (Bell)
 RE: SAME.
 10/26/2000 RBB 0.80 0.00 TELCONS MIKE STURM, BILL DILLON AND 0.80 Relator's Share
 RICK MILLER RE: RELATOR'S SHARE. (Bell)
 10/31/2000 RBB 2.10 0.00 RESEARCH ON RELATORS SHARE AND ON 2.10 Relator's Share
 RELATOR'S AWARD THROUGH AN (Bell)
 ALTERNATE REMEDY; TELCON MILLER.
 11/2/2000 RBB 2.10 0.00 READING CASES ON RELATOR'S SHARE 2.10 Relator's Share
 AND ALTERNATE REMEDIES. (Bell)
 11/6/2000 RBB 2.00 0.00 MEETING WITH KEITH MORGAN AND 2.00 Relator's Share
 CAROLYN MARK RE: RELATOR'S SHARE (Bell)
 AND LITIGATION STRATEGY.

11/7/2000 RBB 1.70 0.00 RESEARCH ON DAMAGES ISSUES; TELCON 1.70 Relator's Share
 RICK MILLER RE; YESTERDAY'S MEETING (Bell)
 WITH DOJ; TELCON MICHAEL STURM.
 11/14/2000 RBB 0.40 0.00 REVIEWING GE CASE AND OUTLINING 0.40 Relator's Share
 ARGUMENT ON RELATOR'S SHARE. (Bell)
 11/17/2000 RBB 1.50 0.50 TELCON RICK MILLER; TELCON CAROLYN 1.00 Relator's Share
 MARK TO NEGOTIATE RELATOR'S SHARE, (Bell)
 TELCON LARRY GONDELMAN.
 11/30/2000 RBB 0.90 0.00 TELCONS KEITH MORGAN, BILL DILLON, 0.90 Relator's Share
 AND RICK MILLER RE: SETTLEMENT ON (Bell)
 RELATOR'S SHARE OF AICI AND B+B
 SETTLEMENTS.
 12/7/2000 RBB 4.30 0.00 REVIEW TIME RECORDS SINCE INCEPTION 4.30 Relator's Share
 OF CASE; DRAFT LETTER TO CAROLYN (Bell)
 MARK RE MILLER'S CONTRIBUTION;
 TELECONS WITH MILLER RE LETTER;
 TELECON WITH MARK.
 12/8/2000 RBB 2.00 0.00 FINAL REVISIONS TO LETTER TO CAROLYN 2.00 Relator's Share
 MARK; SEND LETTER TO MARK; TELECONS (Bell)
 WITH MARK; TELECON WITH MILLER.
 12/11/2000 RBB 0.60 0.00 TELCONS CAROLYN MARK, RICK MILLER 0.60 Relator's Share
 RE: RELATOR'S SHARE. (Bell)

12/12/2000 RBB 1.50 0.00 TELCONS DILLON, KINDRED, GREEN, AND 1.50 Relator's Share
 MILLER RE: B+B SETTLEMENT AND ITS (Bell)
 RELATIONSHIP TO REALTOR'S SHARE.
 12/13/2000 RBB 3.20 2.00 DRAFTING SETTLEMENT AND RELEASE 1.20 Relator's Share
 AMONG B+B, FRUCON AND MILLER; TELCON (Bell)
 JEFF GREEN RE: TERMS OF RELEASE;
 REVIEWING DRAFT AGREEMENT BETWEEN
 DOJ AND MILLER ON RELATOR'S SHARE;
 TELCONS MORGAN AND MARK RE: STATUS
 OF RELATOR'S SHARE APPROVALS, TELCON
 MORGANRE; DAMAGES EXPERT; TELCON
 MILLER.
 12/14/2000 RBB 3.00 2.00 NEGOTIATING TERMS OF B+B RELEASE WITH 1.00 Relator's Share
 JEFF GREEN, REVISING RELEASE, TELCONS (Bell)
 CAROLYN MARK RE: RELATOR'S SHARE;
 TELCON RICK MILLER RE: CONFIRMATION
 OF 22% SHARE; TELCON KEITH MORGAN RE:
 CONSTRUCTION EXPERT.
 12/15/2000 RBB 1.50 1.00 REVISING B+B AGREEMENT; REVIEWING 0.50 Relator's Share
 RELATOR'S SHARE AGREEMENT AND (Bell)
 NEGOTIATING ADDITIONAL LANGUAGE
 WITH CAROLYN MARK; EXECUTING BOTH
 AGREEMENTS; TELCON KEITH MORGAN RE:
 TWO ADDITIONAL EXPERTS; TELCON MILLER
 RE: STATUS.

12/21/2000 RBB 0.20 0.00 TELCON CAROLYN MARK RE: STATUS OF 0.20 Relator's Share
 PAYMENT; LEAVING MESSAGE FOR RICK (Bell)
 MILLER.
 12/29/2000 RBB 0.20 0.00 TELCON RICK MILLER RE: RECEIPT OF 0.20 Relator's Share
 FUNDS (Bell)
 3/16/2001 RBB 4.00 1.00 LEGAL RESEARCH ON ISSUE OF WHETHER 3.00 Relator's Share
 MILLER IS ENTITLED TO SHARE OF (Bell)
 SETTLEMENT PROCEEDS FROM ABB;
 TELCONS WALTER KINDRED AND KEITH
 MORGAN; CONFERENCE RICK MILLER.
 3/17/2001 RBB 2.00 0.00 ADDITIONAL RESEARCH ON MILLER'S 2.00 Relator's Share
 ENTITLEMENT TO ABB SETTLEMENT. (Bell)
 3/18/2001 RBB 3.00 0.00 DRAFTING MEMORANDUM TO FILE ON 3.00 Relator's Share
 MILLER'S ENTITLEMENT TO SHARE OF (Bell)
 ABB SETTLEMENT.
 3/19/2001 RBB 2.50 0.00 REVISING MEMORANDUM ON 2.50 Relator's Share
 ENTITLEMENT TO ABB SETTLEMENT; (Bell)
 DRAFTING LETTER TO MARK AND
 MORGAN RE: ENTITLEMENT; TELCON
 MILLER.
 3/22/2001 RBB 1.30 1.10 MEETING WITH SCOTT HAMMOND (DOJ); 0.20 Solely BLH
 TELCON BRIAN LEVINE (ATTORNEY FOR (Bell)
 HARBERT).
 4/10/2001 RBB 0.70 0.00 TELCON RICK MILLER RE: STATUS OF ABB 0.70 Relator's Share
 SETTLEMENT. (Bell)

4/13/2001 RBB 4.00 0.00 PREPARING FOR MEETING; MEETING WITH 4.00 Relator's Share
 CAROLYN MARK RE: RELATOR'S SHARE OF (Bell)
 ABR SETTLEMENT, TELCONS RICK MILLER,
 TELCON BILL DILLON.
 4/16/2001 RBB 2.00 0.00 RESEARCH ON ARGUMENT THAT RELATOR 2.00 Relator's Share
 IS ENTITLED TO RECOVER ALL DAMAGES (Bell)
 ATTRIBUTABLE TO CONSPIRACY HE
 REVEALED.
 4/18/2001 RBB 3.00 0.00 RESEARCH ON CONSPIRACY LAW, TELCON 3.00 0.20 Solely
 BRYAN LAVINE RE: EXTENSION OF TIME; BLH + 2.80
 RESEARCH ON CONSPIRACY ISSUES; TELCON Relator's Share
 CAROLYN MARK RE: RELATOR'S SHARE. (Bell)
 5/1/2001 RBB 0.40 0.00 TELCON CAROLYN MARK RE: HER 0.40 Relator's Share
 MEETINGS WITH B+B ON DAMAGES AND (Bell)
 RELATOR'S SHARE.
 5/11/2001 RBB 0.50 0.00 TELCON MILLER RE: RELATOR'S SHARE; 0.50 Relator's Share
 TELCON MILLER RE: SAME. (Bell)
 5/14/2001 RBB 0.30 0.00 TELCON CAROLYN MARK RE: RELATOR'S 0.30 Relator's Share
 SHARE. (Bell)
 5/15/2001 RBB 0.30 0.00 TELCON RICK MILLER RE: NEGOTIATING 0.30 Relator's Share
 STRATEGY; LEAVING MESSAGE FOR (Bell)
 CAROLYN MARK.
 5/16/2001 RBB 1.20 0.60 LENGTHY TELCON MARK AND MORGAN 0.60 Relator's Share
 RE; SETTLEMENT STRATEGY AND (Court)
 RELATOR'S SHARE; TELCON MILLER.

7/27/2001 RBB 4.00 3.50 MEETING WITH JIM GRIFFITH, SCOTT 0.50 Relater's Share
 HAMMOND, BILL DILLON (BY PHONE) AND (Court)
 JOHN ORR (BY PHONE); TELCON CAORLYN
 MARK RE: MOTION FOR STAY AND ABB
 SHARE; LENGTHY TELCON RICK MILLER RE:
 ABB STRATEGY.
 8/28/2001 RBB 5.70 0.70 TELCON RICK MILLER; DRAFTING 5.00 Relator's Share
 PRESENTATION ON SHARE OF ABB (Court)
 SETTLEMENT.
 8/29/2001 RBB 7.10 0.00 REVISING PRESENTATION TO CIVIL 7.10 Relates Share
 DIVISION ON ABB; REVIEWING CASES AND (Court)
 ADDING NEW SECTIONS TO
 PRESENTATION.
 9/10/2001 RBB 3.00 2.50 TELCON CAROLYN MARK RE: MOVING FOR 0.50 Relator's Share
 STAY, JOINT DEFENSE AGREEMENT, (Bell)
 NEGOTIATIONS WITH HOLZMANN, AND
 RELATOR'S SHARE; REVIEWING CASE CITED
 BY MARK (SEAL V. SEAL); TELCON RICK
 MILLER.
 9/11/2001 RBB 2.00 0.00 REVIEWING SEAL V. SEAL; RESEARCH ON 2.00 Relator's Share
 JOINT AND SEVERAL LIABILITY, (Court)
 PREPARING NEW SLIDES FOR
 PRESENTATION.
 9/12/2001 RBB 2.50 0.00 REVISING AND ADDING TO PRESENTATION. 2.50 Relator's Share
 (Court)

9/13/2001 RBB 0.60 0.00 TELCON CAROLYN MARK RE: STAY, 0.60 Relator's Share
 HOLZMANN NEGOTIATIONS, AND MEETING (Bell)
 WITH HERTZ ON RELATOR'S SHARE;
 REVISING RELATOR'S SHARE PRESENTATION.
 11/1/2001 RBB 3.10 0.60 TELCON MICHAEL HERTZ RE: ABB 2.50 Relator's Share
 RELATOR'S SHARE; TELCON BILL DILLON (Bell)
 RE: TRIAL STATUS AND RE: RESPONSES TO
 MOTIONS; CONFERENCE ROGER WITTEN,
 BEGINNING OUTLINE OF LETTER TO
 HERTZ, ET AL.
 11/2/2001 RBB 0.60 0.00 TELCON BILL DILLON; TELCON RICK 0.60 Relator's Share
 MILLER RE: ABB RELATORS SHARE. (Bell)
 11/14/2001 RBB 0.40 0.10 TELECON CAROLYN MARK RE COMMON 0.30 Relator's Share
 INTEREST AGREEMENT AND RE (Bell)
 AGREEMENT THAT GOVERNMENT WILL
 NOT OBJECT TO POSTPONING ABB
 RELATOR'S SHARE MOTION UNTIL AFTER
 CRIMINAL TRIAL; TELECON MILLER.

12/7/2001 RBB 3.10 1.60 DRAFTING AND FINALIZING LETTER TO 1.50 Relator's Share
 CAROLYN MARK MEMORIALIZING (Bell)
 CONVERSATION THAT GOVERNMENT WILL
 NOT OBJECT TO TIMING OF MOTION TO
 RECOVER RELATOR'S SHARE FROM ABB
 SETTLEMENT IF MOTION IS FILED AFTER
 CRIMINAL TRIAL; REVIEWING PROPOSED
 COMMON INTEREST AGREEMENT; DRAFTING
 LETTER TO CAROLYN MARK RE: REVISIONS
 NEEDED IN COMMON INTEREST AGREEMENT,

8/14/2002 RBB 7.90 3.70 PREPARING FOR MEETING WITH STEVE 4.20 Relator's Share
 ALTMAN TO NEGOTIATE RELATOR'S (Bell)
 SHARE BY REVIEWING PRESENTATION ON
 ABB RELATOR'S SHARE AND LETTERS
 SENT TO CAROLYN MARK RE: RELATOR'S
 SHARE (1.7); MEETING WITH STEVE
 ALTMAN AND EILEEN ZIMMER TO REVIEW
 DOCUMENTS ABOUT JONES' FINANCES AND
 DISCUSS REASONABLENESS OF
 SETTLEMENT (2.1); SEPARATE MEETING
 WITH ALTMAN TO NEGOTIATE RELATOR'S
 SHARE (.4); REVIEWING TIME ENTRIES;
 DRAFTING LETTER TO ALAN GOURLEY RE:
 HOURLY RATES; DRAFTING
 CONFIDENTIALITY AGREEMENT;
 ASSEMBLING PACKAGE FOR GOURLEY TO
 REVIEW AND MEETING WITH VERONICA
 KAYNE RE: SAME.

8/17/2002 RBB 5.90 4.90 REVIEWING CASES ON APPORTIONMENT OF 1.00 Relator's Share
 FEES AMONG MULTIPLE DEFENDANTS; (Bell)
 TELCON MILLER RE: SETTLEMENT
 STRATEGY; OUTLINING REASONING BEHIND
 $315,000 COUNTEROFFER; LENGTHY TELCON
 GOURLEY RE: ATTORNEYS FEES; FAXING
 DRAFT AGREEMENTS TO MILLER; TELCON
 MILLER RE: DRAFT AGREEMENTS; TELCON
 MILLER RE: $180,000 COUNTEROFFER FROM
 GOURLEY; TELCON GOURLEY RE: $275.000
 MILLER COUNTEROFFER; REVISING DRAFT
 RELATOR'S SHARE AGREEMENT; DRAFTING
 ATTORNEYS FEE SETTLEMENT AGREEMENT
 AMONG MILLER, JONES AND HOLZMANN.

8/19/2002 RBB 3.70 2.00 REVIEWING JONES' DRAFT OF SETTLEMENT 1.70 Relator's Share
 AGREEMENT ON ATTORNEYS FEES; REVISING (Court)
 DRAFT; TELCON GOURLEY TO NEGOTIATE
 CHANGES; REVIEWING REVISED DOCUMENT
 INCORPORATING NEGOTIATED CHANGES;
 REVIEWING STEVE ALTMAN'S REVISIONS
 TO MY CHANGES TO RELATOR'S SHARE
 AGREEMENT; REVISING RELATOR'S SHARE
 AGREEMENT; TELCONS ALTMAN AND
 CAROLYN MARK TO NEGOTIATE
 CHANGES; REVIEWING DOCUMENT WITH
 NEGOTIATED CHANGES; REVIEWING
 THREE-WAY SETTLEMENT AGREEMENT;
 MEETING AT DOJ WITH ALTMAN, MARK,
 MORGAN AND GOURLEY TO EXECUTE ALL
 AGREEMENTS, TELCON MILLER RE: FINAL
 TERMS OF DOCUMENTS.
 11/13/2002 YAA 1.50 0.00 REVIEW PLEADINGS. 1.50 Transitioning
 onto case
 (Bell)
 11/14/2002 YAA 4.20 0.00 REVIEW NOTES AND PLEADINGS; DRAFT 4.20 Transitioning
 QUESTIONS FOR BELL onto case
 (Bell)

11/15/2002 YAA 5.40 0.00 REVIEW NOTES AND PLEADINGS; DRAFT 5.40 Transitioning
 QUESTIONS FOR BELL onto case
 (Bell)
 11/22/2002 YAA 3.10 0.00 REVIEW FALSE CLAIMS ACT TREATISE RE 3.10 Transitioning
 PROCEDURE; REVIEW FRCP 9(B) STANDARD; onto case
 REVIEW WRIGHT AND MILLER DISCUSSION (Bell)
 OF 9(B) CLAIMS AND NOTED CASES
 11/23/2002 YAA 2.20 0.00 REVIEW TREATISE ON FALSE CLAIMS ACT; 2.20 Transitioning
 REVIEW WRIGHT AND MILLER NOTES ON onto case
 FRCP 12; REVIEW CITED CASES (Bell)
 5/23/2006 RBB 3.90 3.60 REVIEW CURRENT DRAFT OF 0.30 Relator's Share
 INTERROGATORY ANSWERS; MEETING WITH (Court)
 O'CONNOR, TERRY, REECE, AND MILLER (BY
 PHONE) TO REVIEW INTERROGATORY
 ANSWERS; VOICEMAIL FROM SAUNTRY RE:
 SERVICE ON BILHAR AND EXTENSION OF
 TIME; TELECON FROM MILLER RE: LETTER
 TO DOJ SEEKING SHARE OF CRIMINAL
 PROCEEDS; TELECON SAUNTRY RE: SERVICE
 ON BILHAR AND EXTENSION OF TIME;
 CONFERENCES O'CONNOR RE: DISCOVERY OF
 ISSUES.

7/5/2006 MMB 11.80 0.00 RESEARCH RE RELEVANCE OF BILL HARBERT 11.80 Solely BLH
 BANK RECORDS TO PROVING CONSPIRACY, (Bell)
 AND TO ESTABLISHING ABILITY TO SATISFY
 DAMAGES; DRAFT MOTION TO COMPEL
 RELATED INTERROGATORY ANSWER AND
 DOCUMENT PRODUCTION; CONFER WITH MR.
 GOTTLIEB AND G. REECE RE TASKS
 RELATING TO DRAFTING MOTIONS TO
 COMPEL.
 7/24/2006 MMB 13.80 11.80 TRAVEL TO ATLANTA; REVIEW DOJ 2.00 Travel
 ANTITRUST DOCS; PREP SPREADSHEET FOR (Court/Bell)
 DOCS REVIEWED; CONFER WITH DOJ RE
 STRATEGY, REVIEW, SIGNIFICANT DOCS;
 CONFER WITH MS. O'CONNOR, MR.
 CEDARBAUM, G. REECE RE REVIEW PROCESS.
 7/24/2006 JC 10.80 6.00 TRAVEL TO AND FROM ATLANTA (4.8); 4.80 Travel (Bell
 REVIEW DOCUMENT INDEXES; REVIEW
 DOCUMENTS (6.0)

7/24/2006 GR 13.50 11.50 TRAVEL TO ATLANTA: REVIEW DOCUMENTS 2.00 Travel (Bell)
 AT DOJ ANTITRUST DIVISION OFFICES IN
 ATLANTA; DISCUSS COPYING SERVICE JOB
 WITH VENDOR; PREPARE SPREADSHEET FOR
 KEEPING TRACK OF DOCUMENT REVIEW
 PROGRESS; INPUT RESULTS OF DAY'S
 DOCUMENT REVIEW PROGRESS INTO INDEX.
 7/27/2006 MMB 15.70 13.70 REVIEW DOJ ANTITRUST DOCS; UPDATE 2.00 Travel (Bell)
 SPREADSHEET FOR DOCS REVIEWED;
 CONFER WITH MS. O'CONNOR, MR.
 CEDARBAUM, G. REECE RE REVIEW
 PROCESS; TRAVEL BACK TO D.C.
 7/27/2006 GR 15.70 13.70 REVIEW DOCUMENTS AT DOJ ANTITRUST 2.00 Travel (Hell)
 DIVISION OFFICES IN ATLANTA; CONFER
 WITH MS. O'CONNOR AND MR. CEDARBAUM
 RE: PROGRESS OF DOCUMENT REVIEW;
 UPDATE DOCUMENT REVIEW TRACKING
 SPREADSHEET; TRAVEL BACK TO
 WASHINGTON, D.C. FROM ATLANTA.

7/28/2006 JC 4.20 2.20 MEET WITH MS. O'CONNOR RE: OVERALL 2.00 Travel (Bell)
 PLANNING; TELEPHONE CALL WITH BELL RE:
 CONFERENCE CALL WITH DILLON;
 CONFERENCE CALL WITH MS. O'CONNOR
 AND MS. MARK RE: COORDINATION; EMAIL
 EXCHANGES RE: DISCOVERY; BILHAR
 MOTION FOR JUDGMENT ON THE PLEADINGS;
 TRIP TO BIRMINGHAM; DRAFT OUTLINE
 FOR CONFERENCE CALL WITH DILLON;
 DRAFT "MAP" OF CASE
 8/1/2006 NT 0.50 0.00 REVIEW TEAM ELECTRONIC 0.50 Solely BLH
 CORRESPONDENCE; TELEPHONE (Bell)
 CONFERENCE FROM/TO MS. BUNCH/MS.
 TILLOTSON REGARDING RESEARCH OF
 DEADLINE TO RESPOND TO BILL HARBERT
 PETITION TO UNSEAL GRAND JURY
 TESTIMONY FILED WITH ELEVENTH CIRCUIT;
 REVIEW ELEVENTH CIRCUIT COURT WEBSITE
 REGARDING SAME
 8/8/2006 JC 7.00 5.00 REVIEW AICI DOCUMENTS AT AKIN GUMP; 2.00 Travel
 EMAIL EXCHANGES RE: VARIOUS (Court/Bell)
 DOCUMENTSS, WITNESS CONTACT INFO;
 MEET WITH MR. REECE RE: DRAFT
 OPPOSITION TO BILHAR MOTION FOR
 JUDGMENT ON PLEADINGS; TEAM MEETING;
 TRAVEL TO BIRMINGHAM FOR HC/HII
 DOCUMENT REVIEW

8/8/2006 MG 17.00 14.50 PREPARE FOR AICI DOCUMENT REVIEW; 2.50 2.00 Travel
 REVIEW AICI DOCUMENTS AT AKIN GUMP; (Bell) + 0.50
 TRAVEL FROM AKIN GUMP TO WILMER; Local Travel
 ATTEND WEEKLY MILLER MEETING; FINISH (Court)
 DRAFTING FORMER TESTIMONY MEMO; FAX
 MEMO TO BIRMINGHAM; TRAVEL TO
 NATIONAL AIRPORT; TRAVEL DCA  CLT 
 BHM; REVISE FORMER TESTIMONY MEMO;
 REVIEW MASTER DOCUMENT MEMO TO
 PREPARE FOR HARBERT DOC REVIEW;
 TRAVEL FROM BHM AIRPORT TO
 SHERATON; PRINT AND SEND FORMER
 TESTIMONY MEMO TO MR. CEDARBAUM.
 8/10/2006 JC 6.50 4.50 REVIEW HC/HII DOCUMENTS; RETURN 2.00 Travel (Bell)
 TRAVEL FROM BIRMINGHAM; REVIEW
 REVISED OPPOSITION TO BILHAR MOTION
 FOR JUDGMENT ON THE PLEADINGS
 8/10/2006 MG 11.20 8.70 COMPLETE HARBERT DOCUMENT REVIEW; 2.50 2.00 Travel
 TRAVEL TO AIRPORT; TRAVEL FROM BHM (Bell) + 0.50
 TO CLT TO DCA; TRAVEL FROM AIRPORT Local Travel
 HOME; WHILE TRAVELING, REVIEW, CLEAN (Court)
 UP, REVISE NOTES / REPORT FROM
 DOCUMENT REVIEW; RESEARCH
 ADDITIONAL CASE LAW ON
 AUTHENTICATION OF PRIOR TRIAL EXHIBITS
 QUESTION.

8/25/2006 MG 11.50 10.50 PREPARE FOR AICI DEPOSITION; TRAVEL TO 1.00 Local Tray
 AND FROM AND ATTEND AICI DEPOSITION; (Bell)
 DISCUSS DEPOSITION WITH MR. CEDARBAUM
 AND MS. O'CONNOR; PROOFREAD REVISED
 MOTION FOR PROTECTIVE ORDER REPLY;
 ASSIST IN FILING OF REPLY; WRITE COVER
 LETTER AND SEND COPIES OF RECENT
 FILINGS TO COMPLY WITH SERVICE
 REQUIREMENTS
 9/14/2006 MMB 18.70 14.00 TRAVEL TO ATLANTA; REVIEW BHIC 4.00 Travel
 DOCUMENTS; TRAVEL TO DC; REVIEW (Court/Bell)
 CONTRACT 29 DOCUMENTS AND OUTLINE
 FOR MEETING WITH GORDON LANG
 9/14/2006 JC 11.50 9.50 TRAVEL TO ATLANTA TO REVIEW 2.00 Travel
 DOCUMENTS AT TROUTMAN SANDERS; (Court/Bell)
 REVIEW DOCUMENTS; CONE CALL WITH MS.
 O'CONNOR, MR. GOTTLIEB RE: NICHOLS
 DEPOSITION

9/14/2006 JMO 7.90 7.00 MEETING WITH MR. REECE ET AL RE FRUCON 0.90 Relator's Share
 DEPOSITIONS; CONFER WITH MR. (Court)
 CEDARBAUM RE DOCS IN ATLANTA AND
 OTHER ISSUES; REVIEW MR. MINER'S
 CORRESPONDENCE; EMAILS TO MR. MORGAN
 AND MS. MARK RE SAME; MESSAGES TO
 DRINKER BIDDLE RE VARIOUS ISSUES;
 CONFER WITH EXPERT RE EXPERT ISSUES;
 REVIEW NEW DISCOVERY ORDER, EMAILS RE
 SAME AND RE APPEAL OF SAME; REVIEW
 MR. MINER'S CORRESPONDENCE RE
 RELATOR'S SHARE; EMAILS WITH TEAM
 RE SAME; EMAIL WITH CO-COUNSEL RE
 SAME; CONFER WITH MR. GOTTLIEB RE
 NICHOLS DEPOSITION; CONFER WITH MR.
 CEDARBAUM RE NICHOLS DEPOSITION AND
 STAFFING ISSUES; CONFER WITH MR. REECE
 RE FILING NOTICE OF DISMISSAL; CONFER
 AND EMAILS MR. LANG RE NOTICE OF
 DISMISSAL; EMAILS MS. MARK RE LANG
 MEETING; EDIT NOTICE OF DISMISSAL;
 PREPARE FOR LANG MEETING.

9/15/2006 JC 9.00 7.00 REVIEW DOCUMENTS AT TROUTMAN 2.00 Travel
 SANDERS; REVISE, OVERSEE SERVICE OF (Court/Bell)
 BILHAR 30(B)(6) NOTICE; CONF CALL WITH
 MS. O'CONNOR, MR. MORGAN, MS. MARK RE:
 NICHOLS DEPOSITION, WITNESS INTERVIEWS;
 MEET WITH MS. SAUNTRY RE: DOCUMENT
 REVIEW; TRAVEL BACK FROM ATLANTA
 9/16/2006 RBB 0.10 0.00 EMAILS TO AND FROM MS. O'CONNOR 0.10 Relator's Share
 REGARDING DOCUMENTS SHOWING (Court)
 RELATORS SHARE
 9/16/2006 JMO 4.50 4.20 EMAILS WITH MR REECE ET AL RE 0.30 Relator's Share
 TRANSCRIPTS, FRUCON ISSUES, EMAILS (Court)
 WITH MR. CEDARBAUM ET AL RE
 RELATOR'S SHARE REQUESTS BY
 DEFENDANTS, EMAILS WITH MR. BELL AND
 MR. SHAPIRO RE DOJ STAFFING ISSUES,
 PREPARE FOR FRUCON DEPOSITIONS.

9/17/2006 GR 9.80 9.30 REVIEW DOCUMENTS AND PREPARE 0.50 Relator's Share
 SUMMARIES OF ANTITRUST SIGNIFICANT (Court)
 DOCUMENTS; REVIEW R. BELL'S FILES FOR
 DOCUMENTS RE: RELATOR'S SHARE; SEND
 E-MAIL SUMMARIZING CONVERSATION WITH
 WITNESS F; RESPOND TO E-MAIL QUESTIONS
 FROM OTHER TEAM MEMBERS; PREPARE
 INSTRUCTIONS FOR SCANNING OF
 KWAJALIEN PROCEEDING TRANSCRIPTS;
 SEARCH FOR MISSING PLEADINGS.
 9/18/2006 JMO 14.80 10.30 TRAVEL TO LONDON AND LOCAL TRAVEL 4.50 4.00 Travel
 RE SAME FOR FRUCON DEPOSITIONS; (Bell) + 0.50
 PREPARE FOR DEPOSITIONS ON PLANE; Local Travel
 CONFER WITH MS. MARK AND MR. MORGAN (Court)
 AND MR. GREEN RE LOGISTICS; CONFER
 WITH MR. REECE AND MS. MOORE RE
 FRUCON DOCUMENTS; CONFER WITH MR.
 CEDARBAUM RE VARIOUS DEVELOPMENTS.

9/18/2006 GR 9.00 8.00 ARRANGE FOR SCANNING OF TRANSCRIPTS; 1.00 Relater's Share
 ARRANGE FOR REVIEW OF USAID HOT (Court)
 DOCUMENTS FOR REFERENCES TO
 UPCOMING DEPONENTS; DRAFT SUMMARIES
 OF DOCUMENTS, SUPERVISE K. KENYON IN
 COMPLETION OF DOCUMENTS BINDERS;
 ATTEND CONFERENCE CALL WITH EXPERT
 RE: B+B DEPOSITION ISSUES; REVIEW
 DOCUMENTS RE: RELATOR'S SHARE AND E-MAIL
 TO TEAM MEMBERS WITH SUMMARY
 OF DOCUMENTS; SEARCH DATABASE FOR
 DOCUMENTS TO PROVIDE TO EXPERTS.
 9/19/2006 JMO 14.80 14.30 MEETINGS WITH MR. MORGAN AND MS. 0.50 Local Travel
 MARK; PREPARE FOR FRUCON WITNESS (Court)
 INTERVIEWS, PREPARE FOR FRUCON
 DEPOSITIONS, LOCAL TRAVEL, MEETING
 WITH MR. GREEN RE FRUCON DEPOSITIONS,
 CONFER WITH MR. KLEIN RE APPEALING
 MOTION TO COMPEL ORDER, CONFER WITH
 MR. MORGAN AND MR. BELL RE MBI CASE.
 9/21/2006 JMO 17.30 12.80 PREPARATION FOR KAUS DEPOSITION; 4.50 4.00 Travel
 PARTICIPATE IN KAUS DEPOSITION; (Court/Bell +
 MEETINGS WITH KAUS ATTORNEYS; 0.50 Local
 MEETINGS WITH DOJ ATTORNEYS; LOCAL Travel (Court)
 TRAVEL TO AND FLIGHT BACK TO DC

9/25/2006 NT 10.00 9.50 REVIEW TEAM ELECTRONIC 0.50 Local Travel
 CORRESPONDENCE; TELEPHONE (Court)
 CONFERENCE WITH MR. CEDARBAUM
 REGARDING REQUEST FOR DRAFTS OF
 NOTICE OF DEPOSITIONS AND SUBPOENAS
 FROM GOV., TO HALL, HILL, LALOR AND
 HOOVER; REVIEW AND EDIT NOTICE OF
 DEPOSITION AND SUBPOENA TO WITNESS D
 TO REFLECT IT BEING SERVED BY GOV.;
 MEET AND CONFER WITH MS. O'CONNOR TO
 OBTAIN SIGNATURE ON SAME; TELEPHONE
 CONFERENCE WITH CAPITAL PROCESS
 SERVERS REQUESTING PICK UP OF JONES
 SUBPOENA (CANCELLED REQUEST),
 TELEPHONE CONFERENCE WITH MS. HENIFIN
 AND MS. TREACY FROM BUCHANAN
 INGERSOLL REQUESTING CONFERENCE
 ROOM SET UP FOR HEMLER INTERVIEW WITH
 WCPHD AND US. GOV.: ATTEND TEAM
 MEETING; TRAVEL TO/FROM USAID OFFICE
 TO MEET AND CONFER WITH MR. NICHOLS
 REGARDING GOULD INTERVIEW DOCUMENTS

9/26/2006 MMB 22.40 20.40 TRIAL BOOK PREP; HEMLER INTERVIEW 2.00 Travel (Court)
 PREP; CONFER WITH MS. O'CONNOR RE SAME;
 PARTICIPATE IN HEMLER INTERVIEW; EDIT
 LANG SUMMARY MEMO; TRAVEL TO
 PRINCETON, N.J.; TRAVEL TO
 WASHINGTON, D.C.
 9/26/2006 JMO 11.40 9.40 CONFER WITH MR. SHAPIRO AND MR. BELL 2.00 Travel (Court)
 STRATEGIC ISSUES, PREPARE FOR
 HEMLER INTERVIEW, TRAVEL TO AND
 FROM HEMLER INTERVIEW AND WORK ON
 TRAIN ON PREPARING FOR INTERVIEW AND
 CONFERENCE WITH MS. MARK, CONFER WITH
 MR. LANG RE SCHEDULING WITNESSES,
 INTERVIEW MR. HEMLER, CONFER WITH MR.
 CEDARBAUM RE PASKAR DEPOSITION,
 EMAILS WITH TEAM RE DISCOVERY ISSUES,
 REVIEW TRIAL BOOK DRAFT AND COMMENT
 ON SAME AND EMAIL QUESTIONS RE SAME
 TO TEAM, EDIT BILHAR MOTION TO COMPEL,
 EDIT LETTER TO EWERT, EDIT LETTER TO
 MURPHY, SCHEDULE TEAM MEETING,
 CONFER WITH MR. CEDARBAUM RE
 DEVELOPMENTS.

9/29/2006 JMO 13.40 11.40 TRAVEL TO AND FROM TOLEDO TO MEET 2.00 Travel (Court)
 WITH MR. NAGEL, INTERVIEW MR. NAGEL,
 DRAFT MEMO RE INTERVIEW, CONFER WITH
 MS. MARK, MR. MORGAN ET AL RE NAGEL
 INTERVIEW AND OTHER TASKS, CONFER
 WITH MR. SHAPIRO RE NAGEL INTERVIEW
 AND OTHER TASKS, CONFER WITH MR. REECE
 AND MS. BUNCH RE VARIOUS ISSUES, EMAILS
 WITH MR. GOTTLIEB RE OUTLINES FOR NEXT
 WEEK.
 10/2/2006 MG 4.00 3.75 REVIEW D LIGHT DOCUMENTS FOR LIGHT 0.25 Local Travel
 PREP SESSION; TRAVEL TO DOJ; ATTEND (Court)
 PREPARATION SESSION FOR LIGHT
 DEPOSITION; DRAFT SUMMARY OF PREP
 SESSION TO TEAM
 10/7/2006 JMO 1.30 0.00 EMAILS WITH MSRS. CEDARBAUM, REECE, 1.30 Solely BLH
 BELL AND MS. BUNCH RE HII DEPOSITION, (Bell)
 WITNESS D INTERVIEW, MILLER AND
 KITCHENS' DEPOSITIONS, HEMLER
 DEPOSITION, BILL HARBERT DEPOSITION
 AND ATLANTA DOCUMENTS ISSUES; CONFER
 WITH MR. REECE RE MILLER DEPOSITION
 AND RESEARCH ISSUES.

10/10/2006 JC 9.00 7.00 TEAM MEETING; TELECON WITH MS. EWERT 2.00 Travel
 RE: WINDLE DEPO; MEET WITH MS. (Court/Bell)
 O'CONNOR, MR. REECE RE: VARIOUS
 DISCOVERY ISSUES; FINALIZE PREP FOR HC
 30(B)(6) DEPO; TRAVEL TO BIRMINGHAM
 FOR 4 DEPOS
 10/12/2006 JC 13.00 11.00 TAKE, ATTEND C MILLER, R HARBERT DEPOS; 2.00 Travel
 TRAVEL BACK FROM ATLANTA; TELECONS (Court/Bell)
 WITH MS. O'CONNOR RE: VARIOUS
 DISCOVERY ISSUES; VISIT CLERK'S OFFICE
 RE: ANDERSON GRAND JURY PETITION; MEET
 WITH MS, MARK RE: DISCOVERY ISSUES;
 EMAIL EXCHANGES RE: SAME
 10/15/2006 RBB 7.80 5.80 PREPARE FOR OLLIS DEPOSITION; 2.00 Travel (Court)
 CONFERENCE BUNCH RE; OLLIS DEPOSITION
 DOCUMENTS; TRAVEL TO ASHEVILLE, NC
 10/15/2006 MMB 10.10 8.10 OLLIS DEPO PREP; REVIEW DOJ DOCS 2.00 Travel (Court)
 RECEIVED BY CAROLYN MARK; TRAVEL
 FROM WASHINGTON, DC TO ASHEVILLE,
 NC; CONFER WITH R. BELL, MR. CEDARBAUM,
 G. REECE
 10/16/2006 RBB 13.50 11.50 DEPOSE JOHN OLLIS; TELECON O'CONNOR RE: 2.00 Travel (Court)
 KITCHENS DEPOSITION; REVIEW LANG
 INTERVIEW MEMO, HEMLER INTERVIEW
 MEMO, AND HEMLER DOCUMENTS; RETURN
 TRAVEL

10/16/2006 MMB 15.50 13.50 ATTEND OLLIS DEPO; TRAVEL FROM 2.00 Travel (Court)
 ASHEVILLE, NC TO WASHINGTON, DC; PREP
 FOR HEMLER DEPO; CONFER WITH R. BELL RE
 SAME
 10/16/2006 JMO 16.30 14.30 PREPARATION FOR KITCHENS DEPOSITION, 2.00 Travel (Court)
 TRAVEL TO SAME, CONFER WITH TEAM AND
 CO-COUNSEL RE VARIOUS DEPOSITIONS AND
 OUTLINES; CONFER WITH WITNESS E;
 MEETING WITH KENT GARDINER RE WITNESS
 D AND DAVIDSON AND CONFER WITH TEAM
 RE SAME AND REVIEW OF DOCUMENTS RE
 SAME; CONFER WITH KITCHENS' ATTORNEY;
 REVIEW OF RESPONSE TO ANDERSON
 MOTION; EDIT WENDORFF MOTION; EMAILS
 AND CONFER RE OLLIS DEPOSITION; EMAILS
 AND CONFER RE WITNESS E
 CORRESPONDENCE
 10/16/2006 GR 13.70 11.70 PREPARE TOMMY KITCHENS DEPOSITION 2.00 Travel (Court)
 OUTLINE; PREPARE OTHER MATERIALS TO
 TAKE TO ORLANDO; TRAVEL TO ORLANDO
 FOR TOMMY KITCHENS DEPOSITION

10/17/2006 MB 11.60 8.60 TERRY WINDLE DEPOSITION PREP.;TOMMY 3.00 Solely BLH
 KITCHENS' DEPOSITION PREP.; BHIC 30(B)(6) (Bell)
 DEPOSITION PREP.; REVIEW TOMMY
 KITCHENS' NOTES FOR EVIDENCE OF
 CHARLIE DAVIDSON AND JOHNNY JONES'
 CONFRONTATION OF BILL HARBERT ABOUT
 RIGGED BIDS
 10/18/2006 JC 12.00 10.00 PREPARE FOR BHIC 30(B)(6) AND ALAN HALL 2.00 Travel
 DEPOSITIONS; REVISE LETTER RE: WITNESS E (Court/Bell)
 SUBPOENA; TELECONS WITH MS. O'CONNOR,
 MR. SHAPIRIO RE: SAME; WORK ON OTHER
 DISCOVERY MATTERS; TRAVEL TO
 BIRMINGHAM FOR DEPOSITIONS; FINISH
 PREPARATIONS FOR BHIC 30(B)(6)
 DEPOSITION
 10/18/2006 MG 16.00 11.00 TRAVEL FROM WILMER  BWI  BHM  5.00 Travel (Bell)
 OPELEIKA, ALABAMA; COMPLETE VAN
 HOOVER OUTLINE; PREPARE FOR WINDLE
 DEPOSITION; DRAFT CORRESPONDENCE;
 CONFER WITH TEAM RE DEPOSITIONS AND
 DISCOVERY MATTERS; CONFER WITH MR.
 BAUMGARTNER RE: MOTIONS; REVIEW
 DRAFT MOTIONS

10/18/2006 JMO 18.20 13.20 PREPARE FOR AND TAKE KITCHENS 5.00 Travel (Bell)
 DEPOSITION, TRAVEL ORLANDO TO
 OPELIKA, CONFER AND EMAILS CO-COUNSEL
 RE DEPOSITIONS, EDIT
 CORRESPONDENCE TO OPPOSING COUNSEL
 MEET AND CONFER OPPOSING COUNSEL RE
 VARIOUS MOTIONS AND ISSUES
 10/18/2006 GR 15.00 13.00 PREPARE FOR TOMMY KITCHENS 2.00 Travel (Court)
 DEPOSITION; ATTEND TOMMY KITCHENS
 DEPOSITION; TRAVEL BACK TO
 WASHINGTON, DC FROM ORLANDO
 10/19/2006 JMO 16.30 14.30 PREPARE FOR WINDLE DEPOSITION; WINDLE 2.00 Travel
 DEPOSITION; TRAVEL TO BIRMINGHAM; (Court/Bell)
 PREPARE FOR VAN HOOVER DEPOSITION;
 CONFER WITH JUDGE ACKER'S CLERK;
 PREPARE FOR ORAL ARGUMENT; CONFER
 WITH CO-COUNSEL RE VARIOUS ISSUES;
 CONFER WITH OPPOSING COUNSEL RE
 VARIOUS ISSUES; MEET AND CONFER LEEPER
 RE ADDITIONAL EXHIBITS TO RELATOR'S
 STATEMENT

10/20/2006 JC 12.00 10.00 ATTEND HEARING ON MOTION TO QUASH 2.00 Travel
 BILLY HARBERT SUBPOENA; ATTEND VAN (Court/Bell)
 HOOVER DEPOSITION; PREPARE FOR, TAKE
 BILLY HARBERT DEPOSITION, WORK ON
 OTHER DISCOVERY MATTERS; MEET WITH
 MS. O'CONNOR, MR. GOTTLIEB, MR. KLEIN RE:
 SAME, TELECONS, EMAIL EXCHANGES RE:
 SAME; TRAVEL BACK TO D.C. FROM
 BIRMINGHAM
 10/20/2006 JMO 11.00 9.00 PREPARE FOR ORAL ARGUMENT AND VAN 2.00 Travel
 HOOVER DEPOSITIONS, VAN HOOVER (Court/Bell)
 DEPOSITION, BILLY HARBERT DEPOSITION,
 CONFER WITH CO-COUNSEL RE VARIOUS
 ISSUES, CONFER WITH OPPOSING COUNSEL
 RE VARIOUS ISSUES, TRAVEL FROM
 BIRMINGHAM TO DC
 10/21/2006 RBB 16.20 10.20 DEPOSE IATROU; RETURN TRAVEL FROM 6.00 Travel (Bell)
 LONDON TO DC, REVIEW EMAILS RE:
 HOOVER AND LALOR DEPOSITIONS
 10/22/2006 MMB 16.00 9.00 PREP FOR SMILIE ANDERSON DEPO; TRAVEL 7.00 Travel (Bell)
 FROM D.C. TO BOISE, IDAHO
 10/23/2006 MMB 17.00 10.00 ATTEND SMILIE ANDERSON DEPO; TRAVEL 7.00 Travel (Bell)
 FROM BOISE, IDAHO TO D.C.

10/23/2006 MG 16.20 12.70 PREPARE FOR BARNES DEPOSITION; TRAVEL 3.50 Travel
 TO SAN FRANCISCO; CORRESPOND WITH (Court/Be 1)
 TEAM; DISCUSS HILL AND BARNES
 DEPOSITIONS WITH MR. REECE AND MS.
 O'CONNOR
 10/23/2006 JMO 15.20 13.20 CONFER WITH CO-COUNSEL AND OPPOSING 2.00 Travel
 COUNSEL RE DISCOVERY MATTERS, REVIEW (Court/Bell)
 DRAFT BRIEFS, PREPARE FOR HILL
 DEPOSITION, TRAVEL TO BIRMINGHAM,
 CONFER WITH MR GOTTLIEB TO PREPARE
 FOR BARNES DEPOSITION
 10/23/2006 GR 15.50 13.50 REVIEW AND PREPARE MATERIALS FOR ALF 2.00 Travel
 HILL DEPOSITION; REVISE ALF HILL (Court/Bell)
 DEPOSITION OUTLINE; DISCUSS ALF HILL
 DEPOSITION WITH MS. O'CONNOR; TRAVEL
 TO BIRMINGHAM FOR ALF HILL DEPOSITION
 10/24/2006 MG 13.00 9.50 PREPARE FOR BARNES DEPOSITION; TAKE 3.50 Travel (Belt)
 BARNES DEPOSITION; RETURN TRAVEL
 FROM SAN FRANCISCO TO DC; REVIEW
 NOTES AND DRAFT SUMMARY OF
 DEPOSITION

10/24/2006 JMO 16.00 14.00 FOR HILL DEPOSITION, TAKE HILL 2.00 Travel
 DEPOSITION, CONFER WITH MS MARK AND (Court/Bell)
 MR. REECE RE SAME. CONFER AND EMAILS
 WITH MR GOTTLIEB RE BARNES DEPOSITION,
 TRAVEL FROM BIRMINGHAM TO DC.
 10/24/2006 GR 16.00 14.00 REVISE OUTLINE FOR ALF HILL DEPOSITION; 2.00 Travel (Bell)
 DISCUSS ISSUES RELATED TO ALF HILL
 DEPOSITION; ATTEND ALF HILL DEPOSITION
 WITH O'CONNOR; TRAVEL BACK TO D.C.
 FROM BIRMINGHAM
 10/25/2006 MB 10.80 8.80 PREPARE FOR FRANK KIMBALL DEPOSITION; 2.00 Travel (Bell)
 REVIEW DOCUMENTS AND PREPARE
 POTENTIAL QUESTIONS; FRANK KIMBALL
 DEPOSITION PREPARATION SESSION;
 TRAVEL FROM D.C.TO HILTON HEAD, SC
 10/26/2006 MB 9.30 7.30 FINALIZE FRANK KIMBALL DEPOSITION 2.00 Travel
 OUTLINE; TAKE FRANK KIMBALL (Court/Bell)
 DEPOSITION; WRITE SUMMARY OF SAME;
 TRAVEL FROM HILTON HEAD BACK TO D.C.

11/2/2006 GR 15.80 13.80 PREPARE AND COLLECT DOCUMENTS FOR. 2.00 Travel (Bell)
 FINANCIAL EXPERT; REVIEW DEPOSITIONS
 FOR FINANCIAL EXPERT; REVIEW MORRISON-KNUDSEN
 DOCUMENTS; PREPARE OUTLINE
 FOR DEPOSITION OF BRIEN GOODALE;
 DISCUSS DEPOSITION OUTLINE WITH MS.
 O'CONNOR AND MR. CEDARBAUM; TRAVEL
 TO NASHVILLE; REVIEW TRIAL TRANSCRIPT
 OF BRIEN GOODALE AND SMILEY ANDERSON;
 REVIEW GRAND JURY TRANSCRIPT OF ROY
 ANDERSON
 11/3/2006 GR 16.50 14.50 PREPARE DEPOSITION OUTLINE FOR BRIEN 2.00 Travel (Bell)
 GOODALE; ATTEND AND TAKE DEPOSITION
 OF BRIEN GOODALE; TRAVEL FROM
 NASHVILLE TO D.C.; REVIEW DEPOSITION
 TRANSCRIPT OF RICK MILLER AND
 SUMMARIZE RELEVANT PAGES FOR
 EXPERTS; PREPARE SUMMARY OF BRIEN
 GOODALE DEPOSITION AND E-MAIL TO TEAM

11/7/2006 MT 14.00 13.50 REVIEW TEAM ELECTRONIC 0.50 Local Travel
 CORRESPONDENCE AND RESPOND (Court)
 ACCORDINGLY; MEET AND CONFER WITH MS.
 KENYON REGARDING DELIVERY AND
 QUALITY CHECKING OF DUPLICATED EXPERT
 EXHIBIT MATERIAL; TELEPHONE CALLS TO
 LANGUAGE INNOVATIONS TO INQUIRE
 ABOUT GERMAN TRANSLATIONS, FOLLOW
 UP TELEPHONE CONFERENCE WITH MR.
 REECE REGARDING SAME; TELEPHONE
 CONFERENCE WITH MR. CEDARBAUM
 REGARDING DELIVERY OF DOCUMENTS TO
 BE TRANSLATED; MEET AND CONFER WITH
 MR. REECE REGARDING ADDITIONAL EXPERT
 EXHIBITS AND COMPARISON OF EXPERT
 INDEX TO TEAM INDEX; TRAVEL TO, FROM
 LANGUAGE INNOVATIONS FOR MEET AND
 CONFER WITH MARIELA BUTLER REGARDING
 HAND OVER OF DOCUMENTS TO BE
 TRANSLATED, MEET AND CONFER WITH MR.
 REECE REGARDING SAME; ATTEND TEAM
 MEETING REGARDING EXPERT REPORTS;
 FINALIZE PRODUCTION OF EXPERT REPORTS
 AND EXHIBITS THERETO TO CASE PARTIES

11/20/2006 JMO 14.30 8.30 TRAVEL TO/FROM ST. LOUIS; INTERVIEW 6.00 Travel (Bell)
 WITNESS J; CATCH UP ON
 READING/RESPONDING TO TEAM EMAILS.
 12/7/2006 JMO 12.10 11.60 PREPARE FOR, TRAVEL TO/FROM AND 0.50 Local Travel
 PARTICIPATE IN HEARING. (Court)
 12/19/2006 MG 9.80 9.30 PREPARE FOR NEWMAN DEPOSITION; 0.50 Local Travel
 TRAVEL TO/FROM AND CONDUCT NEWMAN (Court)
 DEPOSITION; REVIEW FILINGS AND EMAILS;
 DISCUSS HARBERT U.K. HEARING.
 1/23/2007 JMO 11.20 7.20 SET UP MEETINGS RE MOTIONS TO COMPEL 4.00 Travel (Court)
 BHIC AND HII; SET UP CONFERENCE RE
 AMENDMENT COMPLAINT; EMAIL SCHUBERT
 RE MEETING; EMAILS RE DOCUMENT
 TRANSLATIONS; CONFER W/MR. GOTTLIEB
 RE AMENDED COMPLAINT; CONFER W/MR.
 SMITH RE C&L DOCUMENT; CONFER W/MR.
 REECE AND MR. BAUMGARTNER RE
 WENDORFF DEPOSITION AND DOCUMENTS;
 PREPARE FOR WENDORFF DEPOSITION;
 EMAILS RE FACCIOLA; EMAILS AND
 MESSAGES RE PWC WITNESSES; CONFER W/
 MR. ZANE RE WENDORFF DOCUMENTS;
 EMAIL GOVERNMENT RE WITNESS F;
 TRAVEL TO GERMANY FOR WENDORFF
 DEPOSITION.

1/24/2007 RBB 10.00 8.50 REVIEW DOCUMENTS RELATED TO KRINGS 1.50 Travel (Court)
 AND ICON; DRAFT LIST OF QUESTIONS FOR
 CRANDALL; INTERVIEW CRANDALL;
 CONFERENCES SMITH RE: INTERVIEW AND
 INTERVIEW MEMO; RETURN TRAVEL.
 1/24/2007 JMO 16.10 11.60 TRAVEL TO GERMANY FOR DEPOSITION; 4.50 4.00 Travel +
 LOCAL TRAVEL; MEET WITH USAID AGENTS; 0.50 Local
 MEET WITH GERMAN ATTORNEYS; CONFER Travel (Court)
 W/ MR. ZANE RE WENDORFF DOCUMENTS;
 PREPARE FOR DEPOSITION; CONFER W/ TOM
 FINNEGAN, PWC.
 1/24/2007 STS 10.10 8.60 TRAVEL TO METROPARK, NJ WITH MR. 1.50 Travel (Court)
 BELL TO CONDUCT INTERVIEW OF BRIAN
 CRANDALL (ICON); PREPARE ROUGH DRAFT
 OF IMPORTANT NOTES FROM MEETING WITH
 BRIAN CRANDALL; COORDINATE WITH
 PARALEGAL STAFF RE: PREPARATION OF
 C&I. DOCS FOR REVIEW WITH MR. GOTTLIEB

1/25/2007 JMO 15.40 15.15 TRAVEL TO AND TAKE AND DEFEND 0.25 Local Travel
 WENDORFF DEPOSITION; PREPARE FOR SAME (Court)
 AND PREPARE FOR NEXT DAY; CONFER W/
 LOCAL COUNSEL AND USAID AGENTS;
 CONFER WITH MR. CEDARBAUM AND MR.
 BELL RE VARIOUS ISSUES; EMAILS W/ MR.
 SCHUBERT RE UPDATE; EMAILS W/ USAID
 AGENTS RE WITNESS SEARCHES.
 1/26/2007 JMO 12.10 11.85 LOCAL TRAVEL. AND TAKE AND DEFEND 0.25 Local Travel
 WENDORFF DEPOSITION; EMAIL MR. ZANE RE (Court)
 SAME.
 1/27/2007 JMO 11.10 6.60 LOCAL TRAVEL AND TRAVEL TO US; EMAIL 4.50 4.00 Travel +
 RE CRANDALL. 0.50 Local
 Travel (Bell)

1/31/2007 JMO 8.90 8.65 PREPARE FOR STATUS CONFERENCE; 0.25 Local Travel
 TRAVEL TO STATUS CONFERENCE; STATUS (Court)
 CONFERENCE; TRAVEL RETURN; CONFER
 WITH MS. WIGMORE RE PLANNING; CONFER
 W/ MR. SHAPIRO RE FLAWING; CONFER W/
 MR. CEDARBAUM RE PLANNING; REVIEW
 LOCAL RULES AND DEPOSITION
 DESIGNATION MATERIALS; EDIT AND
 CONFER RE AMENDED COMPLAINT AND
 MOTION TO FILE SAME; EDIT TALKING
 POINTS; CONFER W/ MR. REECE, MR.
 BAUMGARTNER AND MR. GOTTLIEB RE
 SCHEDULE.

2/6/2007 NT 11.00 10.75 CONTINUE DRAFTING PRETRIAL STATEMENT 0.25 Local Travel
 PLAINTIFFS WITNESS LIST; REVIEW (Court)
 DEPOSITIONS, NOTICES AND SUBPOENAS FOR
 DEPONENT RESIDENCY INFORMATION,
 ELECTRONIC CORRESPONDENCE WITH MR.
 CEDARBAUM REGARDING SAME; MEET,
 CONFER AND SUPERVISE MS. PRICE WITH
 REVIEWING TRANSCRIPTS FOR EXHIBITS
 HELD AND ORDERING COPIES OF SAME FROM
 COURT REPORTERS; FORWARD DRAFT OF
 PRETRIAL STATEMENT PLAINTIFFS' WITNESS
 LIST, WITNESS INTERVIEW LIST AND
 DEPOSITION DESIGNATION LIST TO MS.
 O'CONNOR, MR. CEDARBAUM AND MR.
 SHOOK; ELECTRONIC CORRESPONDENCE
 WITH MS. CARRINGTON AND MR. SHOOK
 REGARDING MS. CARRINGTON'S REQUEST
 FOR DEPOSITION TRANSCRIPTS
 INFORMATION AND FORWARDING OF
 TOWSEY AND BILLY HARBERT, JR.
 TRANSCRIPTS TO MS. BARRY, DO)
 PARALEGAL; TRAVEL TO FROM AND TIME
 SPENT AT FEDERAL FINGERPRINTING
 CENTER FOR GOVERNMENT SECURITY
 CLEARANCE; EDIT WITNESS LIST AND
 PRETRIAL STATEMENT PLAINTIFFS' WITNESS
 LIST

2/19/2007 JMO 15.20 11.20 TRAVEL TO/FROM TOLEDO; INTERVIEW MR. 4.00 Travel (Court)
 NAGEL; PREPARE FOR NAGEL MEETING;
 CONFER W/ MR. SHAPIRO RE STRATEGY AND
 PRETRIAL STATEMENTS; REVIEW
 DEPOSITION EXCERPTS; PREPARE FOR
 ECKERT CALL RE BRINKMANN DEPOSITION;
 WORK ON PRETRIAL STATEMENTS.
 2/19/2007 HS 11.20 7.20 PREPARE FOR AND CONDUCT INTERVIEW OF 4.00 Travel (Court)
 MR. NAGEL; REVIEW DRAFT VERDICT FORM
 AND JURY INSTRUCTIONS; TRAVEL
 TO/FROM TOLEDO; EMAIL TO MR. MORGAN
 3/15/2007 MG 14.30 14.15 PARTICIPATE IN VARIOUS WITNESS 0.15 Local Travel
 PREPARATION SESSIONS; REVISE PROOF (Court)
 OUTLINES; REVIEW DIRECT EXAMINATION
 OUTLINES; REVIEW EXHIBIT DESIGNATIONS;
 REVIEW AND REVISE GRAPHICS; TRAVEL TO
 DOJ AND PARTICIPATE IN
 VIDEOCONFERENCE INTERVIEW OF DAVID
 WILLIAMS; OTHER MISCELLANEOUS TRIAL
 PREPARATION

3/17/2007 NT 13.00 12.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; BEGIN GATHERING OF (Court)
 DOCUMENTS AND DRAFTING OF INDEX FOR
 MILLER TRIAL PREPARATION BINDERS IN
 PREPARATION FOR CLIENT MEETING PER MR.
 BELL'S REQUEST; TRAVEL TO COURT
 HOUSE AND ASSIST WITH WORK ROOM SET
 UP; SUPERVISE PROJECT ASSISTANTS WITH
 WORKLOAD; MEET AND CONFER wan MR.
 REECE REGARDING MILLER RESPONSES TO
 DEFENDANTS INTERROGATORIES; MEET AND
 CONFER WITH MS. CASWELL REGARDING
 PENDING WORK ASSIGNMENTS
 3/19/2007 MG 16.60 16.50 PREPARE DOCUMENT BINDERS FOR JURY 0.10 Local Travel
 SELECTION; PREPARE TO ARGUE MOTIONS IN (Court)
 LIMINE; TRAVEL TO COURT; ATTEND FIRST
 DAY OF TRIAL; PREPARE WITNESSES;
 REVIEW DEMONSTRATIVES; RESEARCH
 CONSPIRACY ADMISSIONS CASE LAW;
 PREPARE TALKING POINTS AND BINDER FOR
 MS. O'CONNOR RE: DEFENSE
 DEMONSTRATIVES AND CONSPIRACY
 ADMISSIONS ARGUMENT

3/22/2007 NT 11.00 10.80 REVIEW AND MONITOR TEAM ELECTRONIC 0.20 Local Travel
 CORRESPONDENCE; TRAVEL TO  FROM (Court)
 COURT HOUSE TO ASSIST WITH WORK ROOM
 CLEAN UP; TELEPHONE CONFERENCES WITH
 MS. BAYNHAM REGARDING READING OF
 GRESELIN AND PENDING TRIAL EXHIBITS TO
 BE USED; MEET AND CONFER WITH MS.
 BUNCH REGARDING HEMLER TRIAL
 EXHIBITS; MEET, CONFER AND ELECTRONIC
 CORRESPONDENCE WITH MR. BYRDSONG
 REGARDING LOADING OF HEMLER
 DOCUMENTS INTO TRIAL DIRECTORY,
 UPDATE MASTER LIST OF EXHIBITS
 ADMITTED INTO EVIDENCE; MEET AND
 CONFER WITH MS. CASWELL REGARDING
 PENDING ASSIGNMENTS

3/27/2007 NT 12.00 11.80 REVIEW TEAM ELECTRONIC 0.20 Local Travel
 CORRESPONDENCE; PREPARE SABBIA (Court)
 STIPULATION COPIES AND PDF SAME PER MR.
 CEDARBAUM'S REQUEST; TRAVEL TO AND
 FROM DISTRICT COURT AND ASSIST TEAM
 WITH TRIAL ROOM SETUP, PREPARE WORK
 ROOM FOR AFTERNOON BREAK; REVIEW PDX
 DEMONSTRATIVE EXHIBITS FOR NEXT
 NUMBER AVAILABLE PER MR. RUSHING;
 UPDATE OF MASTER EXHIBITS ADMITTED
 LIST; MEET WITH AND SUPERVISION OF
 PROJECT ASSISTANTS; MEET AND CONFER
 WITH MS. DAVIS REGARDING TRIAL
 TRANSCRIPTS

3/28/2007 NT 15.00 14.80 REVIEW TEAM ELECTRONIC 0.20 Local Travel
 CORRESPONDENCE; PREPARE EXHIBITS AND (Court)
 GATHER WITNESS DOCUMENTS; TRAVEL TO
 AND SET UP OF COURT WORK ROOM; ASSIST
 TRIAL TEAM WITH COURT ROOM SET UP;
 EDIT BRINKMANN DESIGNATIONS TO ADD
 HC/HII COUNTER DESIGNATIONS,
 ELECTRONIC CORRESPONDENCE WITH MR.
 RUSHING AND MR. BAUMGARTNER
 REGARDING SAME; MEET AND CONFER WITH
 MR. SMITH REGARDING BOOTH DOCUMENTS;
 MEET AND CONFER WITH MR. REECE
 REGARDING MILLER DIRECT EXAMINATION
 EXHIBITS; TRAVEL TO COURT HOUSE FOR
 AFTERNOON DELIVERY OF EXHIBITS TO BE
 USED; MEET AND CONFER WITH PROJECT
 ASSISTANTS REGARDING TOWSEY
 DESIGNATION COPIES NEEDED IN COURT PER
 MS. O'CONNOR'S REQUEST; ASSIST TRIAL
 TEAM WITH COURT ROOM AND COURT WORK
 ROOM CLEAN UP; REVIEW AND EDIT MASTER
 EXHIBITS ADMITTED LIST; MEET AND
 CONFER WITH MS. CASWELL, MR. RUSHING
 AND MR. CULTICE REGARDING PENDING
 WITNESS PREPARATION; MEET AND CONFER
 WITH MR. CEDARBAUM REGARDING
 WENDORFF

3/29/2007 NT 15.00 14.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; PREPARE DOCUMENTS (Court)
 FOR COURT; TRAVEL TO AND ASSIST WITH
 COURT ROOM AND COURT WORK ROOM SET
 UP; ATTEND TRIAL AND ASSIST TRIAL TEAM
 AT COURT; MONITOR ELECTRONIC
 CORRESPONDENCE; PREPARE HOOVER
 EXHIBITS FOR PENDING HOOVER DIRECT;
 UPDATE MASTER EXHIBITS ADMITTED LIST;
 MEET AND CONFER WITH TEAM MEMBERS
 REGARDING UPDATES TO WITNESS FILES;
 SUPERVISE PA STAFF WITH CASE PROTECTS;
 MEET AND CONFER WITH MS. CASWELL
 REGARDING PENDING ASSIGNMENTS
 4/3/2007 NT 12.00 11.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; PREPARE DAILY COURT (Court)
 DOCUMENTS FOR COURT; TRAVEL TO AND
 SET UP OF COURT WORK ROOM AND COURT
 ROOM; ATTEND TRIAL AND ASSIST TRIAL
 TEAM; PACK UP COURT ROOM; UPDATE
 MASTER EXHIBITS ADMITTED LIST AND
 FORWARD TO TEAM; MEET AND CONFER
 WITH MR. RUSHING REGARDING TOWSEY
 AND MASHBURN EXHIBITS; SUPERVISE
 PROJECT ASSISTANTS

4/4/2007 NT 13.00 12.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; PREPARE FURTHER (Court)
 EXHIBITS FOR MASHBURN TESTIMONY;
 REVIEW AND PRINT OUT MASTER ADMITTED
 EXHIBIT LIST FOR COURT; TRAVEL TO AND
 ASSIST WITH COURT ROOM SET UP; ASSIST
 AND ATTEND TO TRIAL TEAM AT COURT;
 ASSIST WITH PACK UP OF COURT ROOM;
 ATTEND TEAM MEETING; UPDATE MASTER
 ADMITTED EXHIBIT LIST AND DISTRIBUTE TO
 TEAM; PREPARE MASHBURN EXHIBITS FOR
 REDIRECT; ELECTRONIC CORRESPONDENCE
 WITH MR. RUSHING REGARDING PENDING
 PROJECTS; MONITOR OF TEAM ELECTRONIC
 CORRESPONDENCE

4/5/2007 NT 12.00 11.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; TRAVEL TO AND (Court)
 PREPARE TRIAL TEAM AND COURT ROOM;
 ATTEND AND ASSIST TRIAL TEAM DURING
 TRIAL; PACK UP OF COURT ROOM AND TRIAL
 TEAM MATERIAL; PREPARE PENDING
 EXHIBITS; SUPERVISE PROJECT ASSISTANTS
 ON CREATION OF CROSS WITNESS BINDERS;
 MEET AND CONFERS WITH MS. CASWELL
 AND MR. RUSHING REGARDING PENDING
 PROJECTS; MONITOR TEAM ELECTRONIC
 CORRESPONDENCE
 4/6/2007 GR 14.80 10.80 REVISE OUTLINE AND PREPARE DOCUMENTS 4.00 Travel
 FOR MIKE GWYN INTERVIEW; TRAVEL TO (Court/Bell)
 AND FROM CHARLOTTE FOR GWYN
 INTERVIEW; DRAFT MEMORANDUM RE:
 INTERVIEW OF MIKE GWYN; RESEARCH
 ISSUE RE: ALF HILL.

4/9/2007 NT 10.00 9.90 MONITOR OF ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; PREPARE DOCUMENTS (Court)
 FOR COURT: TRAVEL TO COURT AND ASSIST
 WITH PACKING OF COURT MATERIAL; MEET
 AND CONFER WITH MS. CASWELL
 REGARDING PROJECT ASSISTANT
 WORKLOAD; MEET AND CONFER WITH MR.
 RUSHING REGARDING PENDING
 ASSIGNMENTS; REVIEW AND UPDATE
 MASTER ADMITTED EXHIBITS LIST,
 FORWARD SAME TO TEAM; SUPERVISE
 PROJECT ASSISTANTS WITH PENDING
 WITNESS BINDERS
 4/10/2007 NT 12.00 11.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE, PREPARE DOCUMENTS (Court)
 FOR COURT SESSION; TRAVEL TO AND
 ASSIST WITH COURT ROOM SET UP; PREPARE
 HILL PHOTO EXHIBITS AND SUPERVISE
 PROJECT ASSISTANTS REGARDING SAME;
 TRAVEL TO AND FROM COURT TO ASSIST
 WITH AFTERNOON SESSION; REVIEW
 PLAINTIFF'S TRIAL EXHIBIT LIST; UPDATE
 MASTER ADMITTED EXHIBIT LIST; MONITOR
 OF TEAM ELECTRONIC CORRESPONDENCE

4/11/2007 NT 12.00 11.80 PREPARE DOCUMENTS FOR TODAYS COURT 0.20 Local Travel
 SESSION; TRAVEL TO AND ASSIST WITH (Court)
 COURT ROOM SET UP; TELEPHONE
 CONFERENCES, MEET AND CONFERS WITH
 MR. HEFFEL REGARDING BOUTWELL AND
 INSURANCE DOCUMENT RESEARCH IN
 CPORT; REVIEW TRIAL TRANSCRIPTS VIA
 LIVENOTE; TRAVEL TO AND ASSIST WITH
 PACK UP OF COURT ROOM AND WORK ROOM
 SPACE; ATTEND TEAM MEETING; MEET AND
 CONFER WITH MR. GOTTLIEB REGARDING
 REDACTION OF HII'S RESPONSES TO
 RELATORS FIRST SET OF INTERROGATORIES,
 MEET AND CONFER WITH MS. BROWN
 REGARDING SAME; SUPERVISE PROJECT
 ASSISTANTS AND TEMPORARY ASSISTANTS
 REGARDING PENDING WITNESS
 PREPARATION MATERIAL; UPDATE MASTER
 ADMITTED EXHIBITS LIST; MEET AND
 CONFER WITH MR. RUSHING REGARDING
 BURLES EXHIBITS AND PENDING WITNESS
 PREPARATION

4/12/2007 NT 12.00 11.90 PREPARE COURT DOCUMENTS FOR TODAYS 0.10 Local Travel
 COURT SESSION; TRAVEL TO AND ASSIST (Court)
 WITH COURT ROOM SET UP; REVIEW AND
 ORGANIZE BURLES EXHIBITS; REVIEW APRIL
 11, 2007 TRIAL TRANSCRIPT AND COMPARE
 NOTED EXHIBITS TO MASTER ADMITTED
 EXHIBITS LIST; TRAVEL TO COURT HOUSE
 AND ASSIST WITH REMOVAL OF COURT
 DOCUMENTS AND CLEAN UP OF WORK
 ROOM; MEET AND CONFER WITH MR.
 RUSHING REGARDING PROJECT ASSISTANT
 WORKLOAD AND SCHEDULING; UPDATE
 MASTER ADMITTED EXHIBITS LIST;
 ELECTRONIC CORRESPONDENCE TO AM
 COURT REPORTER REGARDING
 DISCREPANCIES FOUND ON APRIL 11, 2007 AM
 TRIAL TRANSCRIPT; SUPERVISE PROJECT
 ASSISTANTS REGARDING WITNESS
 PREPARATION MATERIALS; MEET AND
 CONFER WITH MS. CASWELL REGARDING
 TODAYS COURT SESSION; MONITOR TEAM
 ELECTRONIC CORRESPONDENCE

4/13/2007 NT 11.50 11.40 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE. PREPARE EXHIBIT LISTS (Court)
 AND TRANSCRIPTS FOR TODAYS COURT
 SESSION TRAVEL TO AND ASSIST WITH
 COURT ROOM SET UP; DELIVER DOCUMENTS
 TO COURT ROOM ON DAILY BASIS; REVIEW
 TRANSCRIPTS IN LIVENOTE; REVIEW AND
 EDIT ADMITTED EXHIBIT LIST; SUPERVISE
 PROJECT ASSISTANT TEAM; MEET AND
 CONFER AND ELECTRONIC
 CORRESPONDENCE WITH MS. CASWELL
 REGARDING UPDATES OF DOCUMENT
 REQUESTS FROM COURT; ORGANIZE
 PLEADING DOCUMENTS AT COURT HOUSE
 WORK ROOM; ATTEND TRIAL AND ASSIST
 WITH COURT ROOM CLEAN UP; MONITOR
 TEAM ELECTRONIC CORRESPONDENCE

4/18/2007 NT 12.00 11.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; ASSIST MR. GOTTLIEB (Court)
 WITH WILLIAMS EXHIBIT DOCUMENTS;
 TRAVEL TO AND ASSIST WITH SET UP OF
 COURT ROOM; ATTEND TRIAL AND ASSIST
 TRIAL TEAM; PACK UP COURT ROOM;
 SUPERVISE PROJECT ASSISTANTS
 REGARDING ATTORNEY REQUESTS; REVIEW
 PLAINTIFFS AND DEFENDANTS EXHIBIT LISTS
 AND UPDATE ADMITTED EXHIBIT LIST;
 MONITOR TEAM ELECTRONIC
 CORRESPONDENCE AND RESPOND
 ACCORDINGLY
 4/19/2007 NT 12.00 11.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; ASSIST WITH (Court)
 PREPARATION OF MCCUE CROSS EXHIBITS;
 TRAVEL TO AND ASSIST WITH COURT ROOM
 SET UP; ATTEND TRIAL AND ASSIST TRIAL
 TEAM; ASSIST WITH PACK UP AND
 UNLOADING OF COURT PRODUCTION;
 REVIEW ADMITTED EXHIBIT LIST; SUPERVISE
 PROJECT ASSISTANTS REGARDING
 ATTORNEY REQUESTS; MONITOR TEAM
 ELECTRONIC CORRESPONDENCE AND
 RESPOND ACCORDINGLY

4/20/2007 NT 12.00 11.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; ASSIST WITH PASKAR (Court)
 AND PLEADING PRINT OUTS FOR TRIAL TEAM
 REVIEW; TRAVEL TO AND SET UP OF COURT
 ROOM; ATTEND TRIAL AND ASSIST TRIAL
 TEAM; MEET AND CONFER WITH COURT
 DEPUTY CLERK REGARDING FORMAT OF
 PLAINTIFFS EXHIBITS TO BE USED BY JUDGE
 AND JURY DURING DELIBERATIONS
 4/30/2007 NT 14.00 13.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; PREPARE DOCUMENTS (Court)
 FOR COURT; TRAVEL TO AND ASSIST TEAM
 DURING TRIAL; PACK UP OF COURT
 MATERIAL; DOWNLOAD DEFENDANTS'
 CLOSING DEMONSTRATIVES TO L DRIVE;
 REVIEW AND PRINT OUT PARTIES CLOSING
 DEMONSTRATIVES IN PREPARATION FOR
 COURT; MONITOR ELECTRONIC
 CORRESPONDENCE
 5/1/2007 NT 12.00 11.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; TRAVEL TO ATTEND (Court)
 AND ASSIST TRIAL TEAM DURING CLOSING
 ARGUMENTS; MEET AND CONFER WITH MR.
 RUSHING REGARDING PENDING CASE
 ASSIGNMENTS

5/2/2007 NT 12.00 11.90 REVIEW TEAM ELECTRONIC 0.10 Local Travel
 CORRESPONDENCE; ASSIST MR. CEDARBAUM (Court)
 WITH CD COPY REQUESTS OF PROPOSED
 JURY INSTRUCTIONS AND PLAINTIFFS
 OPPOSITIONS TO DEFENDANTS JURY
 INSTRUCTIONS; TRAVEL TO AND ASSIST
 WITH COURT ROOM SET UP; ASSIST TRIAL
 TEAM; PACK UP OF COURT ROOM
 5/4/2007 MG 4.40 4.30 RESEARCH VERDICT FORM LAW; TRAVEL TO 0.10 Local Travel
 AND ATTEND FINAL DAY OF TRIAL; DISCUSS (Court)
 POST-TRIAL WORK
 5/7/2007 MG 2.00 1.80 TRAVEL TO/FROM COURT TO ATTEND 0.20 Local Travel
 SESSION FOR JUROR QUESTION ANSWER (Court)
 5/14/2007 MG 4.50 4.30 REVIEW COUNTERCLAIM INSTRUCTIONS AND 0.20 Local Travel
 MTD; TRAVEL TO/FROM COURT FOR (Court)
 VERDICT; ATTEND COURT SESSION RE:
 VERDICT
 5/14/2007 JMO 1.80 1.60 TRAVEL TO AND FROM AND ATTEND COURT 0.20 Local Travel
 FOR VERDICT. (Court)
 TOTAL 1.047.00 288.50

APPENDIX III
The Court has determined the following, comprehensive reductions are necessary to exclude time dedicated to non-compensable tasks and to counter unreasonable and/or excessive billing:

Clerical Tasks (non-compensable)
 Attorney Hours 0.5%
 Paralegal Hours 5.0%
Ambiguous Time Entries 10.0%
Block Billing 10.0%
Inefficient Staffing 5.0%

NOTES
[1] They are: individual defendant E. Roy Anderson ("Anderson"); and corporate defendants Harbert Corporation ("HC"), Harbert International, Inc. ("HII"), Bill Harbert International Construction, Inc. ("BHIC"), Bilhar International Establishment f/k/a Harbert International Establishment ("Bilhar"), and Harbert Construction Services (U.K.) Ltd. ("HUK").
[2] The jury set total damages at $34,346,029.22. (See Verdict Form [858] at 9, 10, 12.) The Court then trebled the damages award in accordance with 31 U.S.C. section 3729(a) and set off the $13.7 million the government had received from settling codefendants. (Mem. Op. of Aug. 10, 2007[882] at 10-11.) It further determined the appropriate civil penalty to be $10,000 per false claim, yielding a total penalty of $1,100,000.00. (Id. at 7-9, 11.) The Court calculated total liability in this casethe sum of the trebled damages and civil penaltiesas $90,438,087.66. (Id. at 11.) It also adjudged defendants liable for plaintiffs' costs and for relator Richard F. Miller's reasonable attorneys' fees and expenses. (Id. at 2-3.)
[3] Initially, the government requested reimbursement in the amount of $50,702.25 $838.65 for service of summons and subpoena, $23,706.10 for trial and hearing transcripts, and $26,157.50 for deposition transcripts. (See U.S. Bill of Costs [928] at 1.) Due to an unanticipated closure of the courthouse, the government was unable to timely confirm certain information necessary to compute its witness fees pursuant to 28 U.S.C. section 1821, (id. at 2), so it later requested an additional $3,735.62, (see U.S. Supplemental Bill of Costs [933] at 1).
[4] Relator seeks $587.00 for clerk's fees, $345.00 for service of summons and complaint, $19,271.60 for deposition transcripts, $9,323.09 for trial and hearing transcripts, $299.85 for other copying, $1,974.92 for statutory witness fees, and $172.00 for subpoena service. (See Relator's Bill of Costs [929] at 2.)
[5] Relator's original fee petition sought $9,989,707 in fees. (See Mot. for Fees, Costs, and Expenses [930] at 1.) Based on criticisms raised in defendants' oppositions, relator subtracted certain time that had been inadvertently included in his original request and reduced the amount sought by $18,941.75. (See Ex. B to Bell Supplemental Decl., Ex. 1 to Reply to HII's Opp'n [957].) Relator also concedes the requested amount must be offset by $25,000 in attorney's fees received from AICI, a settling co-defendant. (See Mot. for Fees, Costs, and Expenses [930] at 1, n. 1.)
[6] While the original petition sought $522,851.04, (see Mot. for Fees, Costs, and Expenses [930] at 1), relator subsequently lowered this amount by $11,127.98, (see Bell Supplemental Decl. ¶¶ 26-28, Ex. 1 to Reply to HII's Opp'n [957]).
[7] Where appropriate, the Court will indicate which defendant(s) make(s) which arguments, but although they have filed five separate oppositions, defendants have largely adopted one another's objections. (See Anderson's Opp'n [946] at 1 ("[t]o the extent they are applicable and not inconsistent with []his response," adopting arguments in BHIC, Bilhar, HII, and HC's oppositions); BHIC and HUK's Opp'n [948] at 1 n. 1 (adopting all arguments in HII, HC, and Anderson's oppositions, to the extent they apply); HII's Opp'n [949] at 44 (referring the Court to HC's Opposition for arguments against fee enhancement); HC's Opp'n [950] at 1 (incorporating by reference all arguments in HII's Opposition); Bilhar's Revised Opp'n [951] at 1 (adopting "the grounds set forth in all codefendants' oppositions"); HII and HC's Notice of Joinder [952] (adopting arguments in BHIC and HUK and Anderson's Oppositions).)
[8] Under these analogous statutes, a prevailing party is one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." Tex. State Teachers Ass'n v. Garland Independent Sch. Dist., 489 U.S. 782, 792-93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). In this Circuit, a prevailing party must demonstrate: (1) "a courtordered change in the legal relationship between the plaintiff and the defendant"; (2) that it is "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded"; and (3) that it has done more than "having acquired a judicial pronouncement unaccompanied by judicial relief." Select Milk Producers, Inc. v. Johanns, 400 F.3d 939, 946-47 (D.C.Cir.2005). Moreover, "[t]hat a plaintiff has prevailed against one party does not entitle him to fees from another party." Kentucky v. Graham, 473 U.S. 159, 168, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Relator appears to concede that he did not "prevail" against Anderson under this definition.
[9] Notwithstanding the statutory language, courts have frequently described the FCA's fee-shifting provision as applying only to "prevailing parties," but never under the precise circumstances presented here. See, e.g., Fed. Recovery Servs., Inc. v. United States, 72 F.3d 447, 449-50, 453 (5th Cir.1995) (affirming district court's denial of attorneys' fees to relator whose claims were dismissed for lack of jurisdiction); United States ex rel. ATC Distrib. Group, Inc. v. Ready-Built Transmissions, Inc., No. 03 Civ. 2150, 2007 WL 2522638, *1, *9, 2007 U.S. Dist. LEXIS 65963, at *1, *25 (S.D.N.Y. Sept. 7, 2007) (awarding attorney's fees to relator who was party to settlement between defendants and United States); United States ex rel. Averback v. Pastor Med. Assocs. P.C., 224 F.Supp.2d 342, 344-45, 348 (D.Mass.2002) (awarding attorney's fees to relator after government settled with defendants where "[t]he fact that [relator] is entitled to attorney's fees is not in dispute"); United States ex rel. Butler v. Magellan Health Servs., Inc., 74 F.Supp.2d 1201, 1205, 1217 (M.D.Fla.1999) (noting that "the FCA Amendments of 1986 authorize awards of attorney's fees to prevailing qui tam plaintiffs" before granting defendant's motion to dismiss relator's amended complaint); United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc., 755 F.Supp. 1040, 1044 (S.D.Ga.1990) (noting that "the FCA Amendments of 1986 now authorize awards of attorney's fees to prevailing qui tam plaintiffs" before denying defendant's motion to dismiss relator's complaint).
[10] The reading deduced above would, for example, afford a relator's share and attorneys' fees where, while investigating spurious allegations in a qui tam complaint, the government stumbled upon wholly separate fraud by the defendant, of which the lucky relator knew nothing.
[11] The Court would ordinarily hesitate to stake its interpretation of the fee-shifting provision's eligibility criteria on a single statement in the provision's legislative history. See IBEW, Local Union No. 474 v. NLRB, 814 F.2d 697, 712 (D.C.Cir.1987) ("a cardinal principle of the judicial function of statutory interpretation is that courts have no authority to enforce principles gleaned solely from legislative history that have no statutory reference point"). Here, however, crediting this statement avoids dissonance among the statute's various provisions. And where statutory language is unclear, resort to the legislative tea leaves is a well-accepted interpretative step. See, e.g., Green v. Bock Laundry Mach. Co., 490 U.S. 504, 511, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) ("[b]ecause the plain text does not resolve these issues, we must examine the history leading to [Federal Rule of Evidence 609's] enactment"); Pierce v. Underwood, 487 U.S. 552, 563-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (looking to Congressional report for "elaborat[ion] on the meaning of the phrase ... `substantially justified'"); Blum v. Stenson, 465 U.S. 886, 893-94, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (relying on Senate Report in interpreting feeshifting statute to permit calculation of fee awards "according to prevailing market rates").
[12] Moreover, the Court observes that relator will be "rewarded with both a relator's share and attorneys fees" from the other defendants, against whom he obtained judgment, even if he receives nothing from Anderson. (See Reply to Anderson's Opp'n at 4.) The others contest only the amount of fees demanded, not relator's entitlement to them.
[13] When it dismissed relator's claims against Anderson, the Court laid responsibility at the government's feet, citing its "failure to exercise due diligence in investigating the civil claims against" Anderson. (See Mem. Op. of June 14, 2007[872] at 29.) But it was relator, in the first instance, who failed to name Anderson as a defendant until he filed his Second Amended Complaint on December 28, 2000, when the six-year limitations period on which he might otherwise have relied had already expired. (See id. at 3-4 n. 4.) This delay is virtually inexplicable given that the Confidential Disclosure Statement relator provided to the government in 1995 described Anderson's leading role and extensive involvement in the bid-rigging conspiracy. (See Ex. 1 to Reply to HC's Opp'n, at 2, 11, 14, 20-21.)
[14] These individuals are: Clarence Anderson, Allen Hall, Evangeline Hoover, William Lalor, Alfred Hill, Michael Gould, Dieter Kadenbach, Werner Hoffmeister, Wolfgang Eric Kaus, Thomas Kitchens, Richard Miller, Scott Nichols, and Robert Hemler. (See Ex. 2 to U.S. Bill of Costs [928]; Ex. 3 to Relator's Bill of Costs [929].)
[15] Unlike the United States, relator has not attached copies of the court reporters' invoices. He has provided some supporting datasuch as the court reporting service name, invoice number, invoice date, and/or hearing or deposition datefor each individual expenditure, however, and scrutiny yields some obvious conclusions.

For example, each plaintiff seeks reimbursement for precisely $1,282.00 for two transcripts of Kadenbach, Hoffmeister, and Kaus's depositions, provided by Anglo-American Court Reporters. (See Ex. 3 to U.S. Bill of Costs [928] at 11; Ex. 3 to Relator's Bill of Costs [929] at 2.) Relator's chart lists a single deposition date of September 20, 2006, while the government's invoice indicates the depositions occurred on September 20-21, 2006. Relator indicates that his invoice, # 11976, was dated October 19, 2006; the government received invoice # 11978, dated October 9, 2006. Clearly, plaintiffs collectively seek to be paid for four copies of the same thing.
Similarly, both plaintiffs paid Hedrick Court Reporting for two copies of Clarence Anderson's October 23, 2006 deposition transcript. (See Ex. 3 to U.S. Bill of Costs [928] at 1; Ex. 3 to Relator's Bill of Costs [929] at 2.) The details plaintiffs provide for the deposition transcripts of Nichols, Gould, Hemler, Kitchens, Hill, and Miller are likewise sufficiently similar that it is clear to the Court they paid for four separate copies.
[16] The Court strongly suspects that Xeroxing a single, expedited transcript for trial team members who needed to promptly review it might have proven far less costly than purchasing a second hard-copy from the court reporter at $2.25 per page.
[17] As relator notes, his fee petition seeks these same costs. (See Mot. for Fees, Costs, and Expenses [930] at 40 n. 18.) Thus, the Court will reduce any FCA expenses award by this amount to prevent a double recovery.
[18] Blum involved efforts to recoup attorneys' fees pursuant to 42 U.S.C. section 1988, not the FCA. 465 U.S. at 888, 104 S.Ct. 1541. But case law construing what constitutes a "reasonable" fee applies uniformly across federal fee-shifting statutes that employ this language, including the FCA. See, e.g., City of Burlington v. Dague, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (applying Blum and its progeny to fee awards under Solid Waste Disposal Act and Federal Water Pollution Control Act); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 538, 542-44 (10th Cir.2000) (applying section 1988 case law to fee awards under FCA).
[19] Relator's fee petition includes hours billed by five Wiley Rein attorneys and two paralegals, from 1995-1999, while relator's principal counsel, Robert Bell, was a partner at that firm. (See Bell Decl. ¶¶ 102-03 & Ex. B-2, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Hours for Wilmer Hale, billed by eighteen attorneys and three paralegals, stretch from September 1999 through July 2007. (Id. ¶¶ 107-08 & Ex. D-2.)
[20] See also Wilcox v. Sisson, No. 02-1455, 2006 WL 1443981, *2, 2006 U.S. Dist. LEXIS 33404, at *8 (D.D.C. May 25, 2006) (Collyer, J.) ("The rates charged by counsel for the winning party are presumptively reasonable if they are the same rates that counsel customarily charge other fee-paying clients for similar work."); Adolph Coors Co. v. Truck Ins. Exchange, 383 F.Supp.2d 93, 98 (D.D.C.2005) (Facciola, M.J.) ("the most fundamental economic analysis indicates that, all things considered, the rate that [a firm] charges its clients is the market rate"); Cobell v. Norton, 231 F.Supp.2d 295, 302-03 (D.D.C.2002) (Lamberth, J.) ("`There is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay.'") (quoting Griffin v. Wash. Convention Ctr., 172 F.Supp.2d 193, 197 (D.D.C.2001)) (Facciola, M.J.); Allen v. Utley, 129 F.R.D. 1, 7 (D.D.C.1990) (Richey, J.) ("when an attorney has a customary billing rate, that rate is the presumptively reasonable rate to be used in computing a fee award").
[21] The Court merely notes that Davidson finds Wilmer Hale's rates' correspondence with this matrix persuasive. As set forth more fully below, the Court does not adopt this methodology. See infra part III.A. l.b.
[22] Relator also bears an evidentiary burden with respect to his "attorneys' skill, experience, and reputation." Covington, 57 F.3d at 1108. Accordingly, he has set forth their impressive credentials in his fee petition. (See Mot. for Fees, Costs, and Expenses [930] at 14-17.) Defendants' only challenge to this showingthey advocate a 20% across-theboard reduction in fees based on relator's counsel's near-total lack of prior experience with qui tam litigationcites no authority whatever, (HII's Opp'n [949] at 39-40), so the Court need not dwell on it here. A few highlights will convey how formidable a team relator's counsel assembled. For example, Bell and Cultice, the two senior partners most involved in the case, each boast over twentyfive years' experience as litigators. (See Bell Decl. ¶ 5, Ex. 2 to [930]; Cultice Decl. ¶ 3-6, Ex. 6 to [930].) Though more junior, O'Connor has represented corporate and individual clients in a wide range of federal cases across the country. (See O'Connor Decl. ¶¶ 5-6, Ex. 7 to [930].) Cedarbaum, a former Supreme Court clerk and Bristow Fellow in the Office of the Solicitor General, made partner during the pendency of this case, and his litigation experience is concentrated in the antitrust field. (See Cedarbaum Decl. ¶ 4-5, Ex. 8 to [930].) The Wilmer Hale associates who assisted with this case are, almost uniformly, graduates of prestigious law schools and/or former judicial clerks. (See Bell Decl. ¶ 114, Ex. 2 to [930].) Similarly, the paralegals for whose time relator seeks compensation had substantial prior experience in litigation and formal training. (Id. ¶ 115.)
[23] In one case, this Court declined to award "market rates" set out in a Pricewaterhouse-Coopers Survey commissioned by the plaintiffs and relied instead on an updated Laffey matrix. See Cobell v. Norton, 407 F.Supp.2d 140, 170 (D.D.C.2005) (Lamberth, J.). But in Cobell, the plaintiffs presented no evidence that these "market" rates were either comparable to their counsel's established billing rates oras required by Blum"in line with those prevailing in the community." See id. ("PwC Survey suggests plaintiffs be compensated [at] a rate greater than permitted by Laffey . . . without any supporting affidavit by an attorney or law firm knowledgeable in the activities litigated by plaintiffs."). Thus, this Court relied on the U.S. Attorney's Office ("USAO") Laffey matrix to supply the "prevailing market rates in the District of Columbia." Id. Here, however, relator has complied with his evidentiary burden by submitting affidavits from attorneys with knowledge of counsel's performance in this case, their standard billing rates, andcrucially the prevailing rates in the community.. Hence, Cobell is inapposite.

Defendants' other two authorities from this Circuit lend them no support whatever. Indeed, one appears to bolster relator's case. See Jordan v. U.S. Dep't of Justice, 691 F.2d 514, 521 (D.C.Cir.1982) ("affidavit[] attesting to the prevailing market rate," such as that offered to support instant fee claim, suffices as "specific evidence of the prevailing community rate" so long as "affiant avows that the quoted rate is based upon `personal knowledge about specific rates charged by other lawyers' ") (quoting Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1325 (D.C.Cir.1982)). In the other case, this Court awarded relator's counsel his requested rates because the defendants did not contest them, and they were below the prevailing market rate in the community. (See Mem. Op. & Order of May 18, 2004[951] in In re Columbia/HCA Health v. Lead Defendants, No. 01-mc-50-RCL (MDL).)
[24] At least one other district court has implicitly reached a contrary conclusion, requiring relators seeking attorneys' fees under the FCA to submit evidence of prevailing rates for "comparable qui tam litigation" in the relevant market. See United States ex rel. Abbott-Burdick v. Un, *8, 2002 U.S. Dist. LEXIS 26986, at *30 (D.S.C. May 23, 2002). That court relied solely on a lone Fourth Circuit precedent, which, in turn, points only to an Eleventh Circuit case. See id.; Buffington v. Baltimore County, 913 F.2d 113, 129 (4th Cir.1990). In this latter case, the Eleventh Circuit Court of Appeals observed that "[t]he market rate for federal civil litigation [was] too over-inclusive to be relevant" to civil rights plaintiffs' fee petition. Perkins v. Mobile Housing Bd., 847 F.2d 735, 737 (11th Cir.1988). Read in context, however, this comment is attributable to the evidentiary record then before the court:

The fee application in this case is inadequate. It provides the trial judge with no guidance as to the market rate for attorneys of similar skill representing similar clients in similar cases in the Mobile area.... The record in this case demonstrates that rates vary from $50 to more than $120 per hour for federal civil litigation without any consideration of skill, client, or type of case. The typical rate within the range can be artificially raised or lowered with the inclusion of quotes for work for government authorities or work of great complexity involving sophisticated legal problems.
Id. at 737-38. Here, however, relator has offered evidence of the prevailing market rates for complex federal litigation charged by attorneys of comparable skill and experience. Further, his evidence reflects that in the D.C. legal market, attorneys at large, international law firms such as Wilmer Hale typically charge a standard rate for litigation matters, regardless of the "client[] or type of case." Hence, relator's evidence does not suffer the same deficiencies that rendered the Perkins fee application "inadequate." Moreover, this Circuit's Court of Appeals has repeatedly endorsed a method of determining "reasonable rates" (the Laffey matrix) that is not subject-matter specific. See, e.g., Hansson, 411 F.3d at 236; Role Models Am., Inc., 353 F.3d at 970. Cf. Laffey, 572 F.Supp. at 374 (finding that "the relevant legal market in this action is complex employment discrimination litigation [but] that this market is subject to the same hourly rates that prevail in other complex federal litigation").
[25] That one Ohio FCA specialist firm's rates do happen to correspond to thpse in the up-dated Laffey matrix is equally unpersuasive.
[26] Four Wilmer Hale associates for whose time relator requests fees have left the firm. (See Bell Decl. ¶ 108, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Relator proposes that compensation for these individuals' time be paid at the established billing rates of current Wilmer Hale associates who graduated law school in the same years. (Id.) This request does not strike the Court as unreasonable, and it boasts the virtue of simplicity. Given that defendants do not specifically object, the Court will thus order these four individuals' time reimbursed at their peers' standard billing rates.
[27] Sturm, a 1987 law graduate and Wiley Rein litigation partner, bills $495 per hour, (Bell Decl. ¶ 104, Ex. 2 to Mot. for Fees, Costs, and Expenses [930]), while O'Connor, a Wilmer Hale litigation partner who finished law school ten years after Sturm, bills $510 per hour, (see id. Ex. D-1).
[28] Compare Smith v. District of Columbia, 466 F.Supp.2d 151, 156 (D.D.C.2006) (Kessler, J.) (approving), and Salazar v. District of Columbia, 123 F.Supp.2d 8, 13-14 (D.D.C.2000) (Kessler, J.) (same), with Yazdani v. Access ATM, 474 F.Supp.2d 134, 138 (D.D.C.2007) (Facciola, M.J.) (declining to adopt); Am. Lands Alliance v. Norton, 525 F.Supp.2d 135, 148-49 (D.D.C.2007) (Walton J.) (same); and Muldrow v. Re-Direct, Inc., 397 F.Supp.2d 1, 3-4 & n. 3 (D.D.C.2005) (Huvelle, J.) (same).
[29] Due to its widespread acceptance, this matrix has been aptly described as "the benchmark for reasonable fees in this Court." Pleasants v. Ridge, 424 F.Supp.2d 67, 71 n. 2 (D.D.C.2006) (Facciola, M.J.). Like its colleagues, this Court has frequently employed the USAO matrix in calculating fee awards. See, e.g., Judicial Watch, Inc. v. BLM, 562 F.Supp.2d 159, 175 (D.D.C.2008) (Lamberth, J.); Bynum v. District of Columbia, 412 F.Supp.2d 73, 85 (D.D.C.2006) (Lamberth, J.); Cobell, 407 F.Supp.2d at 170 (D.D.C. 2005) (Lamberth, J.).
[30] As defendants point out, another court in this district has read Jenkins as contemplating an award of historical fees at current market rates only when delay is "substantial." See Salazar, 123 F.Supp.2d at 15. On this basis, Judge Kessler rejected payment at 1999 rates for hours worked during the previous calendar year. Id. Defendants would extend this rationale to Wilmer Hale's 2005 and 2006 hours, which they contend should be reimbursed at historic rates. (See BHIC and HUK's Opp'n [948] at 19.) But circumstances here differ noticeably from those in Salazar. This fee award will issue in 2008. If the parties' behavior in this case to date is any guide, it will surely snowball into the second "major ratemaking proceeding" envisioned with horror by the Court of Appeals in Laffey. See 746 F.2d at 24. Relator's counsel would be exceedingly fortunate to receive their fees this year. Moreover, our Court of Appeals has held that even a brief delay may merit an adjustment in the fee award. See EDF v. EPA, 672 F.2d 42, 60 (D.C.Cir. 1982) (awarding fees at current market rates and increasing lodestar by 17 percent due to "public benefit and delay in receipt of payments," where suit was filed less than three years earlier, and court characterized "actual period of delay" as "no more than six months"). This Court agrees with relator that the two and three-year delays in payment for hours worked in 2006 and 2005, respectivelyas well as the much longer delays applicable to counsel's other pre-2007 hours warrant such an adjustment.
[31] Defendants also complain that relator has offered no, evidence of hardship to justify an adjustment for delay in payment. (HII's Opp'n [949] at 42 (citing Covington v. District of Columbia, 839 F.Supp. 894, 902 (D.D.C. 1993) (Lamberth, J.) ("Generally, to collect current rates [a fee petitioner] must show that the delay in fee payment has produced some degree of hardship such that an award of current rates does not produce a windfall.")).) This argument is specious. Kavanaugh's original declaration offers a rationale for compensating for delay in this case. (See Kavanaugh Decl. ¶¶ 6-18, Ex. 5 to Mot. for Fees, Costs, and Expenses [930].) Further, in his supplemental declaration, Bell explains that Wilmer Hale's billing cycle averages 89 daysfar less than even the shortest delay period here. (See Bell Supplemental Decl. ¶¶ 23-24, Ex. 1 to Reply to HII's Opp'n [957]; see also Kavanaugh Supplemental Decl. ¶¶ 13-16, Ex. 4 to Reply to HII's Opp'n [957] (describing how Wilmer Hale's reliance on combined debt-equity financing magnifies the detriment it suffers from long-delayed payment for its services).) Finally, all involved are well aware that relator's counsel have worked on this case for twelve years, presumably largely without compensation. The hardship caused by delay is self-evident.
[32] According to relator's fee petition, his counsel have made a first effort at exercising the required billing judgment. (See Mot. for Fees, Costs, and Expenses [930] at 24-27.) First, relator has attempted to exclude all hours attributable solely to his claims against Bill Harbert, who was dismissed from the case. (See Bell Decl. ¶ 111, Ex. 2 to [930]; Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].) Second, he has excluded all time for individuals who worked fewer than 65 hours. (See Bell Decl. ¶ 112, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Finally, he has excluded time dedicated to a variety of other, miscellaneous tasks deemed tangential to the case. (See id. ¶¶ 105, 113; Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].)
[33] For the most part, BHIC and HUK have not specifically identified which time entries they challenge. Their arguments largely pertain to the same subject areas as HII's, however, so the Court will consider them with respect to the time entries cited by HII's Opposition. As an additional note, unless its analysis of defendants' objections clearly points to uncited time entries as non-compensable, the Court will evaluate only those time entries which defendants have specifically challenged. See Donnell v. United States, 682 F.2d 240, 250 (D.C.Cir.1982) ("We emphasize that the party challenging an application for fees should frame its objections with specificity. The district court cannot inquire into the reasonableness of every action taken and every hour spent by counsel, and it will consider objections to filed hours only where it has been presented with a reasonable basis for believing the filing is excessive.").
[34] For example, plaintiffs were able to estop Bilhar from contesting its liability on Contracts 20A and 29 based on its guilty plea in the prior, criminal case, and the Court admitted Bilhar's plea agreement and Rule 11 memorandum against all defendants in the civil case. (See Mem. Op. & Order of Mar. 14, 2007[713] at 5-6; Mem. Op. & Order of Mar. 20, 2007[738] at 1-2.)
[35] See also Armstrong v. Davis, 318 F.3d 965, 971-72 (9th Cir.2003) (work in separate case was compensable because it was "important to the preservation of the[se][] Plaintiffs' rights, and because their counsel performed the work in order to protect their interests"); McDonald v. Armontrout, 860 F.2d 1456, 1462 (8th Cir. 1988) (services rendered in prior habeas action making same claims were compensable because work in "habeas action `obviated the need for comparable work in' this proceeding, and `contributed directly to [its] successful outcome'") (quoting Webb v. County Bd. of Educ., 471 U.S. 234, 249-50, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985) (Brennan, J., concurring in part and dissenting in part) (alteration in original)); Perkins v. Cross, 728 F.2d 1099, 1100 (8th Cir.1984) (time spent on "research or investigation done in connection with [prior] proceeding" is compensable if it "proved directly relevant to the [instant proceeding's] successful prosecution").

On closer examination, defendants' authorities are not to the contrary. See Loranger v. Stierheim, 10 F.3d 776 (11th Cir.1994); Schrader v. Idaho Dep't of Health & Welfare, 631 F.Supp. 1426 (D.Idaho 1986). In Loranger, where an attorney submitted a voluminous fee petition that listed hours expended on multiple state, federal, and other matters, the Eleventh Circuit Court of Appeals declared that "[t]ime expended independent of the relevant federal litigation [was] not compensable." 10 F.3d at 782. Yet the examples it cited demonstrate that its definition of "independent" matters would not reach hours relator's counsel spent assisting the government in the criminal case. See id. at 782 n. 7 (citing as non-compensable time devoted to defending case against petitioner's mother in state court and time spent on state court claims that were voluntarily dismissed). In Schrader, the district court declined to hold one defendant liable for hours expended by the prevailing plaintiff's attorneys before that defendant was joined, but it did so without any explanation of its reasoning leaving its conclusion devoid of persuasive value. See 631 F.Supp. at 1430.
[36] (See, e.g., 6/21/95 LD ("review reference materials and court decisions in case raising issues of privileged ... documents relied upon by qui tam plaintiff") (emphasis added); 10/25/1995 RBB ("Meet with Mr. Sturm and Ms. Hebert re Hebert's research on common interest doctrine") (emphasis added); 12/15/95 LD ("Research and review Jencks Act and Federal Rule of Criminal Procedure 6(e)," which limit discovery of privileged matter disclosed by potential prosecution witness to the government).)
[37] The Court does not consider relator's single, out-of-circuit district court precedent for this proposition as even "persuasive" authority: that court concluded that 9.15 hours "related to [defendant's] placement of [co-relator] on administrative leave, representing the time researching the approach and negotiating the arrangement," were "reasonable," but it did so without any hint as to why it reached this conclusion. See United States ex rel. Doe v. Pa. Blue Shield, 54 F.Supp.2d 410, 417, 419 (M.D.Pa.1999).
[38] For example, Luis de la Torre spent 7.75 hours in one day researching Jones' potential cause of action against Miller for breach of duty of loyalty under North Carolina law. (See 2/24/96 LD.) This research had no application to plaintiffs' pending FCA claims.
[39] The Sixth Circuit Court of Appeals has implicitly suggested that time devoted to such obstructionism is not compensable. See United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co., 41 F.3d 1032, 1044 (6th Cir. 1994) (reversing as unsupported by evidence the district court's determination that virtually all relators' attorneys' fees were reasonable, and remanding for consideration of, inter aha, whether relator unfairly denied GE an opportunity to conduct an internal corporate investigation, thereby unduly extending the subsequent litigation process).
[40] Defendants further complain that relator has attempted to bill them for time spent negotiating his own fee agreement with Wilmer Hale. (See HII's Opp'n [949] at 11.) Relator concedes this time is not compensable and has withdrawn it. (See Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].) Cf. Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 973 (D.C.Cir.2004) (government should not have to pay for "time spent drafting and revising [] firm's engagement letter with [prevailing plaintiff]").
[41] He also finds meaning in Congress's consolidation of the fee-shifting and relator's share provisions into the same statutory subsection. (Reply to BHIC and HUK's Opp'n [960] at 8.) But the Sixth Circuit read this statutory subsection rather differently, declining to find Congressional intent implied in the text:

The text of the qui tam attorneys' fees provision does not address the question of who pays for the relators' legal fees and expenses incurred during the course of a Relators'-Share Litigation. Indeed, although the statutory text explicitly states that the relator is to receive between 15% and 25% of the proceeds, in a case in which the government intervenes, it fails to contemplate that a collateral litigation process may ensue between the government and the relator.
Taxpayers Against Fraud, 41 F.3d at 1045 (citation omitted). This Court agrees that nothing in the statutory text supports charging the defendants for fees incurred in such collateral proceedings. See 31 U.S.C. § 3730(d) (2008).
Relator also claims that if he cannot recoup these attorneys' fees from the defendant, "it would permit the Government to force a relator to take a lower share under a threat of protracted litigation." (Reply to BHIC and HUK's Opp'n [960] at 8.) The potential for hard bargaining by the government may weigh against requiring a relator to bear the cost of efforts to obtain his share, but it does not necessarily follow that the defendant should be required to protect him against governmental parsimony. Moreover, to paraphrase Chief Judge Sentelle of our Court of Appeals at a recent oral argument, before attempting to "parade horribles," relator should make sure they are, in fact, horrible. In the scenario relator describes, the relator would still receive at least 15% of the take, and the government would be more fully compensated for its damages.
[42] See also United States ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc., 87 F.Supp.2d 351, 358 (D.Vt.2000) ("The time counsel spent on negotiation of the Relator's share is not appropriately billed to the defendants in this case."). Contra United States v. Stern, 818 F.Supp. 1521, 1523 (M.D.Fla. 1993), as modified by 932 F.Supp. 277, 278 (1993) (defendants must compensate relator for attorneys' fees incurred in connection with relator's share litigation).
[43] Cf. Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 538, 544-45 (10th Cir.2000) (where government did not intervene in qui tam action, prevailing relator who initiated execution of judgment and garnishment proceedings on government's behalf could recover "attorneys' fees for time spent in post-judgment collection activities").
[44] This conclusion also disposes of defendants' argument that relator waived his entitlement to attorneys' fees incurred in pursuing or settling claims against Bilfinger & Berger and ABB SUSA by consenting to the Civil Division's settlements with those defendants, absent any provision for such fees in the settlements' terms. (See HII's Opp'n [949] at 12.)
[45] The FCA's qui tam provisions offer two incentives to prospective whistleblowersa guaranteed share of any recovery, and reimbursement for attorneys' feesand it may seem odd that hours a relator's counsel spends securing the latter for his client are compensable, while hours devoted to obtaining the former are not. See 31 U.S.C. § 3730(d)(1) (2008). One factual distinction between these two tasks justifies their differential treatment: a relator seeks his attorneys' fees from the defendant, who can choose to prolong litigation over the fees or simply cut his losses, but the relator must obtain his share from the government. As the Sixth Circuit Court of Appeals observed in Taxpayers Against Fraud, qui tam defendants typically have no involvement in this latter process. See 41 F.3d at 1046. They can neither hasten nor delay nor prevent the relator's receipt of his share. See id. Of course, in Taxpayers Against Fraud, the defendant had settled with the government before trial to "minimize its losses," whereas these defendants lost at trial. See id. But here, as there, defendants had no control over whether, when, and under what circumstances the government would award relator a share. In principle, it would seem inequitable to hold defendants accountable for fees incurred due to governmental intransigence. Moreover, even preliminary researchsuch as Luis de la Torre's memorandum on "whether relator can be awarded part of recovery from a defendant not initially named in relator[']s complaint," (6/24/95 RBB)would be non-compensable under National Association of Concerned Veterans because such research is not directed toward "a successful resolution of the case." See 675 F.2d at 1335.

Relator has responded to HII's itemized list of allegedly non-compensable time entries with explanations and recommended deductions. (See Ex. E-4 to Bell's Supplemental Decl., Ex. 1 to Reply to HII's Opp'n [957].) Bell classifies these entries, which HII characterizes as efforts to secure a relator's share and/or attorneys' fees, as, inter alia, "relator's share," "successful settlement," "unsuccessful settlement," "preservation of ability to collection judgment," and "Jones fee claim." (See id.) Rather than speculate as to counsel's primary motivation for activities such as "review[] extensive research on financial condition of Philipp Holzmann," (10/1/99 RBB), the Court will accept Bell's classifications as having been made in good faith and will adopt them in reducing the challenged time entries.
[46] In 1997 and 1998, relator's counsel advised him concerning his role in a potential government contract debarment proceeding against J.A. Jones, and defendants contend they should not be compensated for work related to this "completely collateral" matter. (See HII's Opp'n [949] at 13.) Relator represents that the government considered debarment as a means to pressure Jones to settle, (see Reply to HII's Opp'n [957] at 22), and there is some support for this position in the record, (see, e.g., 6/25/97 RBB (Antitrust Division attorney requested that relator testify at AID debarment hearing)). Because this time was thus "expended in pursuit of a successful resolution" of the case against J.A. Jones, which resolution greatly advanced the civil case against these defendants, it is compensable. See Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1335. See also Chrapliwy v. Uniroyal, Inc., 670 F.2d 760, 766-67 (7th Cir. 1982) (awarding attorneys' fees to Title VII plaintiffs for "efforts to persuade the government to debar the defendant from its federal contracts [that] ... caused the defendant to settle the Title VII action").
[47] Furthermore, it would be anomalous to withhold compensation for fees relator incurred in connection with mediation ordered by this Court. Cf. Wilkett v. ICC, 844 F.2d 867, 874 (D.C.Cir.1988) (awarding fees for work on court-ordered supplemental brief because "[a]ny work ordered by this Court is [] compensable").
[48] See, e.g., Hite v. Vermeer Mfg. Co., 361 F.Supp.2d 935, 952 (S.D.Iowa 2005) (awarding attorneys' fees to FMLA plaintiff who prevailed at trial for time devoted to unsuccessful settlement negotiations); Lintz v. Am. Gen. Fin., Inc., 87 F.Supp.2d 1161, 1163, 1168-69 (D.Kan.2000) (awarding attorneys' fees to Title VII plaintiff who prevailed at trial for time "spent on matters relating to mediation and settlement efforts" because "[t]o hold otherwise might discourage counsel for plaintiffs from exploring settlement possibilities"); United States ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc., 87 F.Supp.2d 351, 354, 357, 359 (D.Vt.2000) (awarding attorneys' fees to FCA relator for all relator's requested hours, including successful settlement efforts); Davis v. Catholic Univ. of Am., No. 99-1153, 1999 WL 813663, *6, 1999 U.S. Dist. LEXIS 15654, at *18-19 (D.D.C. Aug. 31, 1999) (Urbina, J.) (awarding attorneys fees to civil rights plaintiff for time spent on successful settlement efforts). Cf. Cobell v. Norton, 407 F.Supp.2d 140, 156 (D.D.C.2005) (Lamberth, J.) (refusing to compensate plaintiffs in interim fee award for unsuccessful settlement and court-ordered mediation efforts).
[49] Cooper forecloses relator's reliance on Environmental Defense Fund. (See Reply to HII's Opp'n [957] at 23.) The Court of Appeals read this earlier decision as having "apparently" included travel time in a fee award without actually deciding the issue. 24 F.3d at 1417.
[50] Cf. In re Segal (Segal Fee Application), 145 F.3d 1348, 1353 (D.C.Cir., Spec.Div.1998) (in fee application under Ethics in Government Act, travel expenses not reimbursable absent showing that use of local counsel to accomplish task was not feasible); Cobell v. Babbitt, 188 F.R.D. 122, 127 (D.D.C.1999) (Lamberth, J.) (refusing to include travel time in sanctions award of reasonable attorneys' fees and expenses incurred due to defendants' failure to obey court's orders).
[51] Due to relator's counsel's practice of block billing, the Court cannot perform this calculation with precision. In his supplemental declaration, Bell proposes reductions the Court may use should it choose to compensate travel time at 50% of hourly rates. (See Bell Supplemental Decl. ¶ 21 & Ex. E-7, Ex. 1 to Reply to HII's Opp'n [957].) Though Bell has not addressed all time entries involving travel, his calculations appear reasonable given the destinations involved, and the Court will apply them consistently to entries involving travel to those destinations. For local travel and for destinations for which Bell has not proposed travel time reductions, the Court will make reasonable calculations.
[52] Cf. United States ex rel. LeFan v. Gen. Elec. Co., 00-222, 2008 WL 152091, **3-4, 2008 U.S. Dist. LEXIS 3020, at * 12 (W.D.Ky. Jan. 15, 2008) ("While some of the billed tasks, such as reviewing and organizing documents and preparing binders for witness interviews may appear clerical, the Court accepts the Relators' argument that these tasks had to be performed by an attorney or paralegal familiar with facts and law of the case.").
[53] Defendants cite Copeland v. Marshall for the proposition that "no compensation should be given for hours spent litigating issues on which plaintiff did not ultimately prevail," see 641 F.2d at 902 (emphasis added), and on this basis, they argue that hours devoted to relator's unsuccessful pursuit of grand jury materials protected by Federal Rule of Criminal Procedure 6(e) are not compensable. (HII's Opp'n [949] at 14-15.) Elsewhere in its decision, however, the Court of Appeals made clear that only non-prevailing claims are noncompensable. See 641 F.2d at 891-92 & n. 18 ("no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail") (emphasis added). This reading is in harmony with the Court of Appeals' subsequent holding that a petitioner may seek fees for hours "expended in pursuit of a successful resolution of the case in which fees are being claimed." See Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1335.

Parties often proceed under more than one legal theory, or seek to acquire supporting evidence from more than one source. See Copeland, 641 F.2d at 892 n. 18. Generally, some efforts succeed, while others fail, but all are clearly "expended in pursuit of a successful resolution of the case." See Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1335. Relator failed to secure a modification of the protective order that would have allowed him to use grand jury testimony adduced in the prior criminal case, but his counsel's efforts in this vein were directed toward successful resolution of the qui tam action. Accordingly, they are compensable.
[54] HII also argues that no work performed in connection with relator's claims on Contracts 29 and 07 is compensable because: 1) this Court lacked jurisdiction to hear them, as relator was not the original source of the information on which they were based; and 2) these claims did not relate back to the date of relator's original complaint and thus were time-barred. (HII's Opp'n [949] at 15-16.)

This Court has previously weighed and rejected both these argumentsrepeatedly. (See Mem. Op. & Order of Mar. 14, 2007[715] (denying HII and HC's motion in limine to preclude relator from participating in all phases of trial concerning contracts 07 and 29); Order of May 4, 2007[854] (denying HII and HC's motion to dismiss relator's claims on Contracts 07 and 29 due to lack of subject matter jurisdiction and for reconsideration of ruling on relator's status as an original source); Mem. Op. & Order of Mar. 6, 2007 (sustaining relator's objection to magistrate judge's recommendation that his Contract 07 and 29 claims were time-barred); Mem. Op. of June 23, 2008[964] (denying HII's motion for judgment as a matter of law, based on statute of limitations, as to relator's Contract 07 and 29 claims).)
HII now raises these issues yet again in a rather unusual procedural contextits opposition to relator's fee petition. Even if these questions are properly before the Court, which it doubts, the Court sees no infirmity in the reasoning of its previous rulings on them. Time expended litigating relator's Contract 07 and 29 claims is compensable.
[55] Defendants also claim that "a review of the deposition of Billy Harbert demonstrates that it clearly was taken solely with respect to issues related to Bill Harbert." (BHIC and HUK's Opp'n [948] at 7.) They have not affixed this deposition to their opposition, however, and do not point to its location elsewhere in the record, so the Court cannot review the deposition for itself. Without doing so, it can only reason that issues "related to Bill Harbert" are not necessarily unrelated to other defendantsparticularly in a conspiracy case such as this one. Moreover, relator insists the younger Harbert was deposed "to determine if he knew anything about the conspiracy," and to learn details of "meetings he may have had with co-conspirators and other witnesses beyond his father." (Reply to BHIC and HUK's Opp'n [960] at 10.) This explanation is perfectly reasonable, and the Court will compensate relator's counsel for time devoted to preparing for and taking the deposition.
[56] See, e.g., Uniroyal v. Goodrich Tire Co. v. Mut. Trading Corp., 63 F.3d 516, 526 (7th Cir.1995) ("we are not prepared to link our definition of `reasonable' to whether the fees are incurred in pursuit of a successful task"); Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992) ("[t]he relevant issue ... is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures"); Blum v. Witco Chem. Corp., 829 F.2d 367, 378 (3d Cir.1987) ("mere failure of certain motions or the failure to use depositions is insufficient to warrant a fee reduction under Hensley").
[57] Comprehensive deductions are a well-accepted remedy for the widespread defects defendants allege. See, e.g., Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 973-74 (D.C.Cir.2004) ("A fixed reduction is appropriate given the large number of entries that suffer from one or more of the deficiencies we have described."); Cobell v. Norton, 407 F.Supp.2d 140, 166 (D.D.C.2005) (Lamberth, J.) (collecting cases).
[58] BHIC and HUK also object to counsel's use of labels, e.g., "Witness A," to identify individuals in their time records. Relator explains in his reply that these labels are designed to protect attorney-client privilege and/or attorney work product. (Reply to HII's Opp'n [957] at 15.) The Court finds this claim plausible, and in any event, the problematic labels appear so infrequently that their impact on the Court's ability to subject the records to meaningful review is negligible.

Further, defendants contend that counsel's time records are internally inconsistent: where one attorney bills time for a conference with another, his supposed conversation partner's time entry for the day fails to mention this discussion. (See BHIC and HUK's Opp'n [948] at 11-12.) Given counsel's consistent practice of block-billing, such discrepancies would be unsurprising. Yet defendants' marquee example is ill-chosen. They cite Howard Shapiro's time entry for May 25, 2006, which lists "meet with Ms. O'Connor," but the quoted language to which they refer "confer with O'Connor"appears in the subsequent.time entry, for May 30. (Id.; see 5/26/2006 HS; 5/30/2006 HS.) O'Connor's time entries for those days reflect a "conference with team re various issues" which Shapiro may well have attended, (5/26/2006 JMO), and a "confer[ence] with Ms. Terry and Mr. Shapiro re various issues," (5/30/2006 JMO). These entries are impenetrably vague, but they do match up. To the extent the other examples defendants relegate to a footnote fail to correspond, the Court considers this inconsistency an outgrowth of block billing, addressed below, that does not require separate discussion.
[59] To bolster this rebuttal, he relies on declarations from attorneys Braga and Davidson. (See Davidson Supplemental Decl. ¶¶ 7-8 and Braga Supplemental Decl. ¶ 2, Exs. 2, 3 to Reply to HII's Opp'n [957].) But Davidson's assertion that "courts [do not] routinely expect more detail than that provided" is demonstrably incorrect. (See Davidson Supplemental Decl. ¶ 8.) His assurance that "[u]nder these circumstances . . . the Court ... would know precisely what activities counsel have undertaken" does not render counsel's cryptic time entries more intelligible to this Court. (See id. ¶ 7.) Braga's declaration is similarly unpersuasive.
[60] Cf. United States ex rel. Abbott-Burdick v. Univ. Med. Assocs., No. 96-1676, 2002 WL 34236885, *16, 2002 U.S. Dist. LEXIS 26986, at *50 (D.S.C. May 23, 2002) ("while the fee application may contain some vague entries, the Court's review of the entire fee application gives it ample information to determine the reasonableness of the request").
[61] Cf. Role Models Am., Inc., 353 F.3d at 973 (reducing compensation by 50 percent due to "inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries").
[62] For example, on October 2, 2006, Jennifer O'Connor billed 13.8 hours in this case. Her time entry reads:

Prepare for Anderson prep session, participate in same; prepare for light prep session, participate in same; conf Ms. Mark et al. re various strategic issues, emails Mr. Reece and Ms. Moore re Nagel issues, review correspondence from defendants re discovery issues, email Mr. Lang re Hemler interview or deposition, finalize and send letter to Mr. Murphy, emails Mr. Cedarbaum re Bilhar motion to compel, emails to Archer deposition, review Wendorff letters of request, review draft protective order and correspondence re same, review email to Ms. Mark re coordination.
(10/2/2006 JMO.)
[63] Another court in this district has looked on block billing with a more friendly eye. See Smith v. District of Columbia, 466 F.Supp.2d 151 (D.D.C.2006) (Kessler, J.) In Smith, Judge Kessler observed that "[n]one of the factors examined and relied upon [by our Court of Appeals in issuing its `stinging criticism' of block-billing] in Role Models exist in this case." Id. at 157. Unlike Role Models, and much like the instant case, Smith was exceedingly complex, involving "a very substantial motion to dismiss," "a substantial summary judgment motion, and post-trial motions," as well as "extremely significant" discovery. Id. More critically, however, Judge Kessler compared the underlying fee petitions:

While there is no question that block billing does, as the Court of Appeals emphasized in Role Models, make it difficult to determine the accuracy and reasonableness of billing entries, the use of such entries in this case was not unduly excessive[,] nor did the entries in this case[] suffer from the inadequate description concerns voiced in Role Models ....
Id. at 158. By contrast, counsel here routinely documented their time in daily blocks, and as explained above, see supra part III.B.2.a.i, their time entries most certainly "suffer from [] inadequate description concerns," see 466 F.Supp.2d at 158. Thus, Role Models offers far more apt guidance in the instant case than it did in Smith.
This Court heartily agrees with Judge Kessler that "[i]n examining the fee petition and evaluating the reasonableness of the hours claimed, it is essential for the trial Court to be practical and realistic about how lawyers actually operate in their day-to-day practice." Id. Indeed, like Judge Kessler, it does not propose that "[w]hen a lawyer writes, for example, that she spent six or eight hours in one day `researching and drafting' a brief[,]" she should be required to "itemize every case she looked up or every paragraph she labored over." Id. But where during that six or eight hours, the lawyer also attends a meeting, makes telephone calls, reviews (unidentified) documents, and responds to and drafts emails, this Court believes she can and should distinguish how much time she spent on these various, disparate tasks. Judge Kessler predicted "two undesirable results""fee petitions will be higher, and [ ] lawyers will [ ] waste precious time doing menial clerical tasks"would follow from more detailed time-keeping. Id. This Court, however, is sanguine that existing technology and a little training can forestall both.
[64] Cf. Role Models Am., Inc., 353 F.3d at 973 (reducing compensation by 50 percent due to "inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries"); Reyes v. Nations Title Agency of Ill., Inc., No. 00-7763, 2001 WL 687451, *2, 2001 U.S. Dist. LEXIS 8446, at *6 (N.D. Ill. June 19, 2001) (reducing block-billed entries by 10 percent); Oberdorfer v. Glickman, No. 98-1588, 2001 WL 34045732, *6, 2001 U.S. Dist. LEXIS 14677, at *18 (D.Or. Sept. 14, 2001) (declining to allow fees for block-billed entries).
[65] On this same note, attorney Davidson deems such conferences reasonable "because it is not at all uncommon on tight discovery schedules to divide work among different attorneys, necessitating their participation in group discussions to share their knowledge." (Davidson Supplemental Decl. ¶ 11, Ex. 2 to Reply to HII's Opp'n [957] at 6.) Division of labor, however, does not necessarily require that each participant have complete knowledge of each stage in the overall process. This defeats the very purpose of dividing workimproving efficiency through specialization. Assigning eleven different attorneys to work on one deposition, however crucial the witness, can hardly be characterized as efficient.
[66] Cf. In re North (Reagan Fee Application), 94 F.3d 685, 691 (D.C.Cir.Spec.Div.1996) ("Because of the number of attorneys involved, the fees for these meetings aggregate to well over $1,000 per hour. While it may be reasonable for a client facing serious charges to pay the additional costs of having a highly staffed case ... this does not mean that a petitioner has established the reasonableness of billing such duplication of effort to the public fisc."); In re North (Bush Fee Application), 59 F.3d 184, 191-92 (D.C.Cir. Spec.Div.1995) (deducting hours for "multiple attendance at the same conferences, or production of the same documents").
[67] For example, Jonathan Cedarbaum's presence at Evangeline Hoover's deposition appears to have been superfluous. His time records reveal no advance preparation, and he appears to have concentrated on the depositions of Alan Hall and BHIC's corporate representative, which he conducted on the same trip to Birmingham. (See 10/15-10/20/2006 JC.)
[68] Exercising "billing judgment," Bell limited the fee petition to hours billed by 18 lawyers and 3 paralegals. (See Bell Decl. ¶¶ 108, 112, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].)
[69] They somewhat confuse the issue by pointing to government counsel's allegedly superior FCA litigation skills, downplaying relator's merely "supporting role" in the litigation, and spotting supposed logical fallacies in Bell's laudatory description of his own value to the case. (See HII's Opp'n [949] at 29-30.) Defendants utterly fail to tether any of these cavils to the law, so the Court will not address them.
[70] HII also argues that relator and the government are "solely responsible" for the eleven-year delay in bringing this case to trial and that as a result, "a substantial portion of the attorney hours expended was unreasonable." (HII's Opp'n [949] at 19.) As the Court has already explained, HII's initial proposition is inaccurate. See supra part III.A.2. While relator does share some responsibility for this case's protracted duration, defendants have identified no evidence of bad faith. Cf. United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co., 41 F.3d 1032, 1044 (6th Cir.1994) (remanding to district court for further factfinding where some evidence supported defendant's allegation that relators and their counsel hatched a "deliberate scheme to delay filing an action, systematically `running up' attorneys' fees and trebling the relators'share bounty"). Relator Miller's suspicions were aroused in November 1990, and he immediately reported them to his superiors, who purportedly conducted an investigation that found nothing amiss. (See Apr. 28, 2007 PM Tr. at 88-108.) Two months later, when unusual financial transactions caught his eye, he tipped the previous investigator. (See Apr. 29, 2007 AM Tr. at 24.) In April 1991, he recommended an independent audit, and when his supervisor directed him to destroy the memo embodying this recommendation, he moved up the food chain, sending a memo to company president Johnie Jones. (Id. at 25-33.) Management rebuffed relator's repeated attempts to draw attention to what he believed were suspicious financial transactions, and until June 1995, relator made no effort to raise the alarm outside the company. Though he learned of the FCA in 1992, he waited three years to contact the government out of concern that he would render himself unemployable just when his children were reaching college-age. (See Apr. 29, 2007 AM Tr. at 49-53.) Thus, the only evidence concerning the reason for this delay suggests relator quailed when confronted with a difficult choice. Defendants must offer more than innuendo to persuade the Court that relator engaged in calculated stalling for which his counsel's fees should be reduced.
[71] Notably, the particular time entries defendants have challenged, which total only 37.45 hours, also include other, unrelated tasks, (see, e.g., 2/20/1996 RBB), as well as mandatory attendance at court hearings, (see, e.g., 4/11/1997 MLS).
[72] Cf. Role Models Am., Inc., 353 F.3d at 973 (reducing compensation by 50 percent due to "inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries"); Okla. Aerotronics, Inc. v. United States, 943 F.2d 1344, 1347 (D.C.Cir.1991) (upholding district court's reduction of chargeable hours by 40 percent due to excessive time spent on specific tasks).
[73] In neither of the two decisions he cites for this propositionone of which has been vacateddid the court reward counsel for other attorneys' conduct of other litigation. See Hyatt v. Apfel, 195 F.3d 188, 192 (4th Cir. 1999) (approving lodestar enhancement where plaintiffs brought "about fundamental change to a recalcitrant agency" and "recover[ed] several hundred million dollars in disability benefits to which they are lawfully entitled" after years of proceedings before the Social Security Administration and in federal court); United States ex rel. Garibaldi v. Orleans Parish Sch. Bd., 46 F.Supp.2d 546, 571 (E.D.La.1999), vacated by 244 F.3d 486 (5th Cir.2001) (awarding lodestar enhancement where, because government declined to intervene, "relators' lawyers earned an enormous, multi-million dollar verdict for the United States government, for which the United States paid not one penny").
[74] HC denigrates relator's assistance to the criminal investigation at length. (See HC's Opp'n [950] at 6-9.) In response, relator first explains that his counsel's contribution, not his contribution, is relevant to the enhancement issue, then proceeds to tout his efforts in furthering the government's criminal case. (Reply to HC's Opp'n [959] at 13-16.) Relator's initial point is accurate. This Court must review the result as part of its "analysis of the quality of [counsel's] representation." See McKenzie, 684 F.Supp. at 1106. Relator's individual role in that result is immaterial to an assessment of counsel's performance.

HC's attempts to rebut relator's claim that he was "directly responsible for the information underlying [the civil] victory," (Mot. for Fees, Costs, and Expenses [930] at 1), are equally irrelevant. (HC's Opp'n [950] at 9-11.) Again, the pertinent issues are the nature of the result achieved and its causal connection to counsel's professional performance.
[75] Helpfully, relator has identified two examples of the truly extraordinary circumstances in which vindication of the public interest militates in favor of adjusting the lodestar upward. See Ill. Congressional Dists. Reapportionment Cases, 704 F.2d 380, 381, 383 (7th Cir.1983) (plaintiff brought successful challenge to state's failure to reapportion congressional districts after 1980 census, thus protecting all state citizens' voting rights); Louis v. Nelson, 646 F.Supp. 1300, 1304-05, 1318 (S.D.Fla.1986) (human rights activists sought to free Haitian refugees who had been unlawfully imprisoned pending adjudication of their political asylum applications and to stop mass exclusion hearings being held without counsel).
[76] Indeed, it agrees with Judge Carnes of the Eleventh Circuit Court of Appeals that "bad and excessive billing is inconsistent with superb lawyering." Kenny A. v. Perdue, 532 F.3d 1209, 1229 (11th Cir.2008) (citing Delaware Valley, 478 U.S. at 567, 106 S.Ct. 3088). Analogously, routinely devoting excessive manpower to tasks is inconsistent with efficient case management.
[77] Relatedly, relator also declares that "Wilmer Hale went to great lengths to limit the number of lawyers on [this] matter." (Mot. for Fees, Costs, and Expenses [930] at 35.) This purportedly small cadre of young lawyers notched some impressive numerical records. During the discovery period alone, relator's counsel reviewed 665 boxes of documents, from which they culled over 97,000 documents with over 320,000 pages, attended 40 depositions, taking a leading role in some, and participated in two evidentiary hearings. (Bell Decl. ¶¶ 74-75, 78, 85, Ex. 2 to [930].) In total, the parties filed 260 motions, many of them substantive, prompting roughly 165 court orders. (Id. ¶ 10.) During the thirty-two day trial, counsel examined 31 live witnesses, whose testimony was supplemented by ten others' deposition transcripts, and dealt with 539 exhibits. (Id. ¶ 96.)

Attorney declarant Davidson can scarcely find sufficient adjectives to praise this work:
To gear up a case to this level in this short period is very impressive, even for a firm with the resources of Wilmer Hale. There was a staggering amount of work to do. The ability of the firm to commit the talented and tireless human resources to this case to meet the extremely rigorous schedule set by the court is extraordinary.
(Davidson Decl. ¶ 26, Ex. 5 to [930].) Braga declares that when this Court set "an expedited schedule which compressed discovery, pretrial and trial proceedings into an eleven-month schedule, all-out litigation hell began. What followed from Wilmer Hale's attorneys was far more than standard hourly rate legal service in the face of such difficulties. . . ." (Braga Decl. ¶ 6, Ex. 3 to [930].)
Three points are in order. First, to paraphrase HC's Opposition, by no rational definition of the term do fifty-two attorneys constitute a "small" team of lawyers.
Second, counsel had eleven years to contemplate their strategy and gather information before this Court set the "expedited schedule" to which Braga refers, and the "compressed discovery" period was entirely reasonable given that the government had (in essence) tried this case once before. The Court recognizes that a criminal antitrust conspiracy trial and a civil FCA conspiracy trial differ in many respects. (See Reply to HC's Opp'n [959] at 16-18.) But evidence the government compiled in pursuing its criminal case against Anderson and Bilhar would necessarily be probative to proving their civil liability for the same conduct, giving plaintiffs' counsel in this case a significant head start.
Third, like our Court of Appeals in Role Models, this Court does not believe that, "[p]roducing high-quality work on a short deadline" requires "specialized skills or knowledge beyond what lawyers use on a regular basis." See 353 F.3d at 969. Further, its "experience with the work of many large firms convinces [this Court] that [relator's] lawyers were far from the only ones who could have achieved [this] result under the same time pressure." Id. Indeed, as the Court explained above, one factor influencing its decision to use Wilmer Hale's established "mega-law firm" billing rates in calculating the lodestar was Wilmer Hale's ability to leverage "mega-law firm" resources to meet the "overwhelming demands" of litigating this case. See supra part III.A.1.a. To enhance the lodestar for the same reason would result in "double counting." See Delaware Valley, 478 U.S. at 566, 106 S.Ct. 3088.
Thus, neither the size of relator's litigation team, nor the schedule according to which they worked, justifies a lodestar enhancement.
[78] The Court must evaluate the record before it, and factually analogous precedents thus offer limited guidance. For that reason, the sole relevant precedent cited in relator's petition is easily distinguishable. In McKenzie, Judge Parkeron a different recordawarded an enhancement for quality of representation based in part on the exceptional performance of two young associates. 684 F.Supp. at 1107. He noted that the two junior associates had performed "[t]he majority of the work during the early stages of this proceeding" and had "remained actively involved in this litigation for fifteen years." Id. Indeed, one "acted as lead counsel throughout." Id. Moreover, Judge Parker appears to have relied heavily on his own observations, "stat[ing] without hesitation, that counsel's efforts were well above the quality of attorneys appearing before this Court in similar and comparable litigation." Id. Here, by contrast, the more junior Wilmer Hale attorneys' involvement began only a year or two before trial, and while this Court commends their performance, it was consistent with what this Court expects from major law firm associates with comparable credentials and experience levels.
[79] In their filings, the parties battle over whether and to what extent relator's counsel may take credit for various tasks performed in preparation for trial. (BHIC and HUK's Opp'n [948] at 23-25; Reply to BHIC and HUK's Opp'n [960] at 18-20; HC's Opp'n [950] at 11-13; Reply to HC's Opp'n [959] at 8-18.) The Court agrees with relator that his "counsel plainly made major contributions to the success of Plaintiffs' case and the size of the award achieved." (Reply to HC's Opp'n [959] at 18.) But if "major contributions to the success" of one's client's case warranted a bonus, then virtually every prevailing plaintiff's counsel would be entitled to a fee enhancement under any fee-shifting statute. On the contrary, enhancements are appropriate only in "rare" and "exceptional" cases. See Blum v. Stenson, 465 U.S. 886, 899, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).
[80] In full, the relevant portion of the Report reads:

An additional problem noted by hearing witnesses[] exists when large, profitable corporations are the subject of a fraud investigation and able to devote many times the manpower and resources available to the Government. This resource mismatch was recognized by DOD Inspector General Joseph Sherick who said that in far too many instances the Government's enforcement team is overmatched by the legal teams major contractors retain[ ].
The Committee believes that the amendments in S. 1562 which allow and encourage assistance from the private citizenry can make a significant impact on bolstering the Government's fraud enforcement effort.
S. Rep. 99-345, at 8 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5273.
[81] As defendants observe, DOJ "Civil Division attorneys have for years ably represented the government's interests in FCA cases where defendants are represented by large national law firms." (HC's Opp'n [950] at 18.) The government regularly litigates cases of this size and complexity.
[82] Relator relies on two, out-of-Circuit cases in which specific facts persuaded courts that an enhancement was necessary to enable plaintiffs to secure legal counsel. See Knop v. Johnson, 712 F.Supp. 571 (W.D.Mich.1989); Allen v. Freeman, 694 F.Supp. 1554 (S.D.Fla. 1988). These factually distinct cases merely illustrate the "rare" circumstances in which fee enhancements remain appropriate.

In Knop, a "major prison conditions case" brought by the American Civil Liberties Union ("ACLU") on Michigan prisoners' behalf, the ACLU tried and failed "to find private attorneys willing to handle more than one aspect of the case" due to "the complexity of the issues involved, the potential for protracted litigation and the massive expenses which counsel would have to advance in order to properly litigate this case." 712 F.Supp. at 585. Here, by contrast, there is no evidence relator had any difficulty whatsoever in finding counsel. Further, the Knop court's reasoning suggests no fee multiplier is necessary here: "In order to convince counsel in private practice to accept cases of this nature, the fee awards must ... be sufficient to convince them to forego fees they would have earned from their regular clients...." Id. In a competitive marketplace, Wilmer Hale's established billing rates necessarily represent the prices at which its attorneys are willing to forego other representation. Thus, Knop does not support an enhancement here.
In Allen, a civil rights action brought against a county sheriff and two police officers, the court awarded a lodestar enhancement for several reasons. See 694 F.Supp. at 1556. First, it noted, "[t]he quality of representation was superior to that which the plaintiff could have expected to receive in light of the rates claimed." Id. Here, by contrast, counsel's outstanding performance was in line with what relator could reasonably have expected in light of their established billing rates. Second, the Allen court, pointed to "the undesirability of suing the police in the relatively small community of Monroe County," noting that plaintiffs' counsel risked an adverse economic impact on his future practice. Id. Here, if anything, relator's victory will generate more business for Wilmer Hale. Third, by accepting Allen's case, his attorney "limited his small firm's ability to accept other employment." Id. Here, Wilmer Hale's 1000+ other attorneys continued to accept other employment throughout the case, and while at least one associate (Reece) was apparently fully dedicated to this case, this was true only for a limited period (2006). (See Ex. D-2 to Bell's Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Thus, Allen, like Knop, is inapposite.
Like Judge Carnes of the Eleventh Circuit, this Court believes an enhancement would likely be entirely appropriate in cases such as Allen and Knop, where "an attorney's representation vindicates the federal rights of an unpopular client and as a result that attorney suffers a loss of standing in the community which damages his practice and income." Kenny A. v. Perdue, 532 F.3d at 1232-33 (11th Cir.2008). As examples, Judge Carnes cited "an attorney who represents a pedophile attacking a sexual offender registration law on Due Process grounds, or perhaps [] an attorney in a small Bible Belt town who succeeds in having a popular public religious practice enjoined as contrary to the Establishment Clause." Id. at 1234. This Court agrees that when a lawyer risks permanent harm to his career to defend fundamental, if unpopular, legal principles, the lodestar may be inadequate to fully compensate him for this extraordinary sacrifice.
[83] This conclusion disposes of defendant' argument that certain categories of expenses such as travel, long-distance telephone calls, and courier serviceare per se non-compensable under the EAJA. (See BHIC and HUK's Opp'n [948] at 29.)
[84] Because the Court has concluded that time spent assisting the government's criminal case is compensable, see supra part III.B. 1.a, it rejects defendants' objections to associated expenses, (see BHIC and HUK's Opp'n [948] at 29-30).
[85] Defendants' list of proposed expense deductions appears to bear no relationship to the excluded time entries. (See Ex. 2 to HII's Opp'n [949].) For example, they wish to exclude a $368.72 charge for Bell's Westlaw research from November 30 through December 14, 1999, as associated with efforts to secure relator's share or counsel's fees. (See id.) But the Court did not reduce any of Bell's time entries for that period for any reason. Similarly, they seek to exclude three photocopying charges from February 25, 2004, which sum to $142.40. (See id.) They attribute these charges to Bowsher, (id.) though nothing in relator's fee petition associates the charges with him (or anyone else), (see Ex. E-2 to Bell Decl., Ex. 1 to [930] at 7), and this Court did not deduct any hours from Bowsher's time entry for that day, (see infra Appendix II).

Defendants have not offered the Court a viable alternative to Bell's proposals.
[86] In their final substantive paragraph, defendants challenge several miscellaneous charges as "clearly for the convenience of the Wilmer-Hale lawyers." (BHIC and HUK's Opp'n [948] at 32.) They object, for example, to paying for a long-distance conference call involving O'Connor because she "chose to attend the Judicial Conference, rather than being at the office where she could meet in person." (Id.) Carried to its logical conclusion, this reasoning would bar payment for any telephone call, because the lawyer could choose to meet with her client in person; for any means of transportation, because the lawyer could always walk; or for any computerized research charge, given that the lawyer could simply visit the local law library. This would be clearly absurd. This Court considers the challenged expenses wholly reasonable and finds they were necessarily incurred.
[87] In reviewing fee petitions under the Ethics and Government Act, our Court of Appeals has required a similarly reasonable, minimal level of detail:

As the OIC points out, however, the expense pages contain multiple entries for "Taxi" cab rides, "Photocopying," "Courier Service," and "Computer Legal Research," all of which are not otherwise explained.... The court has in the past made deductions for comparable expenses because of a lack of supporting documentation and should do so here....
In re Cisneros (Finkelstein Fee Application), 454 F.3d 342, 350 (D.C.Cir.Spec.Div.2006) (citations omitted). Accord In re Cisneros (Needle Fee Application), 454 F.3d 334, 341-42 (D.C.Cir.Spec.Div.2006); In re Madison Guar. Sav. & Loan (Marceca Fee Application), 366 F.3d 922, 929 (D.C.Cir.Spec.Div.2004) (per curiam).
[88] See U.S. Attorney's Office for the District of Columbia, Laffey Matrix 1992-2003, available at http://www.usdoj.gov/usao/dc /Divisions/Civil_Division/Laffey_Matrix_7.html.